# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UMG RECORDINGS, INC., *et al.*,

                    Plaintiffs,

     v.

RCN TELECOM SERVICES, LLC, *et al.*,

                    Defendants.

Civil Action No. 19-17272 (MAS)
(ZNQ)

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## RCN DEFENDANTS' MOTION TO DISMISS

Thomas R. Curtin
George C. Jones
McELROY, DEUTSCH, MULVANEY
 & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
(973) 993-8100

Robert B. Gilmore (*pro hac vice*)
Philip J. O'Beirne (*pro hac vice*)
Michael A. Petrino (*pro hac vice*)
Kevin L. Attridge (*pro hac vice*)
Shawna C. Bray (*pro hac vice*)
STEIN MITCHELL BEATO &
MISSNER LLP
901 15th Street, N.W., Suite 700
Washington, DC 20005
(202) 737-7777

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................1

FACTUAL BACKGROUND ........................................................5

LEGAL STANDARD ................................................................8

ARGUMENT ...........................................................................9

    I.    RCN'S INTERNET SUBSCRIBERS HAVE ENGAGED IN MASSIVE ONLINE INFRINGEMENT OF PLAINTIFFS' COPYRIGHTED SOUND RECORDINGS. .....................................................................9

        A. RCN Users Have Violated Plaintiffs' Distribution Rights. ............9

        B. RCN Users Have Violated Plaintiffs' Reproduction Rights..........13

    II.   RCN IS LIABLE FOR CONTRIBUTORY INFRINGEMENT. .........................14

        A. RCN Had Actual Or Constructive Knowledge Of, Or Was Willfully Blind To, Its Subscribers' Massive Online Infringement. ....................................................15

           1. The Notices RCN Received From Rightscorp Satisfy The Actual Knowledge Standard. ..................................................15

           2. RCN Had Constructive Knowledge Of The Infringement. ......18

           3. RCN Was Willfully Blind To The Infringement. ....................19

        B. RCN's Provision Of Internet Service Constitutes Material Contribution Under Well-Settled Precedent. .................................21

   III.  RCN IS VICARIOUSLY LIABLE FOR ITS SUBSCRIBERS' INFRINGEMENT. .....................................................................25

        A. RCN Received A Direct Financial Benefit From The Infringement..................................................................26

        B. RCN Had The Right And Ability To Supervise And Control Its Subscribers' Infringement..........................................29

   IV.  OTHER COURTS HAVE REJECTED RCN'S MISAPPLICATION OF THE SUPREME COURT'S *SONY* AND *GROKSTER* DECISIONS IN SIMILAR CASES .....................................................................31

        A. *Sony* Does Not Foreclose Liability For An Internet Service Provider That Knowingly Supplies Infringing Customers With The Means Of Infringing. ....................................................31

B. *Grokster*, And Cases Applying Its Holding, Confirm That RCN Can Be Held Liable For Knowingly Providing Infringing Customers With Internet Service. ...................................................34

1. *Grokster* Addressed Only One Type Of Contributory Liability—Inducement of Infringement; But The Other Alternative Types Of Liability Remained Unaffected..............35

2. An ISP That Knows Of Infringing Material Available On Its Network And Continues To Provide Access Materially Contributes As A Matter Of Law...............................................38

CONCLUSION ....................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.2d 1004 (9th Cir. 2001) .................................................. 11, 21, 26, 32, 38

*Arista Records LLC v. Does 1-27*,
    584 F. Supp. 2d 240 (D. Me. 2008) ................................................... 11

*Arista Records LLC v. Lime Grp. LLC*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011) .............................................. 21

*Arista Records LLC v. Usenet.com, Inc.*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009) ........................................28, 29

*Arista Records, Inc. v. Flea World, Inc.*,
    No. 03-2670 (JBS), 2006 WL 842883 (D.N.J. Mar. 31, 2006) ................ *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................8

*Atl. Recording Corp. v. Howell*,
    554 F. Supp. 2d 976 (D. Ariz. 2008) ............................................... 12

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................8

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    149 F. Supp. 3d 634 (E.D. Va. 2015) ........................................ *passim*

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    199 F. Supp. 3d 958 (E.D. Va. 2016) ........................................*passim*

*BMG Rights Mgmt. LLC v. Cox Commc'ns, Inc.*,
    881 F.3d 293 (4th Cir. 2018) ................................................4, 33, 39

*Broad. Music Inc. v. Hemingway's Café, Inc.*,
    Civ. A. No. 15-6806 (MLC) (DEA),
    2017 WL 2804951 (D.N.J. June 28, 2017) ...................................... 18

*Burgese v. Starwood Hotels & Resorts Worldwide, Inc.*,
    101 F. Supp. 3d 414 (D.N.J. 2015) ................................................... 9

*Capitol Records, Inc. v. Thomas*,
    579 F. Supp. 2d 1210 (D. Minn. 2008) .......................................... 13

*Capitol Records, LLC v. Escape Media Grp., Inc.*,
   No. 12-CV-6646 (AJN), 2015 WL 1402049
   (S.D.N.Y. Mar. 25, 2015) ............................................................. 28, 29

*Cobbler Nev., LLC v. Gonzales*,
   901 F.3d 1142 (9th Cir. 2018) ..................................................... 39, 40

*Covington v. Int'l Ass'n of Approved Basketball Officials*,
   710 F.3d 114 (3d Cir. 2013) ................................................................ 8

*David v. CBS Interactive, Inc.*, No. 2:11-cv-9437,
   2012 WL 12884914 (N.D. Cal. July 13, 2012) ............................... 31

*Durant v. DuPont Publ'g, Inc.*,
   No. CV189794 (MAS)(DEA), 2019 WL 1433620
   (D.N.J. Mar. 29, 2019) ..................................................................... 36

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ..................................................... 26, 28

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
   844 F.3d 79 (2d Cir. 2016) ............................................................... 19

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) .................................................. 19, 21, 26

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ............................................................... 8

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2d Cir. 1971) ................................................14, 18, 35

*Hedges v. United States*,
   404 F.3d 744 (3d Cir. 2005) ............................................................... 9

*In re Aimster Copyright Litig.*,
   334 F.3d 643 (7th Cir. 2003) ........................................................... 19

*Leonard v. Stemtech Int'l, Inc.*,
   834 F.3d 376 (3d Cir. 2016) ....................................... 14, 25, 35, 36

*Luvdarts LLC v. AT&T Mobility, LLC*,
   No. 2:10-cv-05442, 2011 WL 997199 (C.D. Cal. Mar. 17, 2011) ................... 39

*Malibu Media v. Park*,
  No. 2:17-cv-12107-JMV-MF, 2019 WL 2960146
  (D.N.J. July 9, 2019) ....................................................................... 40

*Maverick Recording Co. v. Harper*,
  No. 5:07-CV-026-XR, 2008 WL 11411855
  (W.D. Tex. Sept. 16, 2008) ............................................................. 11

*MGM Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ......................................................... 25, 34, 35

*Motown Record Co. v. DePietro*,
  No. 04 CV 2246, 2007 WL 576284 (E.D. Pa. Feb. 16, 2007) ............ 12

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
  38 F.3d 1380 (3d Cir.1994) ............................................................... 9

*Parker v. Google*,
  242 F. App'x 833 (3d Cir. 2007) .............................................. 35, 36

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .................................................. *passim*

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) ......................................................... 39

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
  494 F.3d 788 (9th Cir. 2007) .............................................. 22, 31, 37

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ................................................................. 31, 32

*Sony Music Entm't v. Cox Commc'ns, Inc.*,
  No. 1:18-CV-950-LO-IDD, 2019 WL 6357963
  (E.D. Va. Nov. 27, 2019) ..................................................... 4, 16, 40

*Star Pac. Corp. v. Star Atl. Corp.*,
  Civ. A. No. 08-04957 (SDW), 2011 WL 2413150
  (D.N.J. June 10, 2011) ................................................................... 36

*Tanksley v. Daniels*,
  259 F. Supp. 3d 271 (E.D. Pa. 2017) ........................................ 23-24

*UMG Recordings, Inc. v. Alburger*,
  Civ. No. 07-3705, 2009 WL 3152153 (E.D. Pa. Sept. 29, 2009) ...... 12

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
384 F. Supp. 3d 743 (W.D. Tex. 2019) ...................................................... *passim*

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
No. A-17-CA-365-LY, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018).......27, 30

*Universal City Studios Prods. LLLP v. Bigwood*,
441 F. Supp. 2d 185 (D. Me. 2006) .................................................. 11

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) ................................................................ 19

*Warner Bros. Records Inc. v. Charter Commc'ns, Inc.*,
No. 19-CV-00874-RBJ-MEH, 2019 WL 5387099
(D. Colo. Oct. 21, 2019) ........................................................ 5, 27, 30

*Warner Bros. Records v. Payne*,
No. CIV.A. W-06-CA-051, 2006 WL 2844415
(W.D. Tex. July 17 2006) ........................................................ 11

*Warner Bros. Records, Inc. v. Walker*,
704 F. Supp. 2d 460 (W.D. Pa. 2010) ............................................ 10

*Wolk v. Kodak Imaging Network, Inc.*,
840 F. Supp. 2d 724 (S.D.N.Y. 2011) ............................................ 24

*Wolk v. Photobucket.com, Inc.*,
569 F. App'x 51 (2d Cir. 2014) .................................................... 24

**Statutes**

17 U.S.C. § 512(c)(3)(A)(ii–iii)). .......................................................17

17 U.S.C. §§ 106(1) ........................................................................13

17 U.S.C. §§ 106(3) ................................................................... 9, 13

17 U.S.C. §§ 501(a) ................................................................... 9, 13

**Rules**

Rule 12(b)(6) ........................................................................ 8, 9

## INTRODUCTION

Defendant RCN Telecom Services, LLC, *et al.* ("RCN") received more than five million notices that its subscribers were using RCN's internet services to engage in the illegal distribution of copyrighted music through online file-sharing programs like BitTorrent.  The notices identified by IP address more than 36,000 of RCN's subscribers who were engaged in repeat infringement; indeed, the notices made clear that 10,628 of those subscribers had engaged in at least 50 acts of infringement, and that 6,913 of them had engaged in at least 100 acts of infringement.  Armed with the knowledge of specific customers who were engaged in repeated acts of copyright infringement, RCN had the legal right and the practical ability to stop it.  But for years, RCN failed to take any meaningful action to curb this massive and ongoing theft.  Instead, RCN continued to provide known repeat infringers with internet services.  The reason for RCN's wrongful conduct was simple: by allowing infringement to run rampant on its network, RCN reaped substantial revenues from subscription fees that it would have lost had it terminated infringing users' accounts.

Plaintiffs filed this lawsuit to hold RCN (and its management company, Patriot Media Consulting, LLC ("Patriot")) liable for conduct that gives rise to textbook claims for contributory and vicarious copyright infringement.  RCN attempts to avoid liability by distorting or disputing the facts alleged in Plaintiffs'

Complaint, and by misstating the law applicable to Plaintiffs' claims.  But those efforts have no merit.

*First*, Plaintiffs have more than adequately pleaded facts establishing massive direct infringement by RCN subscribers.  As Plaintiffs allege, Rightscorp, an online infringement monitoring company, detected over five million instances of RCN customers engaging in online peer-to-peer copyright infringement, including tens of thousands of repeat infringements by individual subscribers.  Rightscorp downloaded copies of tens of thousands of infringing audio files from RCN subscribers, including copies of each of the sound recordings identified in Exhibit A to the Complaint (the "works in suit").  These facts are far more than enough for the direct infringement element of Plaintiffs' secondary liability claims against RCN.

*Second*, Plaintiffs' allegations establish the elements of their contributory infringement claims.  Through the massive volume of detailed notices specifying the particulars of its subscribers' infringing conduct, RCN had knowledge of the infringement.  Despite this knowledge, RCN provided known infringers with the indispensable means of engaging in their wrongful conduct—internet service—without terminating or otherwise stopping these customers.  These allegations, which are similar to the claims music companies have brought against other internet service providers ("ISPs") and have survived dispositive motions in those cases, establish RCN's material contribution to its subscribers' infringement.

*Third*, RCN also bears vicarious copyright infringement liability.   RCN unquestionably has the right and ability to control and supervise its subscribers' infringing conduct, given that it provides (and can terminate) the access to the internet that its customers use to infringe Plaintiffs' copyrighted works.  And as Plaintiffs allege in detail, RCN enjoys a direct financial benefit from its infringing subscribers.  The free reign that RCN gives to infringers, and RCN's policy of allowing infringement without repercussion, draws customers to RCN's high speed internet service.  RCN reaps subscriber fees from those infringers—fees it would not collect if it acted responsibly by terminating infringing customers or by taking other steps to halt the widescale theft of copyrighted content.

*Fourth*, RCN misstates the applicable legal standards governing Plaintiffs' claims of secondary copyright infringement.  In particular, RCN distorts Supreme Court precedent addressing the innocent arms-length sale of *products*, in an unavailing attempt to immunize RCN's ongoing (and knowing) provision of internet *services* used to infringe Plaintiffs' copyrights.  Courts have routinely rejected precisely the arguments that RCN advances here.

Indeed, it bears emphasis that the legal and factual framework for Plaintiffs' suit is well established.  Plaintiffs' case is the latest in a series of lawsuits that music companies have brought against ISPs for secondary copyright infringement on substantially similar facts.  None of those suits has been disposed of by a motion to

dismiss.  In fact, the rulings in the first four of those cases have been overwhelmingly favorable for the music companies, as the courts have found the same or similar claims against ISPs legally and factually supported.  Two of the cases have resulted in jury verdicts against one ISP (Cox Communications), the latter of which was a verdict for $1 billion for contributory infringement and vicarious liability in December 2019; and the Fourth Circuit affirmed the legal principles supporting liability in the *Cox* cases.[1]  In a suit against Grande Communications (RCN's sibling company, which, like RCN, is managed by Patriot), the court denied Grande's dismissal and summary judgment motions on the claim for contributory infringement.  The court rejected essentially the same arguments that RCN makes here; that case is set for trial.[2]  And in a case against ISP Charter Communications, the Magistrate Judge has recommended denying Charter's motion to dismiss the vicarious infringement claim, where Plaintiffs asserted allegations substantially

---

[1] *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, (E.D. Va. 2015) (summary judgment) and 199 F. Supp. 3d 958, (E.D. Va. 2016) (post-trial motions), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018).  This first case against Cox settled for a confidential amount after remand and before re-trial.  *See also Sony Music Entm't v. Cox Commc'ns, Inc.*, No. 1:18-CV-950-LO-IDD, 2019 WL 6357963 (E.D. Va. Nov. 27, 2019).  This second case against Cox resulted in the jury verdict of $1 billion.

[2] *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743 (W.D. Tex. 2019).

identical to those against RCN; notably, in light of the *Cox* and *Grande* precedents, Charter did not even try to dismiss Plaintiffs' contributory infringement claim.[3]

Consistent with those cases, and for the reasons more fully explained below, this Court should deny RCN's motion to dismiss.

## FACTUAL BACKGROUND

Plaintiffs are record companies that produce, manufacture, distribute, sell, and license the great majority of all legitimate commercial sound recordings in this country.  Nov. 22, 2019 Pls.' 1st Am. Compl. ¶ 2 (Dkt. No. 9) ("FAC" or "Complaint").  Defendant RCN is a network of ISPs that provides internet services to customers in several major metropolitan areas.  *Id.* ¶ 3.  RCN has chosen to continue providing internet services to users whom it knows employ them to illegally download Plaintiffs' copyrighted recordings on a massive scale over peer-to-peer file sharing networks.  *Id.* ¶ 4-5.  RCN promises potential subscribers "an online experience that delivers unlimited access to a wealth of resources"—"with speeds up to 1 GB"—which RCN advertises as "the fastest Internet speeds in town to support your entire family online at once." *Id.* ¶ 62.  These claims specifically appeal to consumers who seek to "use RCN's network to download music and other copyrighted content—including unauthorized content—as efficiently as possible[.]"

---

[3] *Warner Bros. Records Inc. v. Charter Commc'ns, Inc.*, No. 19-CV-00874-RBJ-MEH, 2019 WL 5387099, at *5 (D. Colo. Oct. 21, 2019) (Mag. J. R&R).

*Id.* ¶ 62.  In fact, "RCN makes these representations while knowing that many of its subscribers use its service for copyright infringement; and RCN chooses to take no action to prevent repeat infringement. RCN collects significant fees from its subscribers, and subscribers who frequently upload copyrighted content often pay higher monthly fees for greater bandwidth." *Id.* ¶ 64.

RCN has been repeatedly and constantly informed of the widespread infringement taking place on its network, *id.* ¶ 68, including through the *more than five million* notices it received reporting that its users were using RCN's internet services to infringe copyrighted content, including Plaintiffs' copyrighted works. *Id.* ¶ 5.  Those notices were generated by Rightscorp, using a sophisticated system that "identifies actual infringements on the internet and the perpetrators of these infringements[.]" *Id.* ¶ 57.  The notices gave "RCN the specific identities of its infringing subscribers, by referring to their unique Internet Protocol or 'IP' addresses." *Id.* ¶ 65.  Collectively, the notices informed RCN that "36,773 of its customers had engaged in repeat infringement; 10,628 of its customers had each engaged in infringement at least 50 times; 6,913 of its customers had each engaged in infringement at least 100 times; 1,960 of its customers had engaged in infringement at least 500 times; and 966 of its customers had engaged in infringement at least 1,000 times." *Id.* ¶ 66.  Rightscorp has used this system to "notif[y] RCN of specific instances of first-time and repeat copyright infringement

committed by RCN's account holders, and has requested RCN notify its account holders of these infringements." *Id.* ¶ 58. Instead, RCN has "turned a blind eye to the massive infringement, including the infringement of Plaintiffs' works." *Id.* ¶ 65. RCN has "failed to take any meaningful action" to curtail this infringement, electing instead "for years simply to look[] the other way" and "allow the unlawful conduct to continue unabated." *Id.* ¶ 72. Rightscorp also obtained downloaded copies of tens of thousands of infringing audio files infringed by RCN's subscribers, including copies of each of the works in suit in this case. *Id.* ¶ 69.

At all times RCN "had the full legal right and obligation, and technical and practical ability, to prevent or limit the specific acts of infringement occurring on RCN's network." *Id.* ¶ 72. RCN of course freely concedes that it has the "ability to terminate subscribers," but does not even entertain the possibility of actually doing so to prevent the misconduct of its subscribers. RCN Mem. Supp. Mot. to Dismiss at 31 (Dkt. 15-1) ("Mot."). RCN was motivated by greed to avoid terminating any of its paying account holders, no matter how frequent or massive their infringement of Plaintiffs' copyrights; even today "RCN continues to collect substantial money in subscription fees from accounts of known repeat offenders." FAC ¶ 71.

RCN's refusal to stop its infringing subscribers was a "draw for customers to purchase RCN's internet services and to use those services to infringe the Copyrighted Sound Recordings" and "subscribers who sought to engage in online

7

infringement knew that they could do so on RCN's network with impunity, which attracted those subscribers to use RCN's service to do so." *Id.* ¶ 99. "By continuing to provide known repeat infringers with the internet service they use to commit their infringement, RCN obtained a direct financial benefit from the subscribers' infringing activity in the form of monthly subscription fees that [it] would not have received if [it] had terminated those subscribers' accounts." *Id.* ¶ 100.

## LEGAL STANDARD

When considering motions to dismiss under Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotations omitted) (citing *Bell Atl. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). "The pleading standard 'is not akin to a probability requirement'" and a plaintiff "does not have to set out in detail the facts upon which he bases his claim[,]" but "merely has to state a 'plausible claim for relief.'" *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679).

"Only the allegations in the complaint, and matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case are

taken into consideration" when a court evaluates a motion under Rule 12(b)(6). *Burgese v. Starwood Hotels & Resorts Worldwide, Inc.*, 101 F. Supp. 3d 414, 419 (D.N.J. 2015) (citing *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 2 (3d Cir.1994)).

Ultimately, it is the defendant's burden to "show[] that no claim has been presented." *Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir. 2005).

## ARGUMENT

### I. RCN'S INTERNET SUBSCRIBERS HAVE ENGAGED IN MASSIVE ONLINE INFRINGEMENT OF PLAINTIFFS' COPYRIGHTED SOUND RECORDINGS.

Plaintiffs have provided detailed allegations that RCN's internet subscribers have violated Plaintiffs' distribution and reproduction rights.

### A. RCN Users Have Violated Plaintiffs' Distribution Rights.

RCN's argument that Plaintiffs have not alleged direct infringement is demonstrably false. Under the Copyright Act, anyone who violates a copyright owner's exclusive right to distribute copies of a copyrighted work is an infringer. 17 U.S.C. §§ 106(3), 501(a). RCN's motion ignores Plaintiffs' allegations that RCN subscribers distributed copies of each of the works in suit to Rightscorp: "Rightscorp obtained tens of thousands of these audio files, including copies of each of the Copyrighted Sound Recordings listed in Exhibit A [to the FAC], within the applicable statute of limitations period." FAC ¶ 69.

9

"Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both unauthorized copying and distribution of a plaintiff's work." *Cox Commc'ns*, 199 F. Supp. 3d at 972 (citing *Arista Records LLC v. Lime Grp. LLC*, No. 06–cv–5936, 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011) (collecting cases)). *See also Warner Bros. Records, Inc. v. Walker*, 704 F. Supp. 2d 460, 467 (W.D. Penn. 2010) ("It is undisputed that MediaSentry [the copyright holder's investigator] downloaded actual copies of nine of the Copyrighted Recordings from Defendant's computer, establishing unauthorized distribution as to those nine recordings."). RCN's silence as to the audio files Rightscorp downloads from RCN subscribers—indisputable evidence of direct infringement—speaks volumes.

Plaintiffs' allegations regarding the downloads are, on their own, sufficient to defeat RCN's argument on the issue of direct infringement. Plaintiffs have nonetheless pleaded additional facts that further establish direct infringement of the distribution right. Every single Rightscorp notice reflects a BitTorrent user on the RCN system offering for download a specific copyrighted work, which provides even more overwhelming evidence of direct infringement. FAC ¶¶ 57-60, 65-70.

Numerous courts across multiple circuits have held that making files available online for others to download violates the distribution right and thus constitutes infringement. In the case against RCN's sibling company, Grande Communications,

on essentially the same facts, the court found that "a theory of direct liability properly applies to Grande's customers, either through making infringing materials available, or through actual dissemination of infringing materials." *Grande Commc'ns*, 384 F. Supp. 3d at 763–64. *See also A&M Records, Inc. v. Napster, Inc.,* 239 F.2d 1004, 1014 (9th Cir. 2001) (holding that individuals who download unauthorized music files and/or who make available such files for download by others commit copyright infringement); *Maverick Recording Co. v. Harper*, No. 5:07-CV-026-XR, 2008 WL 11411855, at *3 (W.D. Tex. Sept. 16, 2008) (*rev'd on other grounds*) (rejecting "Defendant's argument that merely making copyrighted works available to the public is not enough evidence for summary judgment purposes to establish infringement."); *Universal Studios Prod., LLLP v. Bigwood*, 441 F. Supp. 2d 185, 190 (D. Me. 2006) ("[B]y using [a peer-to-peer network] to make copies of the [infringing materials] available to thousands of people over the internet, Defendant violated Plaintiffs' exclusive right to distribute ...."); *Warner Bros. Records v. Payne*, No. CIV.A. W-06-CA-051, 2006 WL 2844415, at *3 (W.D. Tex. July 17, 2006); *Arista Records LLC v. Does 1-27*, 584 F. Supp. 2d 240, 250 (D. Me. 2008).

Despite these authorities, RCN insists that offering to distribute copyrighted content online is not infringement, citing to a single 2008 District of Arizona case, *Atlantic Recording Corp. v. Howell*, for the proposition that "[m]erely making an unauthorized copy of a copyrighted work available to the public does not violate a

11

copyright holder's exclusive right of distribution." Mot. at 6 (citing 554 F. Supp. 2d 976, 983 (D. Ariz. 2008)).

But "*Atlantic Recording* appears to be contrary to the great weight of the case law[.]" *Grande Comm'cns*, 384 F. Supp. 3d at 763–64 (citing cases). In fact, although RCN conspicuously neglects to cite them, decisions from courts in this circuit have found infringement liability for making copyrighted works available over peer-to-peer networks. In *Motown Record Co. v. DePietro*, for example, the defendant made copyrighted works available through a peer-to-peer service. The court relied on the Ninth Circuit's opinion in *Napster* in holding that a "plaintiff claiming infringement of the exclusive-distribution right can establish infringement by proof of actual distribution *or by proof of offers to distribute*, that is, proof that the defendant 'made available' the copyrighted work." No. 04 CV 2246, 2007 WL 576284, at *3 (E.D. Pa. Feb. 16, 2007).[4] The court reached the same conclusion in *UMG Recordings, Inc. v. Alburger*, holding that "an individual violates the exclusive-distribution right *by making available* that illegally downloaded work to other internet users." No. CIV. 07-3705, 2009 WL 3152153, at *3 (E.D. Pa. Sept. 29, 2009).[5]

---

[4] Emphasis added throughout unless otherwise indicated.

[5] RCN's flawed arguments concerning its users' direct infringement of Plaintiffs' distribution rights leads it to make the strained assertion that Plaintiffs' secondary infringement claims implicate supposedly "impermissible tertiary liability." Mot. at 36. *Grande*, however, rejected this same argument, 384 F. Supp. 3d at 765, which

In short, RCN's argument that Plaintiffs have not pleaded direct infringement of the distribution right by RCN subscribers fails on the facts and the law.

## B.   RCN Users Have Violated Plaintiffs' Reproduction Rights.

Plaintiffs also allege that RCN's subscribers downloaded infringing files through BitTorrent over RCN's network, in violation of Plaintiffs' exclusive right "to reproduce the[ir] copyrighted works." 17 U.S.C. §§ 106(1), 501(a). In the Complaint, Plaintiffs have pleaded that RCN subscribers "utilize RCN's service to download infringing music files using BitTorrent protocols," FAC ¶ 99, and these subscribers both "download and distribute Plaintiffs' copyrighted works," *id.* ¶ 100.

Disregarding the motion to dismiss standard, RCN offers extraneous and mistaken speculation about how its users may have obtained infringing files, in an attempt to discredit Plaintiffs' factual allegations that RCN's subscribers downloaded the works using RCN's service. Mot. at 35, n. 14. It is of course improper to raise such a factual dispute in a motion to dismiss. For that reason alone, RCN's argument should be rejected. Regardless, it is well settled that a plaintiff "may establish direct infringement using circumstantial evidence that gives rise to an inference that [the ISP] account holders or other authorized users accessed its service to directly infringe." *Cox Commc'ns*, 149 F. Supp. 3d at 663. *See also*

---

has no merit, for substantially the reasons explained in Plaintiffs' opposition to Patriot's motion to dismiss.

*Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008).  Here, the Rightscorp system seeks to acquire infringing files from users who are willing to distribute them, and the presence of infringing BitTorrent files on these subscribers' computers is powerful circumstantial evidence that the files were obtained illegally.   FAC ¶¶ 55-57.   As discussed above, these allegations are sufficient to state a claim.

## II.   RCN IS LIABLE FOR CONTRIBUTORY INFRINGEMENT.

RCN's legal arguments misstate the law of contributory infringement, and elide or mischaracterize Plaintiffs' detailed factual allegations concerning RCN's conduct.   Analyzing those allegations under the proper legal framework confirms that Plaintiffs state an actionable contributory infringement claim.

"To establish a claim of contributory infringement, a plaintiff must show: (1) a third party directly infringed the plaintiff's copyright; (2) the defendant knew that the third party was directly infringing; and (3) the defendant materially contributed to or induced the infringement."  *Leonard v. Stemtech Int'l Inc*., 834 F.3d 376, 387 (3d Cir. 2016) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).   As discussed above, Plaintiffs have sufficiently pleaded direct infringement by third parties.   Plaintiffs also have alleged more than sufficient facts establishing the knowledge and material contribution elements of their contributory liability claim.

### A. RCN Had Actual Or Constructive Knowledge Of, Or Was Willfully Blind To, Its Subscribers' Massive Online Infringement.

"Contributory infringement requires that the secondary infringer know or have reason to know of direct infringement. In addition, turning a 'blind eye' to infringement is the equivalent of knowledge." *Arista Records, Inc. v. Flea World, Inc.*, No. CIV.A. 03-2670(JBS), 2006 WL 842883, at \*14 (D.N.J. Mar. 31, 2006) (internal citations omitted). Pleading any one of these three kinds of knowledge suffices. In this case, Plaintiffs have alleged all three.

### 1. The Notices RCN Received From Rightscorp Satisfy The Actual Knowledge Standard.

Plaintiffs set forth detailed allegations concerning RCN's actual knowledge of instances where its subscribers infringed online—knowledge supplied by over five million Rightscorp notices and other communications, providing specific information concerning RCN subscribers' infringement. *See* FAC ¶¶ 5, 58, 65-71.

These allegations are sufficient to establish actual knowledge under the second element of contributory infringement. The *Cox* and *Grande* courts all found that the Rightscorp notices those ISPs received (which were identical to the Rightscorp notices in this case) were evidence of actual knowledge of their subscribers' infringement. "[C]ourts have held that the knowledge element for contributory infringement is met in those cases where a party has been *notified* of specific infringing uses of its technology and fails to act to prevent such uses, or

willfully blinds itself to such infringing uses." *Cox Commc'ns,* 199 F. Supp. 3d at 979.  In rejecting Cox's post-trial motions, the court found that "[t]he jury could reasonably conclude that Rightscorp captured infringing activity on Cox's network, and that had Cox received the notices they would have satisfied the knowledge requirement." *Id.*  Similarly, the court in *Grande* concluded that the fact that "Grande received over a million copyright infringement notices" from Rightscorp was evidence of actual knowledge of specific instances of infringement, requiring a trial.  *Grande Commnc'ns*, 384 F. Supp. 3d at 768.   And in *Sony Music Entertainment v. Cox*, the court found that another company's infringement notices setting forth the same information as Rightscorp's were sufficient to confer knowledge as a matter of law, thus granting many of these same Plaintiffs summary judgment on the knowledge element of contributory infringement.  *See* 2019 WL 6357963, at *10.

Pretending these precedents do not exist, RCN asks the Court to ignore the plain evidence of actual knowledge Plaintiffs have pleaded, mischaracterizing the Rightscorp notices.  RCN attaches to its motion what it claims are notices it received from Rightscorp, and raises factual challenges to what the notices show.  Even if these notices are authentic and properly before the Court at this stage, they do not support RCN's argument; rather, they prove Plaintiffs' allegations.  Plaintiffs have pleaded that the Rightscorp system collects—and the notices include—"identifying

information, including the IP address and port number of the host computer, the date and time the host computer offered the content, the name of the host computer's ISP, and information about the infringing file." FAC ¶ 68. The notices attached by RCN bear this out, and incorporate this and additional information, including the actual unique forensic hash value of the torrent file. *See* Mot., Ex 1.

RCN further argues that the Rightscorp notices fail to provide all of the information that must be included in a DMCA take-down notice pursuant to 17 U.S.C § 512(c)(3)(A). Mot. at 11. But that argument misses the point. The issue is whether RCN's receipt of the notices shows that RCN had knowledge of infringement for purposes of a claim of contributory infringement; as discussed, the case law overwhelmingly establishes that receipt of the notices is evidence of actual knowledge. Regardless, the Rightscorp notices satisfy the criteria in that provision, as a review of the notices demonstrates and as other courts have concluded. "A section 512(c) notice must include, among other things, 'information reasonably sufficient to permit the service provider to locate the [allegedly infringing] material . . . that is to be removed or access to which is to be disabled,' as well as '[i]dentification of the copyrighted work claimed to have been infringed.'" Mot. at 11 (quoting 17 U.S.C. § 512(c)(3)(A)(ii–iii)). The Rightscorp notices identify precisely this information: the notices identify the name of the copyrighted work, as well as the IP address of the RCN subscriber on which the file is located, *see* FAC ¶

17

68 and Mot. Ex. 1, allowing RCN to terminate that subscriber or take other steps to block its use of RCN's service to infringe.[6]  *Cox*, therefore, rejected this same argument against the Rightscorp notices.  *See* 149 F. Supp. 3d at 671 (holding that plaintiff "asserts that Cox had knowledge of its users' infringing activity because Rightscorp sent Cox more than two million infringement notices" and that "[d]espite Cox's arguments to the contrary, DMCA-compliant notices are evidence of knowledge").

### 2.   RCN Had Constructive Knowledge Of The Infringement.

Although Plaintiffs have pleaded facts sufficient to show that RCN had *actual* knowledge, even *constructive* knowledge would establish RCN's liability for contributory infringement.   In the seminal *Gershwin Publishing Corporation* decision, the Second Circuit made clear that a defendant may "be held liable as a 'contributory' infringer if it were shown to have had knowledge, or reason to know, of the infringing nature of the records."  443 F.2d at 1162.

---

[6] RCN also claims that it "had no legitimate way of comparing the alleged copy to the actual copyrighted work" and thus "Rightscorp's emails therefore could not confer knowledge of copyright infringement."  Mot. at 12.  RCN cites no authority that such a comparison is needed for conferring knowledge of infringement, but in any event, RCN ignores the alleged facts, which refute RCN's claim:  "Rightscorp also provided RCN with weekly infringement summaries detailing the notices sent to RCN that week, as well as access to an online dashboard *that allowed RCN to access the Rightscorp records and even listen to the files that its users were infringing*."  FAC ¶ 70.

Courts have since repeatedly reaffirmed the holding in *Gershwin*, including in this district. "Actual knowledge is not required; constructive knowledge of infringement is sufficient to meet this burden." *Broad. Music Inc. v. Hemingway's Cafe, Inc.*, Civ. A. No. 15-6806 (MLC) (DEA), 2017 WL 2804951, at *4 (D.N.J. June 28, 2017). "Plaintiffs need only prove that Defendants had constructive knowledge of infringement. Contributory infringement requires that the secondary infringer know or have reason to know of direct infringement." *Flea World*, 2006 WL 842883, at *14 (citation omitted).

Here, over five million notices providing specific information regarding the IP address, date, time, and work infringed gave RCN "reason to know" that widespread infringement was occurring by its users over its services. FAC ¶¶ 65-70. RCN thus had constructive knowledge of its subscribers' infringement.

### 3.     RCN Was Willfully Blind To The Infringement.

Willful blindness to infringement also satisfies the knowledge requirement for contributory infringement. *See, e.g., In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law as it is in the law generally.") (internal citations omitted); *Viacom Int'l, Inc. v. YouTube, Inc*., 676 F.3d 19, 35 (2d Cir. 2012); *EMI Christian Music Grp., Inc. v. MP3tunes*, LLC, 844 F.3d 79, 91 (2d Cir. 2016) ("[A]t trial the plaintiffs could prevail by demonstrating that MP3tunes's failure to track users who created links to infringing content

identified on takedown notices or who copied files from those links evidenced its willful blindness to the repeat infringing activity of its users."); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996).

"A person is 'willfully blind' or engages in 'conscious avoidance' amounting to knowledge where the person was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Cox Commc'ns*, 149 F. Supp. 3d at 673. Here, as Plaintiffs alleged, "RCN for years simply looked the other way and chose to allow the unlawful conduct to continue unabated. By ignoring the repeat infringement notifications and refusing to take action against repeat infringers, and instead providing those customers with ongoing internet service, Defendants made a deliberate decision to contribute to known copyright infringement." FAC ¶ 73; *see also id.* ¶ 65 ("the notices gave RCN the specific identities of its infringing subscribers, by referring to their unique Internet Protocol or "IP" addresses. Yet RCN consistently turned a blind eye to the massive infringement, including the infringement of Plaintiffs' works"); *id.* ¶ 89 ("RCN had the means to withhold that assistance upon learning of specific infringing activity by specific users, but failed to do so, purposefully ignoring and turning a blind eye to the flagrant and repeated infringement by its subscribers.").

20

RCN's brief fails even to address willful blindness, let alone attempt to demonstrate how Plaintiffs' allegations regarding the information provided to RCN by Rightscorp would fall short of satisfying the willful blindness standard.

**B.    RCN's Provision Of Internet Service Constitutes Material Contribution Under Well-Settled Precedent.**

Plaintiffs allege that RCN provides the "facilities and products necessary for RCN's subscribers to commit direct infringement by delivering uninhibited access to the internet, as well as the system and technology that allow for the storage and transmission of data constituting the infringing files[.]" FAC ¶ 75. "[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996). *See also Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 422 (S.D.N.Y. 2011). In the context of computer system operators, courts have held that services that enable infringement materially contribute for purposes of contributory liability. *See Napster*, 239 F.3d at 1021 ("[I]f a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.").

Courts have repeatedly held that ISPs' provision of internet services to BitTorrent infringers constitutes material contribution. In *Cox*, the jury found the ISP defendant liable for contributory infringement for its users' direct infringement of music copyrights over BitTorrent networks. 199 F. Supp. 3d at 958. BMG made

the same allegation as Plaintiffs in this case: that the ISP "ignored specific notices of infringing activity and continued to provide material support to its users' infringement of [Plaintiffs'] works despite its ability to suspend or terminate customers with the push of a button." *Id.* The court left no doubt that such conduct gives rise to contributory liability: "There can be no question that the provision of high-speed internet service materially contributes to infringement via BitTorrent . . . ." *Id.* at 979. The court in *Grande* reached exactly the same holding, based on facts virtually identical to those here, finding material contribution where "it is beyond debate that [the ISP's] continuing provision of internet services to customers who engage in repeated copyright infringement substantially facilitates access to and the distribution of infringing materials." 384 F. Supp. 3d at 767.

For the same reasons, Plaintiffs' allegations of RCN's knowing and willful continued provision of high-speed internet to users actively engaged in widespread and repeated infringement establishes contributory liability as a matter of law.

RCN attempts to escape the holdings of these cases that are directly on point by comparing itself to payment methods, such as Visa, but the case RCN relies on is easily distinguished. In *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, the defendant was processing payments for transactions that acquired infringing images. 494 F.3d 788, 802 (9th Cir. 2007). The court declined to find liability because Visa did "not facilitate access to websites" and infringers did not use Visa to "copy, alter,

*distribute* or display infringing material," nor did consumers use Visa's payment system to "locate, view *or download* the infringing images. Rather, all parties involved simply use Defendants' system to process payments for that infringing material." *Id.* at 802. But the opposite is true here. RCN expressly "facilitates access to the websites" that allow its subscribers to infringe; subscribers use RCN's service to locate, download and distribute music files. RCN offers precisely the services that the court in *Visa* held would have rendered Visa liable.

In its failed attempt to recharacterize itself as a "peripherally involved third party" to the massive copyright infringement it allows on its network, Mot. at 22, RCN disregards a companion case brought by the same plaintiff against Google. In *Perfect 10 v. Google*, the Ninth Circuit reaffirmed the material contribution standard for defendants providing internet services: "Accordingly, we hold that a computer system operator can be held contributorily liable if it has actual knowledge that specific infringing material *is available using its system* and can take simple measures to prevent further damage to copyrighted works *yet continues to provide access to infringing works*." 508 F.3d 1146, 1172 (9th Cir. 2007) (internal citations and punctuation omitted). This is exactly Plaintiffs' allegation here: RCN knew its users were infringing, could take simple action (termination) but refused to do so, and instead continued to provide internet access to the infringing works. RCN is nothing like Visa, and the argument that failed for Google should fail here as well.

The other cases RCN offers in support of its attempt to dodge its material contribution liability are inapposite. RCN grasps at straws in citing *Tanksley v. Daniels*, which did not deal with sound recordings, peer-to-peer networks, ISPs, or even the internet. 259 F. Supp. 3d 271 (E.D. Pa. 2017), *aff'd,* 902 F.3d 165 (3d Cir. 2018). The plaintiff in that case alleged that he shared a TV pilot with a producer at a pitch event, and seven years later the producer ripped off his idea for a TV show. *Id.* The court dismissed the case for various reasons, including no plausible allegation of direct infringement or knowledge. *Id. Tanksley* bears no resemblance to Plaintiffs' allegations.

RCN's repeated reliance on *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012), *see* Mot. at 19, 22 & fn.10, is equally misplaced. The court dismissed—on a full summary judgment record—secondary infringement claims in part because the *pro se* plaintiff had not shown any evidence of knowledge. In addressing the lack of material contribution, the court actually distinguished that case from cases like this that address widespread infringement over peer-to-peer networks. *Id.* at 751.

Ultimately, RCN concedes that courts hold parties responsible if they provide access to infringing materials, and yet inexplicably insists that Plaintiffs do not allege that RCN provides its customers access to infringement over BitTorrent. Mot. at 26. But this is obviously not true. Plaintiffs expressly allege that "Defendants'

infringing conduct includes providing the facilities and products necessary for RCN's subscribers to commit direct infringement by delivering uninhibited access to the internet, as well as the system and technology that allow for the storage and transmission of data constituting the infringing files that comprise the Copyrighted Sound Recordings." FAC ¶ 75.

RCN also attempts to redefine material contribution by claiming that the availability of *other* potential means of material contribution somehow inoculates RCN from liability for *its* actual material contribution. RCN contends that "simply providing an accused infringer with internet access does not 'materially contribute' to infringement, because a direct infringer can obtain internet access from any number of other sources." Mot. at 26. This makes no sense, and is akin to arguing that because two swap meets across town each include booths selling bootleg albums, neither can ever be liable. That, of course, is not the law.

## III.   RCN IS VICARIOUSLY LIABLE FOR ITS SUBSCRIBERS' INFRINGEMENT.

To state a claim for vicarious liability, Plaintiffs must allege that RCN had "(1) a direct financial interest in the infringing activity and (2) the right and ability to control the activity that causes the infringement." *Leonard*, 834 F.3d at 376 (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 & fn.9 (2005) ("*Grokster*")). Plaintiffs have more than adequately pleaded both elements.

## C.   RCN Received A Direct Financial Benefit From The Infringement.

To establish a direct financial benefit, a plaintiff need only show that "there is a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison v. Robertson,* 357 F.3d 1072, 1079 (9th Cir 2004).  The financial benefit need not be "directly tied to [the] sale of particular infringing items." *Fonovisa, Inc. v. Cherry Auction, Inc.* 76 F.3d 259, 263 (9th Cir. 1996).

**Availability of infringing content as a "draw."**  A financial benefit can include the mere financial benefit of having more users choose the defendant's service, whenever "the availability of infringing material acts as a 'draw' for [the defendant's] customers[.]" *Napster*, 239 F.3d at 1023.  "The case law indicates that the presence of infringing music does not need to be a significant draw to establish vicarious liability, only that infringing music must be 'a' draw." *Flea World*, 2006 WL 842883, at *12 (citing *Fonovisa*, 76 F.3d at 263).

Here, Plaintiffs have pleaded that the ability of RCN customers to use RCN's high internet speeds "without facing any repercussions from RCN and Patriot, acts as a powerful draw for RCN's subscribers, who utilize RCN's service to download infringing music files using BitTorrent."  FAC ¶ 99.  Plaintiffs allege that RCN's refusal to stop its infringing subscribers was a "draw for customers to purchase RCN's internet services and to use those services to infringe the Copyrighted Sound Recordings." *Id.*

Indeed, an infringer-friendly termination policy *is itself a draw* for infringing subscribers.   That was the conclusion in *Charter Communications*, where the plaintiffs alleged that Charter's "failure to stop or take other action in response to notices of infringement *is a draw to current and prospective subscribers* to purchase and use Defendant's internet service to pirate Plaintiffs' copyrighted works."  2019 WL 5387099, at *5.  The Magistrate Judge's Report and Recommendation found such allegations sufficient to state a claim, denying Charter's motion to dismiss. There is no reason to reach a different conclusion in this case.  Here, as with Charter, Plaintiffs have alleged that RCN's "subscribers who sought to engage in online infringement knew that they could do so on RCN's network with impunity, which attracted those subscribers to use RCN's service to do so."  FAC ¶ 100.[7]

**Revenue and financial incentive from permitting infringement.**   In addition, "evidence of financial gain is not necessary to prove vicarious liability as long as the service provider has an economic incentive to tolerate infringing

---

[7] In *Grande*, the court dismissed Plaintiffs' claim for vicarious liability, holding that that the draw must be an ISP's permissive policy towards infringement.  *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, No. A-17-CA-365-LY, 2018 WL 1096871, *10 (W.D. Tex. Feb. 28, 2018).  Here, Plaintiffs have explicitly alleged just that: "RCN's failure to adequately police its infringing subscribers was also a draw for customers to purchase RCN's internet services and to use those services to infringe the Copyrighted Sound Recordings.  Upon information and belief, subscribers who sought to engage in online infringement knew that they could do so on RCN's network with impunity, which attracted those subscribers to use RCN's service to do so."  FAC ¶ 99.

conduct." *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 AJN, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015). This "economic incentive" may even be shown by the ability to sell increased bandwidth. *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009) (finding that a direct financial benefit existed where a defendant's "revenues increased depending on their users' volume of downloads").

As Plaintiffs have alleged, RCN receives revenue from infringing customers that it would forego if it terminated them, supplying the company with a strong financial incentive to allow unlimited infringement. FAC ¶ 100. RCN claims that *Ellison* severely narrows what constitutes a "financial benefit," asserting that a flat monthly fee is insufficient to show a direct financial benefit. Mot. at 28; 357 F.3d at 1079. But this claim misrepresents the holding of *Ellison*, and other courts have soundly rejected RCN's argument. The *Ellison* court found that "flat periodic fees" can "constitute … direct financial benefit[s]." *Ellison*, 357 F.3d at 1079. The "central question" raised by *Ellison* was, given these periodic fees, "whether the infringing activity constitutes a draw for subscribers" or "just an added benefit." *Id.* RCN asks this court to determine that the *only* way to define whether infringing activity is a "draw" is to measure whether RCN "gained or lost subscribers based on its subscribers' alleged ability to engage in copyright infringement." Mot. at 30.

RCN does not offer any case that has so narrowly limited a draw, and courts have rejected previous attempts to narrow the "direct financial benefit" test.

### D. RCN Had The Right And Ability To Supervise And Control Its Subscribers' Infringement.

The right and ability "to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023. Blocking access entails both "a legal right to stop or limit the directly infringing conduct … [and] the practical ability to do so." *Google,* 508 F.3d at 1173. Thus, an ISP is liable for its users' infringing conduct where it has the right to "terminate [users'] accounts" and "revoke [access] privileges," *Escape Media*, 2015 WL 1402049, at * 42, and the practical ability to "terminate, suspend or restrict users' subscriptions, thereby limiting their access to uploading or downloading" infringing content. *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009).

Here, Plaintiffs easily meet this standard. Plaintiffs have pleaded that RCN and Patriot "had the full legal right and obligation, and the technical and practical ability, to prevent or limit the specific acts of infringement occurring on RCN's network[,]" FAC ¶ 74, yet "RCN has refused to take any meaningful action to prevent the widespread infringement by its subscribers." The courts addressing this

same type of case against other ISPs all have concluded these allegations establish an ISP's right and ability to control or supervise its subscribers' infringement.[8]

RCN disputes that this allegation is sufficient, but the cases RCN relies on show why its argument fails. RCN contrasts *Napster*, where the service provider clearly had the right to terminate users, and the ability to see whether users were infringing, with *Google* and *Visa*. But in every relevant way, RCN is like Napster. As the *Perfect 10* court explained, "[b]ecause Napster had a closed system requiring user registration, and could terminate its users' accounts and block their access to the Napster system, Napster had the right and ability to prevent its users from engaging in the infringing activity of uploading file names and downloading Napster users' music files through the Napster system." 508 F.3d at 1174. This statement describes RCN's relationship with its subscribers exactly, in contrast with *Google*, where "Google [lacked] contracts with third-party websites that [could] empower Google to stop or limit them from reproducing, displaying, and distributing infringing copies" of plaintiff's copyrights. 508 F.3d at 1173. And as discussed

---

[8] *See Cox Commc'ns,* 149 F. Supp. 3d at 674 (ISP had the right and ability "to condition the availability of its internet access to users who do not use that service to violate copyrights. If users listen when Cox exercises that power, infringement stops. If users do not and Cox terminates them, that also stops or at least limits infringement."); *Grande Commc'ns*, 2018 WL 1096871, at *10 ("Grande can stop or limit the infringing conduct by terminating its subscribers' internet access. This is clearly sufficient to state a claim on the first element of vicarious liability."); *Charter Commc'ns,* 2019 WL 5387099, at *6 (same).

*supra*, RCN is nothing like Visa, a mere payment provider that did not provide customers with the means for distributing infringing content. *Visa*, 494 F.3d at 802.[9]

RCN has the right and ability to control the infringement.  But it chose to allow unlimited infringement by its subscribers instead of suspending or terminating their service, because of the financial benefit it accrued in doing so.  This conduct makes RCN vicariously liable for infringement of Plaintiffs' copyrights.

## IV. OTHER COURTS HAVE REJECTED RCN'S MISAPPLICATION OF THE SUPREME COURT'S *SONY* AND *GROKSTER* DECISIONS IN SIMILAR CASES.

RCN attempts to immunize its conduct by citing the Supreme Court's holdings in *Sony* and *Grokster*.  As explained below, however, RCN mischaracterizes those cases, and other courts—including, significantly, *Cox* and *Grande*—have rejected the very argument RCN presses here.

### E. *Sony* Does Not Foreclose Liability For An Internet Service Provider That Knowingly Supplies Infringing Customers With The Means Of Infringing.

In *Sony Corp. of Am. v. Universal City Studios, Inc.*, the Supreme Court examined the secondary copyright infringement liability generated by Sony's sale of Betamax video recorders.  464 U.S. 417 (1984) ("*Sony*").  Because Sony had no

---

[9] *David v. CBS Interactive, Inc.*, No. 2:11-cv-9437, 2012 WL 12884914, (N.D. Cal. July 13, 2012), on which RCN relies, Mot. at 32, similarly is no help to RCN.  Unlike the website CNet, which the *David* court held was not vicariously liable, RCN *does* "have the right to stop users from using the software to download copyrighted material illegally" (*id.* at *4)—RCN can terminate infringing users.

ongoing relationship with purchasers—and thus no basis to know of specific infringing uses—liability rested solely on the design of the device as evidencing "constructive knowledge of the fact that their customers may use that equipment to make unauthorized copies of copyrighted material." *Id.* at 439.  The Supreme Court held that the arm's-length sale of a device "capable of substantial non-infringing uses" does not *alone* demonstrate liability for contributory infringement.  *Id.* at 442.

RCN's reliance on *Sony* is misplaced.  *First*, this is not a case about the design of a *product* placed in the stream of commerce.  RCN provides high-speed internet *services* to subscribers for a monthly fee.  Unlike end purchasers of video recorders or other products, RCN's customers have an ongoing relationship with the company.  This fact alone renders *Sony* inapposite, as this Court has held:  "The holding in *Sony* or *Grokster* cannot be applied here to avoid contributory infringement liability because Defendants' business is not analogous to a device put into the stream of commerce."  *Flea World*, 2006 WL 842883, at *16.  *See also Cox Commc'ns*, 199 F. Supp. at 976 ("An ongoing relationship between a defendant and direct infringers presents a potential for culpability quite beyond distribution or design.").

*Second*, Plaintiffs' claims do not depend on the design of RCN's service to impute knowledge to RCN that its customers "may" infringe.  Rather, Plaintiffs have pleaded that RCN has independent knowledge of ongoing infringement, and chooses to provide a service that enabled such infringement.  *Sony* thus is inapposite to the

kind of allegations Plaintiffs make here.  *See Napster*, 239 F.3d at 1023 ("We observe that Napster's actual, specific knowledge of direct infringement renders *Sony*'s holding of limited assistance to Napster.").

RCN argues that Plaintiffs cannot prove contributory infringement because "RCN's internet service has substantial noninfringing uses."  Mot. at 17.  Cox advanced the same claim, but the Fourth Circuit held that "*this argument is meritless*" and observed that "providing a product with 'substantial non-infringing uses' *can* constitute a material contribution to copyright infringement[,]" 881 F.3d at 305-06 (second emphasis in original).  The Fourth Circuit cited *Google*, where the Ninth Circuit held that "Google's image search engine 'substantially assists websites to distribute their infringing copies' of copyrighted images, and thus constitutes a material contribution, even though 'Google's assistance is available to all websites, not just infringing ones.'"  508 F.3d at 1171 fn.11.  *Cox* and *Google* both concluded that a defendant can be liable for contributory infringement, even in cases of services capable of substantial noninfringing uses, because a "company that knows that its action … is substantially certain to result in infringement" can be presumed to have acted purposefully.  *Cox Commc'ns*, 881 F.3d at 308.  There is no reason for this Court to deviate from these precedents.

**F.** ***Grokster*, And Cases Applying Its Holding, Confirm That RCN Can Be Held Liable For Knowingly Providing Infringing Customers With Internet Service.**

RCN's *Grokster* argument fares no better.  *Grokster* offered peer-to-peer software that enabled widespread copyright infringement.  The Ninth Circuit held that, because the software was capable of non-infringing uses, *Sony* foreclosed contributory liability.  But the Supreme Court reversed, and in doing so rejected the exact reading of *Sony* that RCN proposes.  The Court explained that "*Sony* barred secondary liability based on presuming or imputing intent to cause infringement *solely from the design or distribution of a product* capable of substantial lawful use . . ."  *Grokster*, 545 U.S. at 933.  The limited holding in *Sony* addressing imputed intent cannot be stretched to negate the broad liability for contributory infringement recognized by the common law.  "*Sony's* rule limits imputing culpable intent as a matter of law from the characteristics or uses of a distributed product.  But nothing in *Sony* requires courts to ignore evidence of intent if there is such evidence, and the case was never meant to foreclose rules of fault-based liability derived from the common law."  *Id.* at 934-35.  *Grokster* thus left undisturbed the fundamental elements of contributory infringement liability.

RCN nevertheless asserts that after *Grokster*, "material contribution" no longer supplies a basis for liability, which can only flow from "active steps to encourage direct infringement."  Mot. at 13.  This assertion badly misreads *Grokster*.

### 4.   *Grokster* Addressed Only One Type Of Contributory Liability—Inducement of Infringement; But The Other Alternative Types Of Liability Remained Unaffected.

In *Grokster* the Court expressly limited the scope of its holding to inducement claims:  "Because *Sony* did not displace *other theories of secondary liability*, and because we find below that it was error to grant summary judgment to the companies on MGM's *inducement claim*, we do not revisit *Sony* further . . ."  *Id.* at 934. *Grokster* also embraced the seminal *Gershwin* case, which held that "'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.'"  *Id.* (citing *Gershwin Pub. Corp.,* 443 F.2d at 1162).

The law from this Circuit and elsewhere rejects RCN's argument that *Grokster* abolished "other theories of secondary liability" such as material contribution.  *First*, the very cases RCN cites directly refute its *Grokster* argument. *Leonard v. Stemtech Int'l Inc.* cites *Grokster*, but recognizes that material contribution liability, independent from an inducement claim, remains alive and well:  "To establish a claim of contributory infringement, a plaintiff must show: (1) a third party directly infringed the plaintiff's copyright; (2) the defendant knew that the third party was directly infringing; and (3) the defendant *materially contributed to or induced* the infringement."  Mot. at 9 (citing *Leonard*, 834 F.3d at 387).  RCN asserts that *Leonard* and *Parker v. Google, Inc.*, 242 F. App'x 833 (3d Cir. 2007)

"indicate[] that the term 'material contribution' to infringement is merely synonymous with 'intentionally inducing or encouraging' direct infringement…." Mot. at 17 n. 9.  But RCN is incorrect.  As is clear from the *Leonard* standard that RCN itself quotes, "material contribution" and "inducement" are alternatives for contributory liability, not synonyms. 834 F.3d at 387.  And *Parker* articulates the standard as "material contribution to the infringement," without reference to either the word or the concept of "inducement."  242 F. App'x at 837.

Other decisions of this Court are in accord that material contribution and inducement are separate and independently viable claims.  *See, e.g., Durant v. DuPont Publ'g, Inc.*, No. CV189794MASDEA, 2019 WL 1433620, at *2 (D.N.J. Mar. 29, 2019) (Shipp, J.) ("[T]he defendant materially contributed to or induced the infringement."); *Star Pac. Corp. v. Star Atl. Corp.*, No. CIV.A. 08-04957 SDW, 2011 WL 2413150, at *5 (D.N.J. June 10, 2011), *aff'd in part,* 574 F. App'x 225 (3d Cir. 2014) ("As the Third Circuit has noted, it is well settled that one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing activity of another, may be held liable as a contributory infringer.").

The *Cox* and *Grande* courts also rejected the position RCN advances.  *See Cox Commc'ns*, 199 F. Supp. at 976 ("*Grokster* clarified the scope of inducement; it did not explicitly or implicitly reject a material contribution theory of liability. The Court also finds it persuasive that in the wake of *Grokster* courts have continued

to articulate both inducement and material contribution theories of contributory infringement.") (citations omitted); *see also Grande Commc'ns,* 384 F. Supp. 3d at 766 ("Grande's assertion that a cause of action for 'material contribution' to copyright infringement is not recognized in the law is thus misplaced.") (citing *Grokster* and *Gershwin*).

And the cases RCN attempts to rely on actually reject RCN's *Grokster* argument. In *Google,* for example, the Ninth Circuit held that "[o]ur tests for contributory liability are consistent with the rule set forth in *Grokster.* We have adopted the general rule set forth in *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* namely: one who, with knowledge of the infringing activity, *induces, causes or materially contributes* to the infringing conduct of another, may be held liable as a 'contributory' infringer." 508 F.3d at 1171 (internal citations omitted). Rejecting the defendant's inducement argument, the court reiterated that "the Supreme Court in *Grokster* did not suggest that a court must find inducement in order to impose contributory liability under common law principles." *Id.* at n.11. *See also Visa*, 494 F.3d at 796 (recognizing the *Grokster* court "focused primarily on an 'inducement' theory and holding: "[t]o state a claim of contributory infringement, Perfect 10 must allege facts showing that Defendants *induce, cause, or materially contribute to* the infringing conduct.").

5.     **An ISP That Knows Of Infringing Material Available On Its Network And Continues To Provide Access Materially Contributes As A Matter Of Law.**

RCN also tries to distort *Grokster* by arguing that RCN cannot be liable as a matter of law unless it took "active steps to encourage" the infringement. Mot. at 13. Again, however, numerous courts have rejected this argument.

In *Flea World*, the court rejected the defendant flea market operator's argument that *Grokster* immunized its conduct unless it took "affirmative steps" to encourage the infringement. "Plaintiffs do not need to show that Defendants took steps to 'foster' or 'promote' infringement at the Market. The holding in *Sony* or *Grokster* cannot be applied here to avoid contributory infringement liability because Defendants' business is not analogous to a device put into the stream of commerce." 2006 WL 842883, at *16.

Instead, a defendant can be liable for a conscious decision not to limit provision of services, thus enabling infringement. In the 2001 *Napster* decision, prior to *Grokster*, the Ninth Circuit held that "if a computer system operator learns of specific infringing material available on his system and *fails* to purge such material from the system, the operator knows of and contributes to direct infringement." *Napster,* 239 F.3d at 1021. Two years after *Grokster*, in *Perfect 10 v. Google*, the court reaffirmed this rule: "Accordingly, we hold that a computer system operator can be held contributorily liable if it has actual knowledge that

specific infringing material is available using its system and *can take simple measures to prevent further damage to copyrighted works yet continues to provide access to infringing works*." 508 F.3d at 1172 (internal citations and punctuation omitted). The continued provision of internet services to known infringers is sufficient to impose liability on an ISP—as the Fourth Circuit concluded in *Cox*. 881 F.3d at 307-08 (citing *Google*).[10]

RCN attempts to stretch the Ninth Circuit's holding in *Cobbler Nevada, LLC v. Gonzales* to immunize its conduct. 901 F.3d 1142 (9th Cir. 2018). But *Cobbler* is easily distinguished, and the *Grande* and *Cox* courts have rejected its application. *Cobbler* did not concern whether an ISP could be held liable for contributory infringement. Rather, the defendant was an individual who owned an adult day care home, and whose liability was "premised on a bare allegation that [he] failed to police his internet service." The Ninth Circuit concluded that the law did not "create[] an affirmative duty for *private internet subscribers* to actively monitor their internet service for infringement" because "[i]mposing such a duty would put at risk any purchaser of internet service who shares access with a family member or

---

[10] RCN cites two cases, *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671–72 (9th Cir. 2017) and *Luvdarts LLC v. AT&T Mobility, LLC,* No. 2:10-cv-05442, 2011 WL 997199 (C.D. Cal. Mar. 17, 2011), where the courts found that the "notice" to the provider was lacking any specificity. That is quite unlike this case, where the detailed notices of specific infringers and infringements are the type that multiple courts have found provide defendants more than sufficient knowledge.

roommate, or who is not technologically savvy enough to secure the connection to block access by a frugal neighbor." *Id.* at 1149.

The holding in *Cobbler* has no bearing on whether RCN—a large, sophisticated, internet service provider—can be held liable for contributory infringement.  In *Grande*, the court held that the ISP's "reliance on [*Cobbler*] is misplaced" because it "involved an individual subscriber who failed to prevent users of his internet subscription from infringing the plaintiff's copyright … in contrast to the actual ISP defendant in this case."  384 F. Supp. 3d at 767, n 6.  The court in *Sony Music Entertainment v. Cox* similarly rejected the application of *Cobbler* that RCN urges here:  "The law recognizes and treats service providers differently from end users, and *Cobbler's* holdings and dicta are relevant to individual account holders, not the provider of said account."  2019 WL 6357963, at *13.[11]  This Court similarly should reject RCN's *Cobbler* argument.

## CONCLUSION

Plaintiffs respectfully request that the Court deny RCN's motion.[12]

---

[11] RCN also cites to *Malibu Media v. Park*, an unopposed motion for default judgment against the alleged individual subscriber of an IP address, which merely references the holding of *Cobbler*, but provides no analysis or support for its application here. No. 2:17-cv-12107-JMV-MF, 2019 WL 2960146, at *5 (D.N.J. July 9, 2019).

[12] However, if the Court finds any of the allegations insufficient, Plaintiffs respectfully request that the Court allow Plaintiffs to amend their Complaint, rather than dismiss it with prejudice.

Dated: February 18, 2020   Respectfully submitted,

       _s/ Thomas R. Curtin_    
       Thomas R. Curtin
       George C. Jones
       **McElroy, Deutsch, Mulvaney**
        **& Carpenter, LLP**
       1300 Mount Kemble Ave., P.O. Box 2075
       Morristown, NJ 07962-2075
       Telephone: (973) 401-7117
       Facsimile: (973) 425-0161
       tcurtin@mdmc-law.com
       gjones@mdmc-law.com

       Robert B. Gilmore (admitted _pro hac vice_)
       Philip J. O'Beirne (admitted _pro hac vice_)
       Michael A. Petrino (admitted _pro hac vice_)
       Kevin L. Attridge (admitted _pro hac vice_)
       Shawna Bray (admitted _pro hac vice_)
       **Stein Mitchell Beato & Missner LLP**
       901 15th Street NW
       Washington, DC 20005
       Telephone: (202) 737-7777
       Facsimile: (202) 296-8312
       rgilmore@steinmitchell.com
       pobeirne@steinmitchell.com
       mpetrino@steinmitchell.com
       kattridge@steinmitchell.com
       sbray@steinmitchell.com

       **_Attorneys for Plaintiffs_**