Edward F. Behm, Jr.
ARMSTRONG TEASDALE LLP
Attorney I.D. No. 017972002
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: 267.780.2000
Fax: 215.405.9070

*Attorneys for Defendants*

Richard L. Brophy (*pro hac vice*)
Zachary C. Howenstine (*pro hac vice*)
Margaret R. Szewczyk (*pro hac vice*)
Abigail L. Twenter (*pro hac vice*)
Kyle G. Gottuso (*pro hac vice*)
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone:  314.621.5070
Fax:  314.621.5065

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UMG RECORDINGS, INC., et al.,<br><br>        Plaintiffs,<br><br>    vs.<br><br>RCN TELECOM SERVICES, LLC, et al.,<br><br>        Defendants.<br>and<br><br>RCN TELECOM SERVICES, LLC,<br><br>        Counterclaim Plaintiff,<br><br>vs.<br><br>UMG RECORDINGS, INC., et al.,<br><br>        Counterclaim Defendants;<br><br>RECORDING INDUSTRY<br>ASSOCIATION OF AMERICA, INC.,<br><br>        Counterclaim Defendant;<br><br>RIGHTSCORP, INC.,<br><br>        Counterclaim Defendant. | **No.  3:19-cv-17272-MAS-ZNQ**<br><br>**DEFENDANTS' OPPOSITION TO MOTION TO DISMISS COUNTERCLAIMS BY PLAINTIFFS AND THE RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.**<br><br>**ORAL ARGUMENT REQUESTED** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND ................................................................................4

  RCN and Its DMCA Policy ...............................................................................4

  Rightscorp's "System" for Detecting Copyright Infringement............................6

  Plaintiffs' Partnership with Rightscorp .................................................................8

ARGUMENT ......................................................................................................10

  I.    RCN'S UCL CLAIM IS NOT PREEMPTED BY THE DMCA ...............10

  II.    RCN HAS STANDING UNDER THE UCL .........................................25

  III.    RCN HAS STATED A CLAIM FOR INJUNCTIVE RELIEF .............30

  IV.    IF PLAINTIFFS' MOTION TO STRIKE IS NOT MOOT, IT SHOULD BE DENIED .................................................................................................31

  V.    IF NECESSARY, LEAVE TO AMEND IS WARRANTED ................35

CONCLUSION AND REQUEST FOR ORAL ARGUMENT .............................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A. v. Guerra Seijas*,
   No. 1:13-cv-5200, 2015 WL 4496066 (S.D.N.Y. Mar. 26, 2015) .....................20

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008)...........................................................................12, 13, 14, 16

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,
   No. 3:10-cv-5696, 2011 WL 2690437 (N.D. Cal. July 8, 2011).......................22

*Bates v. Dow Agrosciences LLC*,
   544 U.S. 431 (2005).........................................................................................17

*In re Charter Commc'ns, Inc.*,
   393 F.3d 771 (8th Cir. 2005) ...........................................................................22

*In re Chrystler-Dodge-Jeep Ecodiesel Mktg., Sales Practices &*
   *Prods. Liability Litig.*,
   295 F. Supp. 3d 927 (N.D. Cal. 2018)...............................................................14

*Columbia Gas Transmission Corp. v. Tarbuck*,
   62 F.3d 538 (3d Cir. 1995) ...............................................................................34

*In re Commonwealth's Mot. to Appoint Counsel Against or Directed*
   *to Defender Ass'n of Philadelphia*,
   790 F.3d 457 (3d Cir. 2015) .......................................................................11, 13

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000).............................................................................17, 23, 24

*CTS Corp. v. Waldburger*,
   573 U.S. 1 (2014)..............................................................................................13

*Emery v. VISA*,
   95 Cal. App. 4th 952 (2002) .............................................................................27

*Facenda v. N.F.L. Films, Inc.*,
   542 F.3d 1007 (3d Cir. 2008) .....................................................................11, 15

*In re Firearm Cases*,
　126 Cal. App. 4th 959 (2005) ............................................................27

*Funk v. Belneftekhim*,
　No. 1:14-cv-376, 2018 WL 4006878 (E.D.N.Y. May 25, 2018) ......................14

*Local Ventures & Investments, LLC v. Open Found.*,
　No. 3:18-cv-5581, 2019 WL 7877938 (N.D. Cal. Feb. 26, 2019) ......................3

*MD Mall Assocs., LLC v. CSX Transp., Inc.*,
　715 F.3d 479 (3d Cir. 2013) ................................................14, 23, 24

*In re Mercedes-Benz Emissions Litig.*,
　No. 2:16-cv-881, 2019 WL 413541 (D.N.J. Feb. 1, 2019), *vacated
　on other grounds*, 797 F. App'x 695 (3d Cir. 2020) ..........................................13

*In re Mock*,
　398 Fed. App'x. 716 (3d Cir. 2010) ................................................34

*Mometrix Media, LLC v. LCR Publishing, LLC*,
　No. 03-17-00570, 2018 WL 6072357 (Tex. Ct. App. Nov. 21,
　2018) ............................................................22

*NE Hub Partners, L.P. v. CNG Transmission Corp.*,
　239 F.3d 333 (3d Cir. 2001) ............................................................11

*People v. Toomey*,
　157 Cal. App. 3d 1 (1984) ............................................................26

*PMC, Inc. v. Kadisha*,
　78 Cal. App. 4th 1368 (2000) ............................................................26

*Rock River Commcn's, Inc. v. Universal Music Grp., Inc.*,
　No. 08-cv-635, 2011 WL 1598916 (N.D. Cal. Apr. 27, 2011) ........19, 20, 21, 22

*Simoneau v. Stryker Corp.*,
　No. 3:13-cv-1200, 2014 WL 1289426 (D. Conn. Mar. 31, 2014)......................14

*Stardock Sys., Inc. v. Reiche*,
　No. 4:17-cv-7025, 2019 WL 8333514 (N.D. Cal. May 14, 2019) ....................22

*Stevens v. Vodka & Milk, LLC*,
　No. 1:17-cv-8603, 2018 WL 11222927 (S.D.N.Y. Mar. 15, 2018) .............19, 22

*In re TMI Litig.*,
  193 F.3d 613 (3d Cir. 1999) ...............................................................................34

*Twin City Fire Ins. Co. v. Ovation Fund Servs., LLC*,
  No. 2:18-cv-14944, 2019 WL 1275060 (D.N.J. Mar. 20, 2019).................32, 34

*United Mine Workers of America v. Gibbs*,
  383 U.S. 715 (1966)...........................................................................................33

*Wyeth v. Levine*,
  555 U.S. 555 (2009)...........................................................................................14

**Statutes**

17 U.S.C. § 106...............................................................................................15, 16

17 U.S.C. § 301(a) ...............................................................................................15

17 U.S.C. § 301(b)(3)........................................................................15, 16, 17, 23

17 U.S.C. § 512.............................................................................4, 10, 15, 18

17 U.S.C. § 512(i)(1)(A) ........................................................................................4

17 U.S.C. § 512(a) ......................................................................................*passim*

17 U.S.C. § 512(c) ......................................................................................*passim*

17 U.S.C. § 512(c)(1)............................................................................................18

17 U.S.C. § 512(c)(2)............................................................................................19

17 U.S.C. § 512(c)(3)............................................................................................19

17 U.S.C. § 512(f)........................................................................................*passim*

Cal. Bus. & Prof. Code § 17204 .....................................................................25, 30

California Unfair Competition Law.................................................................*passim*

Digital Millennium Copyright Act..................................................................*passim*

**Other Authorities**

7 Charles Alan Wright, et al., Federal Practice & Procedure § 1653
    (3d ed. 2015) ......................................................................................33

Fed. R. Civ. P. 1 ...............................................................................33, 34

Fed. R. Civ. P. 8 ........................................................................................29

Fed. R. Civ. P. 13(h) .................................................................................32

Fed. R. Civ. P. 14 ................................................................................32, 34

Fed. R. Civ. P. 15(a)(2) ............................................................................35

Fed. R. Civ. P. 19 .....................................................................................32

Fed. R. Civ. P. 20 ................................................................................32, 35

Fed. R. Civ. P. 20(a)(2) .......................................................................31-32

Fed. R. Civ. P. 42(a)(2) ............................................................................34

## INTRODUCTION

The Court should deny the Motion to Dismiss brought by Plaintiffs and the Recording Industry Association of America (collectively, "Plaintiffs[1]").  RCN's claims under the California Unfair Competition Law ("UCL") are not preempted by the Digital Millennium Copyright Act ("DMCA"), and RCN's allegations go far beyond what is necessary to state a claim for relief under the UCL.

One would be forgiven for reading Plaintiffs' 30-page memorandum and leaving it with no idea what RCN's UCL claim is about.  Plaintiffs hardly discuss it, for good reason.  The facts are damning and incontrovertible.

Since at least 2016, Plaintiffs have been working with Defendant Rightscorp, Inc.—which has not yet responded to RCN's UCL claim—to manufacture "evidence" of copyright infringement that Plaintiffs can wield against internet service providers like RCN.  Over that time, Rightscorp has sent upwards of hundreds of thousands of emails to RCN, accusing users of RCN's network of infringing Plaintiffs' copyrights by downloading, sharing, and offering to share copyrighted content over peer-to-peer file sharing platforms.

---

[1] Plaintiffs and RIAA are referred to collectively as "Plaintiffs" for ease of reference.  Plaintiffs and RIAA jointly moved to dismiss and have not raised any argument that relies on a distinction between their respective conduct.  *See generally* Memo. of Law ISO Mot. to Dismiss (ECF No. 122-1) (hereinafter, "Pls.' Memo.").

Unbelievably, Rightscorp has destroyed, and continues to destroy, all of the evidence upon which its accusations were based. Rightscorp claims to operate a software system that detects unlawful peer-to-peer file sharing, but after each purported detection, it systematically destroys all of the data that would allow someone to determine whether the accusation was true. Rightscorp also refuses to comply with RCN's public requirements for how to lodge a copyright complaint, such as digitally signing the complaint so that RCN can verify that it came from a legitimate content owner or representative.

Rightscorp does all of this with the blessing of Plaintiffs, who effectively represent the U.S. recording industry as a whole. The recording industry's goal in partnering with Rightscorp is obvious: they want to force ISPs to treat every copyright infringement complaint they receive, no matter how questionable or insubstantial, as legitimate. Instead of actually policing their copyrights—and proving discrete instances of actual, direct copyright infringement—Plaintiffs want to indiscriminately lob vast numbers of accusations at ISPs, forcing ISPs to choose between (1) treating every complaint as grounds for terminating a subscriber's internet access (to ensure the ISP can qualify for the safe harbor from copyright infringement claims under DMCA) or (2) defending against secondary infringement claims like the ones Plaintiffs assert against RCN.

This is precisely the type of abusive business practice that a state unfair competition law like the UCL is intended to address.  *See, e.g.*, *Local Ventures & Investments, LLC v. Open Found.*, No. 3:18-cv-5581, 2019 WL 7877938, at *5–*6 (N.D. Cal. Feb. 26, 2019) ("The [UCL] standard is intentionally broad and may encompass conduct where the gravity of the harm to the alleged victim is greater than the utility of the defendant's conduct.") (quotations & citations omitted). Pursuant to the UCL, RCN seeks an injunction—the UCL's primary form of relief—preventing Plaintiffs and Rightscorp from sending copyright infringement allegations to RCN unless they (1) preserve the underlying evidence and (2) comply with RCN's requirements for the form and content of such notices.

Plaintiffs do not even ***attempt*** to argue that RCN has failed to allege an "unfair or fraudulent business practice or act" under the California UCL.  Instead, Plaintiffs hope to avoid liability by invoking meritless technicalities.  As discussed in detail below, their arguments regarding preemption, standing, and the availability of injunctive relief fail for a number of different reasons.  Moreover, given the extensive overlap in issues, it is eminently sensible to resolve these issues in this case, which will already be focused on Rightscorp's monitoring activities.

The Court should therefore deny Plaintiffs' Motion to Dismiss.

## FACTUAL BACKGROUND

*RCN and Its DMCA Policy*

RCN is a general-purpose internet service provider ("ISP") that offers internet access to customers in a number of U.S. markets.   Am. Answer & Counterclaims, ¶ 41 (ECF No. 104).   RCN merely acts as a conduit, or gateway, for access to the internet.  *Id.*, ¶ 42.   RCN does not offer any other internet-based products or services to its subscribers—it does not distribute software, host websites, or store content.  *Id.*, ¶ 43.

The DMCA, 17 U.S.C. § 512(a), provides "conduit" ISPs like RCN with a defense to copyright infringement claims in certain circumstances.   To qualify for the section 512(a) safe harbor, a conduit ISP is required, among other things, to implement a policy for terminating repeat copyright infringers "in appropriate circumstances"—which the DMCA leaves undefined.  *See* § 512(i)(1)(A).   In the industry, these policies are commonly known as "DMCA policies."

There is no law that affirmatively requires conduit ISPs to establish procedures for accepting or responding to copyright infringement allegations directed at users of its network, and the DMCA does not provide for or purport to regulate how content owners should make conduit ISPs aware of copyright infringement issues.  *See generally* 17 U.S.C. § 512.   Thus, one aspect of a DMCA

4

policy is to establish and publicly communicate how an ISP will receive and respond to such allegations.

RCN—like every other ISP, as far as RCN is aware—receives huge numbers of these accusations by email every year, in some years into the millions. *Id.*, ¶ 47. In 2016, in connection with its DMCA policy, RCN began publicly informing content owners of how to provide RCN with actionable, proper notice of an instance of alleged copyright infringement on its network. *Id.*, ¶¶ 48–51.

RCN cannot verify whether a given accusation is accurate, either practically (due to the huge volume of accusations it receives) or technically (because RCN cannot examine past activity on its network and has no right to inspect its subscribers' internet-connect devices). *Id.*, ¶¶ 49–50. Thus, so that RCN can at least give itself some comfort that a specific accusation *may* be legitimate, it has certain minimum requirements for copyright infringement notices sent by email. *Id.*, ¶ 51. Among other things, RCN requires that the email be in a PGP (Pretty Good Privacy) encryption format and digitally signed, which allows RCN to verify that the sender is who they claim to be. *Id.*, ¶¶ 51, 99. This requirement is industry-standard and is observed by virtually every entity that sends a meaningful number of such emails. *See id.*

As part of its overall DMCA policy, and subject to the above requirements, RCN has developed and implemented an automated, graduated-response DMCA

system that processes copyright infringement complaints. *Id.*, ¶ 53–55. RCN's system ingests emails regarding copyright issues, associates them with a subscriber's account, sends escalating notifications to the subscriber as threshold numbers of complaints are received, and if the complaints continue unabated, triggers permanent termination of the subscriber's account. *Id.*, ¶ 54. In discovery in this case, RCN has produced to Plaintiffs records evidencing all of the subscriber accounts that RCN has terminated pursuant to its DMCA policy.

### *Rightscorp's "System" for Detecting Copyright Infringement*

Since roughly 2011, Defendant Rightscorp, Inc. has been in the business of sending copyright infringement complaints to ISPs, including RCN, ostensibly on behalf of copyright owners. *Id.*, ¶ 67. Rightscorp's emails to ISPs regarding alleged instances of copyright infringement are generated by a software system, which Rightscorp claims can detect offers to upload copyrighted content over the peer-to-peer file sharing protocol BitTorrent. *Id.*, ¶ 65.

As initially conceived, Rightscorp's business model was to send these notices, extract small settlements (*e.g.*, $20) from accused infringers, and then split the proceeds with the copyright owners. *Id.*, ¶ 68–69. As a result, Rightscorp was incentivized to make huge numbers of accusations, and it developed a reputation for engaging in harassment and other unlawful conduct, such as making illegal robocalls to accused infringers. *Id.*, ¶¶ 69–70.

The concerns that informed RCN's DMCA policy—how to know whether a given complaint is legitimate and from a credible party—are front and center with Rightscorp.  Not a single one of Rightscorp's emails to RCN complied with RCN's DMCA policy, specifically the digital signature requirement.  *Id.*, ¶¶ 99–100.  RCN's DMCA system generated bounce-back emails that informed Rightscorp of RCN's policy, but Rightscorp simply ignored them and continued to send non-compliant emails.  *Id.*, ¶ 100.

As detailed in RCN's Counterclaims, there are also many, **many** issues with Rightscorp's system, the "notices" it generates, and the "evidence" it collects.  *See, e.g.*, *id.*, ¶¶ 76–91, 95, 101–111.  Most significantly, Rightscorp systematically destroys all of the data that would show whether an accused infringer actually possessed, *or* was willing to share, the allegedly copyrighted content identified in Rightscorp's "notices."  *Id.*, ¶¶ 82–84.  Rightscorp has also destroyed virtually every other category of data or evidence regarding the operation of its system, including (just as a few examples) evidence of how it matched allegedly infringing content with a copyrighted work (*id.*, ¶ 78), evidence of how it identified alleged infringers on RCN's network (*id.*, ¶¶ 79–81), evidence of changes to the criterion governing whether the system flagged conduct as "infringing" (*id.*, ¶¶ 85–86), and evidence of how often Rightscorp was unable to download allegedly infringing content after sending a notice of infringement (which would conclusively

7

demonstrate that the notice was false) (*id.*, ¶¶ 87–90).  Put simply, Rightscorp systematically deleted the evidence that would reveal false allegations against RCN's subscribers.  *See id.*, ¶¶ 91, 95.

As a result of its deletion efforts, the allegations that Rightscorp made against RCN's subscribers are entirely conclusory.  They contain no evidence of infringement or other verifiable information, and no evidence that the email was sent on behalf of a legitimate rights-holder or concerned a registered U.S. copyright.  *Id.*, ¶ 101–108.

### *Plaintiffs' Partnership with Rightscorp*

Internally, Plaintiffs discussed Rightscorp's efforts "to milk consumers," expressing concern that "[t]o the average user, it looks like us" and asking if there is "any way to block this activity if we don't support and don't benefit."  *Id.*, ¶ 71. Sony's Vice President of Content Protection advised that he did not "see how we can prevent this, except to prevent [Rightscorp] from giving the impression that they're doing this on [Sony's] behalf."  *Id.*  Ultimately, however, instead of speaking out or taking steps to stop Rightscorp, Plaintiffs devised a way to benefit from Rightscorp's conduct while maintaining the fiction that Rightscorp is not acting on their behalf.

In 2016, Plaintiffs entered into the first of (at least) two agreements with Rightscorp, in which Rightscorp agreed to provide Plaintiffs with infringement

"notices" Plaintiffs could use to pursue a secondary copyright infringement suit against a Texas ISP, Grande Communications.  *Id.*, ¶ 96.  Since that time, Rightscorp has continued to send copyright infringement accusations to ISPs, and has continued to destroy any underlying evidence it collected.  *See id.*  In 2019, Plaintiffs entered into another similar agreement in which Rightscorp agreed to supply Plaintiffs with the "evidence" that is the basis of this case against RCN.  *Id.* Since entering into this agreement, Rightscorp has continued to send RCN copyright notices, which Rightscorp is contractually obligated to provide to Plaintiffs for use in this case.  Despite the existence of these agreements, Rightscorp has continued to destroy all of the evidence underlying its notices.  *See id.*

These arrangements allow Plaintiffs to benefit from Rightscorp's conduct by relying on Rightscorp's accusations in court.  At the same time, Plaintiffs avoid the unsavory association with Rightscorp in the eyes of consumers, as Rightscorp is not permitted to identify Plaintiffs as the relevant content owners in its notices. Instead, Rightscorp sends its notices ostensibly on behalf of entities with overlapping copyright interests (*e.g.*, music publishers), and in many instances does not identify any copyright owner at all.  *Id.*, ¶¶ 73–75, 103–104.

At all relevant times, Plaintiffs have known that Rightscorp is spoliating evidence and is refusing to send copyright infringement complaints that comply

with RCN's DMCA policy.  *Id.*, ¶¶ 94–97, 113–114.  Rightscorp has continued to engage in this conduct with Plaintiffs' approval, in violation of Plaintiffs' duties to preserve relevant evidence, and as part of a concerted effort to inundate RCN with copyright infringement complaints that RCN has no way of verifying or meaningfully evaluating.  *See id.*

## ARGUMENT

### I.   RCN'S UCL CLAIM IS NOT PREEMPTED BY THE DMCA

As detailed above, Plaintiffs have conspired with Rightscorp to bombard RCN with copyright infringement allegations while destroying all of the evidence on which those allegations were based, making it impossible for RCN to vet the accuracy of any particular accusation.  RCN's allegations are more than sufficient to allege an "unfair or fraudulent business practice or act" under the California UCL.  Plaintiffs do not attempt to argue otherwise.

Instead, Plaintiffs argue that RCN's UCL claim is preempted by the DMCA, 17 U.S.C. § 512.  The DMCA does not contain any provision regarding preemption, and Plaintiffs therefore do not contend that there is any statutory provision that establishes preemption of RCN's UCL claim (express preemption). Nor do Plaintiffs contend that there is any actual conflict between the DMCA and the UCL (one species of implied conflict preemption) or that there is no room for state action because Congress has pervasively regulated the field (field

preemption).  *See In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, 790 F.3d 457, 476 (3d Cir. 2015) (discussing the "two distinct" types of conflict preemption); *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 348 (3d Cir. 2001) (field preemption).

Instead, Plaintiffs make the narrow argument that implied conflict preemption applies because RCN's UCL claim "stands as an obstacle" to Congress's purposes in enacting the DMCA (the second type of implied conflict preemption).  *See In re Commonwealth's Mot.*, 790 F.3d at 476.  Specifically, Plaintiffs argue that the DMCA "fully regulates the relationship between content owners and online service providers ('OSPs')—including ISPs like RCN—that operate networks on or through which copyrighted material is distributed."  Pls.' Memo. at 13.  Thus, according to Plaintiffs, RCN's exclusive remedy for Plaintiffs' unfair and fraudulent business practices is a cause of action under the DMCA, 17 U.S.C. § 512(f).  *See generally id*.

Plaintiffs are wrong, particularly in view of the strong presumption against preemption that applies here.  ***First***, Plaintiffs' preemption argument is impossible to reconcile with the Copyright Code's preemption statute, which provides that Title 17—which includes the DMCA—*only* preempts state law claims that protect rights equivalent to the rights granted by federal copyright.  *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1026 (3d Cir. 2008) ("[F]or a state-law claim to be

preempted by copyright law, it must protect (1) an exclusive right in (2) a work within copyright's subject matter."). The rights RCN is seeking to vindicate here—relief from Plaintiffs' unfair and abusive business practices—fall far outside the scope of federal copyright preemption. **Second**, conflict preemption is inapplicable in any case because the DMCA does not regulate the conduct at issue in RCN's counterclaim. While the DMCA establishes a "notice and takedown" scheme for copyright infringement notices to service providers that store content at the direction of users, that statutory framework—including the section 512(f) cause of action—does not provide for or apply to copyright infringement allegations sent to a "conduit" ISP like RCN. **Third**, RCN's counterclaim does not present any actual or potential conflict between state and federal law. *Even if* the DMCA regulated the copyright infringement accusations at issue and RCN could therefore bring a section 512(f) claim, RCN's UCL claim would still not be preempted because RCN's UCL claim is premised on different conduct and seeks different relief.

### A.  There Is a Strong Presumption against Preemption.

"When addressing questions of express or implied pre-emption," federal courts begin their "analysis with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)

(quotations & alterations omitted).  "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States."  *Id.*; *see also In re Commonwealth's Mot.*, 790 F.3d at 476 (the presumption against preemption applies unless "Congress legislates in an area of uniquely federal concern").

That is precisely the case here.  17 U.S.C. § 512(f)—the DMCA provision that Plaintiffs contend preempts RCN's UCL claim—provides for certain causes of action where a party suffers injury from relying on a "material misrepresentation" made under the DMCA's "notice and takedown" procedures.  In enacting section 512(f), Congress therefore legislated in a field historically and commonly regulated by the States: tort law, specifically the regulation of fraud and fraudulent business practices.

Accordingly, a strong presumption against preemption applies.  *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014) ("The presumption has greatest force when Congress legislates in an area traditionally governed by the States' police powers.  ***In our federal system, there is no question that States possess the traditional authority to provide tort remedies to their citizens as they see fit***.") (quotations omitted) (emphasis added); *see also, e.g.*, *In re Mercedes-Benz Emissions Litig.*, No. 2:16-cv-881, 2019 WL 413541, at *20 (D.N.J. Feb. 1, 2019) (applying presumption in finding that EPA emissions standards did not preempt state law

consumer fraud claims), *vacated on other grounds*, 797 F. App'x 695 (3d Cir. 2020); *In re Chrystler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods. Liability Litig.*, 295 F. Supp. 3d 927, 1001 (N.D. Cal. 2018) ("consumer protection" is an "area falling within the traditional powers of the state"); *Funk v. Belneftekhim*, No. 1:14-cv-376, 2018 WL 4006878, at *1 (E.D.N.Y. May 25, 2018) ("This presumption against federal law preempting state law is particularly strong when Congress legislates in a field traditionally occupied by the states, such as tort law.") (citing *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)); *Simoneau v. Stryker Corp.*, No. 3:13-cv-1200, 2014 WL 1289426, at *4 n.5 (D. Conn. Mar. 31, 2014) (presumption against preemption applied where plaintiff was seeking "relief for her injury by recourse to traditional state tort law").

In applying this presumption, "when the text of pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria*, 555 U.S. at 77 (quotations omitted). "Thus, the presumption operates both to prevent and to limit preemption." *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 489 (3d Cir. 2013) (quotations & citations omitted). "In the end, preemption applies only if it is the clear and manifest purpose of Congress in enacting the law in question." *Id.* (quotations & citation omitted).

14

**B.     The Copyright Code Forecloses Plaintiffs' Preemption Argument.**

By its express terms, the Copyright Code—Title 17 of the United States Code, which includes the DMCA—only preempts state law to the extent state law purports to grant or regulate equivalent rights in works of authorship.  17 U.S.C. § 301(a) ("On and after January 1, 1978, *all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright* as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, *are governed exclusively by this title*.")   (emphasis added).  By its plain terms, the DMCA falls outside the scope of section 301(a); the DMCA does not purport to grant or modify any such rights, and instead is principally concerned with providing *defenses* to copyright infringement claims. *See generally* 17 U.S.C. § 512.

Moreover, the Copyright Code does not only identify what state laws are preempted—it also identifies those state laws that are ***not*** preempted.  Section 301 "is not meant to 'annul or limit' any rights in works outside the subject matter of copyright under state law."  *Facenda*, 542 F.3d at 1026.  Specifically, section 301(b)(3) provides that no cause of action to vindicate a legal right—other than a right equivalent to one of the exclusive rights of a copyright owner under 17

U.S.C. § 106—is preempted by Title 17.  "In other words, for a state-law claim to be preempted by copyright law, it must protect (1) an exclusive right in (2) a work within copyright's subject matter."  *Id.*

As such, the DMCA does not preempt any state law claim as a matter of law. "Nothing ***in this title***"—Title 17, which includes the DMCA—"annuls or limits any rights or remedies under the common law or statutes of any State with respect to . . . activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 . . . ."  17 U.S.C. § 301(b)(3) (emphasis added).  While the DMCA grants certain rights to online service providers, those rights are of an entirely different character than "the exclusive rights within the general scope of copyright as specified by section 106."  Again, the DMCA is aimed at providing online service providers with additional defenses to copyright infringement claims; it does not purport to create or modify any rights in works of authorship.  Thus, section 301(b)(3) demonstrates that Congress did not intend for any part of the Copyright Code, ***other than section 106***, to preempt state law.  *See Altria*, 555 U.S. at 76 ("Our inquiry into the scope of a statute's pre-emptive effect is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case.").

Indeed, a finding that the DMCA preempts a state-law claim would read section 301(b)(3) out of the Copyright Code altogether.  At a bare minimum, in light of section 301(b)(3), it is impossible to conclude that Congress "clearly and manifestly" intended for the DMCA to preempt RCN's state-law UCL claim.  *See id.* at 77.   Such a result cannot be squared with the presumption against preemption:

> Even if Dow had offered us a plausible alternative reading of § 136v(b)—indeed, even if its alternative were just as plausible as our reading of that text—*we would nevertheless **have a duty** to accept the reading that disfavors pre-emption*.   Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action.  In areas of traditional state-law regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention "clear and manifest."

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (quotations omitted) (emphasis added).  The Court should therefore deny Plaintiffs' motion to dismiss.

## C.   Implied Conflict Preemption Is Inapplicable Because the Conduct at Issue Is Not Regulated by the DMCA.

As noted above, Plaintiffs rely on one specific type of implied conflict preemption—the type that applies where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000); Pls.' Memo. at 13–14.  Under this standard, Plaintiffs contend that RCN's

UCL claim is preempted because the DMCA provides a "comprehensive statutory framework" for regulating the respective rights of content owners and online service providers. *See, e.g.*, Pls.' Memo. at 13–14. Thus, according to Plaintiffs, if Plaintiffs and Rightscorp have engaged in fraudulent or abusive conduct in connection with the copyright infringement allegations they sent to RCN, RCN's exclusive remedy is a claim under the DMCA, 17 U.S.C. § 512(f). *See id.* at 16.

The implicit premise of Plaintiffs' argument—which Plaintiffs stop short of articulating because it is false—is that the copyright infringement allegations Rightscorp sent to RCN are provided for or regulated by the DMCA. In fact, the DMCA says nothing about whether or how a copyright owner may give notice to a section 512(a) "conduit" ISP that the ISP's customer has committed an act of copyright infringement. *See generally* 17 U.S.C. § 512.

Instead, the "notice and takedown" procedures in the DMCA, set forth in section 512(c), only pertain to notices to online service providers that store, "at the direction of a user," content "on a system or network controlled or operated by or for the service provider." *See* 17 U.S.C. § 512(c)(1). Because a section 512(c) service provider stores the allegedly infringing content, the service provider can, upon receiving the notice, identify and remove the infringing content—hence the "notice and takedown" moniker. Critically, RCN does not store user content. For

this simple reason, the "notice and takedown" provisions of the DMCA—including Section 512(f), which Plaintiffs rely on in their motion—do not apply to RCN.

Section 512(c) outlines these "notice and takedown" procedures, including detailed requirements regarding the service provider's designation of an agent to receive such notices (§ 512(c)(2)) and the content of the notices (§ 512(c)(3)). *See, e.g.*, *Stevens v. Vodka & Milk, LLC*, No. 1:17-cv-8603, 2018 WL 11222927, at *2 (S.D.N.Y. Mar. 15, 2018) ("DMCA takedown notices, and the system of which they are a part, are creations entirely of federal law."). Thus, for example, if a copyright owner identifies infringing content in a social media post on Facebook, the copyright owner can look up Facebook's designated agent under section 512(c)(2), send the agent a section 512(c)(3)-compliant "notice," and then Facebook can review the social media post and, if warranted, carry out a "takedown."

Section 512(f) provides for a cause of action where a service provider suffers injury from relying on certain types of misrepresentations in DMCA notices. That is, section 512(f) only pertains to notices ***under § 512(c)***. If a notice does not fall under section 512(c)—for example, because it does not relate to material "stored at the direction of a user"—section 512(f) does not apply because the misrepresentation is not a misrepresentation "under the DMCA." *See Rock River Commcn's, Inc. v. Universal Music Grp., Inc.*, No. 08-cv-635, 2011 WL

1598916, at *16 (N.D. Cal. Apr. 27, 2011) ("[T]he 'take down letter' at issue is not a take-down letter as described in section 512(c) because it does not address claimed infringement 'by reason of the storage at the direction of a user.'  Because the 'notification' at issue is not a notification pursuant to the DMCA, no claim under section 512(f) can stand."); *Distribuidora de Discos Karen C. por A. v. Guerra Seijas*, No. 1:13-cv-5200, 2015 WL 4496066, at *6 (S.D.N.Y. Mar. 26, 2015) ("A false take-down notice can be actionable under subsection 512(f) only when the notice is directed at activity protected by federal law.  As to this point, we are in complete agreement with *Rock River* . . . , which held that a take-down notice was 'not a notification pursuant to the DMCA' when the notice did not complain of infringement 'by reason of the storage at the direction of a user.'").[2]

As a result, there can be no conflict preemption because RCN's UCL claim is based on conduct that is not regulated by section 512(c) or (f).  In this respect, *Rock River* is directly on point.  In *Rock River*, the plaintiff attempted to bring a state-law tortious interference claim and a section 512(f) claim, based on Universal Music Group ("UMG") sending letters to music retailers, including Apple, accusing the plaintiff of copyright infringement.  2011 WL 1598916, at *12–*14.  However, because Apple's iTunes music store does not store content at the

---

[2] As the cited cases make clear, it is immaterial whether the notice *purports* to be a section 512(c) notice.  The question is whether the notice actually addresses alleged conduct within the scope of section 512(c).

direction of users—Apple decides what music to market and sell—the court accepted UMG's argument that its letter to Apple was "not a take-down letter as described in section 512(c)" and therefore "not a notification pursuant to the DMCA."[3]  *Id.* at *16.  Thus, "because the Court [found] that the DMCA is not applicable to the instant dispute, it conclude[d] that the DMCA [did] not preempt the tort action."  *Id.* at *15.

The same reasoning applies here: because RCN indisputably does not store any allegedly infringing content "at the direction of a user," Rightscorp's "notices" to RCN were not governed by sections 512(c) and (f).  Indeed, both parties' allegations make clear that Rightscorp's notices exclusively concerned BitTorrent (*i.e.*, peer-to peer sharing) activity on RCN's network—as a "conduit" ISP, RCN does not host or store any content whatsoever.  Am. Answer & Counterclaims, ¶¶ 42–43 (ECF No. 104); Am. Compl., ¶ 57–58 (ECF No. 9).  In other words, not only does RCN not store the allegedly infringing content "at the direction of a user," RCN also does not "control" or "operate" any "system or network" on which allegedly infringing content "resides."  *See id.*; *see also* § 512(c).  For these reasons, the Eighth Circuit has observed that the section 512(c) "notice and takedown" provisions do not apply to section 512(a) service providers because "the

---

[3] Obviously, the position UMG took in *Rock River*—that section 512(f) only applies to section 512(c) notices—is directly contrary to the position it is taking now.  *See* UMG's Memo. of Points & Authorities ISO Mot. for Summ. J. at 24–25 (ECF No. 295), Case No. 2:08-cv-635 (N.D. Cal.) (filed Dec. 21, 2010).

ISP has no ability to remove the infringing material from its system or disable access to the infringing material." *See In re Charter Commc'ns, Inc.*, 393 F.3d 771, 776 (8th Cir. 2005).

RCN's UCL claim regarding the sending of those notices therefore is not preempted. *See Rock River*, 2011 WL 1598916, at *15; *see also Mometrix Media, LLC v. LCR Publishing, LLC*, No. 03-17-00570, 2018 WL 6072357, at *4–*5 (Tex. Ct. App. Nov. 21, 2018) (tortious interference claim could only be preempted by the DMCA if the defendant's copyright infringement complaints were governed by section 512(c)).

In contrast, the DMCA preemption cases cited by Plaintiffs are readily distinguishable because they all involved attempts to bring state law claims regarding section 512(c) notices. *See Stevens*, 2018 WL 11222927, at *2 (collecting cases in which "courts have held that the remedial provisions of the DMCA preempt state intentional interference with contract claims based on the wrongful use of *DMCA takedown notices*") (emphasis added); *Stardock Sys., Inc. v. Reiche*, No. 4:17-cv-7025, 2019 WL 8333514, at *4 (N.D. Cal. May 14, 2019) ("[T]he DMCA provides a comprehensive notice and takedown scheme that itself regulates the submission of false infringement notices."); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. 3:10-cv-5696, 2011 WL 2690437, at *3 (N.D. Cal. July 8, 2011) (same). Indeed, in *Stevens*, the court reasoned that

preemption applied because the DMCA provides "an express remedy for the very wrong that counterclaimants here allege." *See id.* That is plainly not the case here.

In contrast, RCN is aware of *no case* in which a court found that the DMCA preempted a claim arising out of copyright infringement allegations that were not governed by section 512(c). This is because in such a case, there is no real conflict between the DMCA and the state law claim. The DMCA does not purport to regulate how rights-holders should notify section 512(a) "conduit" ISPs of copyright infringement issues, and so permitting RCN to pursue this UCL claim would in no way "frustrate" the "operation" of the DMCA or otherwise "refuse[] [the] natural effect" of its provisions. *See Crosby*, 530 U.S. at 373; *see also MD Mall*, 715 F.3d at 495 ("[T]he principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together.") (quotations & citation omitted). The Court should therefore deny Plaintiffs' motion to dismiss.

### D. Conflict Preemption Would Be Inapplicable Even If RCN Were Entitled to Bring a Section 512(f) Claim.

Even if the DMCA can preempt state law despite the plain language of section 301(b)(3), and even if the emails sent to RCN were governed by section 512(f), section 512(f) still would not preempt RCN's claim. That is because

section 512(f) only purports to regulate "material misrepresentations" made in DMCA notices, and RCN's UCL claim does not depend on proof of any specific misrepresentation in a copyright infringement allegation made by Plaintiffs and Rightscorp. *See supra* Factual Background. Rather, the thrust of RCN's claim is that Plaintiffs and Rightscorp engaged in unfair business practices by making millions of such accusations while destroying all of the evidence needed to assess their accuracy—*i.e.*, the evidence needed to *identify* specific misrepresentations.[4] *See, e.g.*, Am. Answer & Counterclaims, ¶¶ 93–97 (ECF No. 104). Because RCN's UCL claim does not require it to prove a misrepresentation in a DMCA notice, allowing RCN's claim to proceed would not frustrate or impair the effect of any provision of the DMCA. *See Crosby*, 530 U.S. at 372–73; *see also MD Mall*, 715 F.3d at 495 ("The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power.").

The relief RCN is seeking also does not pose any actual or potential conflict with the provisions of the DMCA. RCN is seeking an order enjoining Plaintiffs and Rightscorp from continuing to send copyright infringement notices to RCN without (1) complying with RCN's policy regarding the form and content

---

[4] To be sure, RCN does contend that the allegations it received contained misrepresentations, but RCN's UCL claim does not rise or fall on the existence of any material misrepresentation.

of those notices and (2) storing and preserving all evidence upon which the accusation is based.  *See* Am. Answer & Counterclaims at 51 (ECF No. 104).  This relief would not frustrate the purpose or effect of the DMCA because, again, the DMCA does not purport to regulate any aspect of copyright infringement notices sent to section 512(a) service providers regarding peer-to-peer file sharing.  In light of the strong presumption against preemption, the Court should therefore deny Plaintiffs' motion to dismiss.

## II.   RCN HAS STANDING UNDER THE UCL

As Plaintiffs acknowledge, all that is necessary for standing under the UCL is that RCN "lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204.  RCN alleges—and will show in great detail—that it has incurred, and continues to incur, costs in connection with developing, implementing, and maintaining a system capable of processing the huge volume of copyright infringement allegations sent by Plaintiffs and Rightscorp.  *See* Am. Answer & Counterclaims, ¶¶ 54–56, 117 (ECF No. 104).  RCN also alleges that it has incurred additional costs in evaluating and attempting to protect itself against this huge volume of accusations.  *Id.*, ¶ 117.  These allegations are more than sufficient to demonstrate standing, and Plaintiffs offer no authority suggesting otherwise.

Instead, Plaintiffs improperly attempt to litigate the facts by suggesting that they have never had any control over Rightscorp's sending of copyright infringement notices to RCN. *See* Pls.' Memo. at 22–24.  That notion is directly inconsistent with RCN's allegations.  Since at least 2016, Rightscorp has been sending notices to RCN with Plaintiffs' "knowledge and consent." *See, e.g.*, Am. Answer & Counterclaims, ¶¶ 13, 18, 96.  Specifically, while Plaintiffs have not allowed Rightscorp to use their names in its notices, RCN alleges that Plaintiffs and Rightscorp have been working together since at least 2016, over which time Rightscorp has sent copyright notices to RCN and other ISPs—notices that Plaintiffs contend pertain to their copyrighted works—so that Plaintiffs can assert and rely on those notices in actual and threatened litigation against RCN and others. *See id.*

These allegations plainly show Plaintiffs' "personal participation in the unlawful practices." *See People v. Toomey*, 157 Cal. App. 3d 1, 14–15 (1984); *see also PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1380 (2000) ("[P]articipation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts.").  While Plaintiffs suggest that RCN must plead that Plaintiffs had "unbridled control" over Rightscorp's activities, *Toomey* actually holds that such "unbridled control" is sufficient, but not necessary, for UCL liability.  157 Cal. App. 3d at 15 ("[I]f the evidence establishes defendant's

participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under sections 17200 and 17500 can be imposed.").

In this respect, the cases cited by Plaintiffs—neither of which concerned a motion to dismiss—are readily distinguishable. In those cases, the defendant neither participated in nor controlled the unlawful conduct. *See Emery v. VISA*, 95 Cal. App. 4th 952, 960 (2002) ("Unlike Mr. Toomey, VISA exercised no control over the preparation or distribution of the solicitations, nor did it have any relationship with the merchants who did."); *In re Firearm Cases*, 126 Cal. App. 4th 959, 985 (2005) ("It is important to emphasize that the evidence presented did not show that any defendant had actual knowledge that specific retailers were illegally supplying guns to the crime gun market or took any action to aid or encourage such activity.").

Additionally, Plaintiffs are wrong to suggest that RCN's allegations indicate that Rightscorp is not Plaintiffs' agent. Under the UCL, a principal may be liable for the unlawful conduct of its agent. *See, e.g.*, *Emery*, 95 Cal. App. 4th at 960–62. RCN's allegations that Plaintiffs have engaged Rightscorp to generate and provide evidence to support copyright infringement litigations are plainly consistent with an agency relationship. *See, e.g.*, Am. Answer & Counterclaims, ¶¶ 13, 18, 96. Moreover, in connection with a recent discovery dispute, it came to light that Plaintiffs intend to claim privilege over every communication they have had with

27

Rightscorp since 2016, on grounds that Rightscorp is their "consultant" with respect to this and another pending litigation.  *See* Pls.' Ltr re Discovery Dispute at 4–5 (ECF No. 105) ("Plaintiffs produced many communications with Rightscorp that predated Plaintiffs' retention of Rightscorp as a litigation consultant [in 2016] . . . .").  If anything, Plaintiffs' position conclusively *establishes* an agency relationship between Rightscorp and Plaintiffs.

While RCN submits that Plaintiffs' control over Rightscorp's activity cannot be evaluated at the pleading stage, RCN notes that it could and would allege more, if the Court deemed it necessary.  Specifically, RCN would allege that Plaintiffs have had, and do have, "unbridled control" over whether and to what extent Rightscorp sends copyright infringement allegations to RCN.  RCN would allege that Rightscorp is financially dependent on Plaintiffs, and that without Plaintiffs' financial assistance, Rightscorp would have been unable to continue its operations and send the notices at issue to RCN.  RCN would allege that if Plaintiffs told Rightscorp to stop sending notices to RCN regarding Plaintiffs' works, Rightscorp would obey.  RCN would allege that Rightscorp has been acting as Plaintiffs' agent at all relevant times and that Rightscorp is coordinating its efforts with Plaintiffs to advance their common goal of prevailing in the present litigation

campaign against RCN and other internet service providers.[5]  Again, RCN does not believe these additional allegations are necessary under Rule 8, but in any event, there is no real question that RCN can meet any conceivable standard with respect to Plaintiffs' direct participation in the unfair and fraudulent business practices at issue.

Plaintiffs also misconstrue RCN's allegations by suggesting that RCN is basing its injury on its legal defense costs in this case.  *See* Pls.' Memo. at 19–22. This is a strawman.  The costs RCN has incurred in evaluating and protecting itself against the accusations at issue include, *but are not limited to*, litigation costs.  *See* Am. Answer & Counterclaims, ¶ 117.  For instance, RCN has also incurred legal costs associated with evaluating the proper response to Rightscorp's notices and with respect to various discrete aspects of RCN's DMCA system.  These legal costs do not implicate *Noerr-Pennington*, as they were not connected to any pending or threatened litigation against RCN.  *See* Pls.' Memo. at 21 (citing cases in which litigation defense costs could not establish standing under the UCL).

---

[5] For example, Rightscorp continues to refuse to include PGP digital signatures on its notices of infringement.  The only rational explanation for this continued refusal by Rightscorp is the recognition any corrective action it takes at this point would de-legitimize the large number of notices it previously sent to RCN and other internet service providers—thereby fundamentally compromising Plaintiffs' infringement claims.  As another example, after another ISP brought a spoliation claim upon discovering that Rightscorp was deleting evidence of changes to its source code, Rightscorp implemented a version control system to shield Plaintiffs against such a charge.

29

In short, RCN's allegations demonstrating standing by showing that RCN "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. The Court should therefore deny Plaintiffs' motion to dismiss.

## III.   RCN HAS STATED A CLAIM FOR INJUNCTIVE RELIEF

Plaintiffs' contention that RCN has failed to plead sufficient facts to maintain a claim for injunctive relief is meritless. This is simply a rehash of Plaintiffs' baseless attempt to litigate, at the pleading stage, how much control they have over Rightscorp's conduct. *See* Pls.' Memo. at 26–27.

As set forth above, RCN alleges that Plaintiffs and Rightscorp acted in concert—and continue to act in concert—in flooding RCN with unverifiable copyright infringement allegations. *See, e.g.*, Am. Answer & Counterclaims, ¶¶ 13, 18, 96 (ECF No. 104). RCN alleges that this conduct will continue unless enjoined by the Court. *See id.*, ¶ 123–24. RCN alleges that it has suffered and continues to suffer irreparable harm, and that the balance of hardships and the public interest also weigh in favor of granting injunctive relief. *See id.*, ¶¶ 125–26. Nothing more is required at the pleading stage.

Furthermore, if anything, Plaintiffs' argument goes to whether they could be found to have violated an injunction, not whether injunctive relief should be granted. If the Court grants the requested injunction, and Rightscorp continues to send copyright infringement allegations without complying with RCN's DMCA

policy and/or preserving the underlying evidence, perhaps *then* Plaintiffs could contend that they are not in violation of the injunction because they did not control Rightscorp's conduct.  But this possibility does not foreclose the availability of injunctive relief *ab initio*.

Additionally, RCN's requested injunction is targeted at notices sent by Plaintiffs as well—not only those sent by Rightscorp.  *See* Am. Answer & Counterclaims at 51.  If the injunction were directed only at Rightscorp, then Plaintiffs could easily continue the same abusive practices by sending notices to RCN themselves and/or through a different vendor.  Thus, in this respect, it is immaterial whether or to what extent Plaintiffs can control whether Rightscorp sends copyright notices to RCN.  RCN has stated a claim to injunctive relief, and the Court should therefore deny Plaintiffs' motion to dismiss.

## IV.   IF PLAINTIFFS' MOTION TO STRIKE IS NOT MOOT, IT SHOULD BE DENIED

Plaintiffs implicitly acknowledge that if RCN's UCL claim against Plaintiffs is not dismissed, then RCN's UCL claim against Rightscorp is procedurally proper. *See* Fed. R. Civ. P. 20(a)(2)(B) ("Persons . . . may be joined in one action as defendants if . . . any question of law or fact common to all defendants will arise in the action.").  Thus, for the reasons set forth above, Plaintiffs' request to strike RCN's claim against Rightscorp should be denied as moot.

However, even if the Court were to dismiss RCN's claim as to Plaintiffs, RCN's claim against Rightscorp would be properly before this Court.  Rule 13(h) provides that "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim."  Rule 20 (Permissive Joinder of Parties) provides that "[p]ersons . . . may be joined in one action as defendants if (A) any right to relief is asserted against them . . . with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."   Fed. R. Civ. P. 20(a)(2)(A)–(B).

Here, there is no dispute that RCN's claim against Rightscorp satisfies both standards.   That is, Plaintiffs' claims against RCN are based on the same "evidence" that RCN contends was gathered through fraudulent and unfair practices that violate the California UCL.  The parties' respective claims therefore concern the same "series of transactions or occurrences," and involve many of the same legal and factual questions with respect to Rightscorp's alleged detections of copyright infringement by users of RCN's network.  Thus, permissive joinder of Rightscorp under Rule 20(a)(2) is proper.

This joinder is consistent with Rule 14, the purpose of which "is to avoid circularity of action and multiplicity of litigation." *Twin City Fire Ins. Co. v. Ovation Fund Servs., LLC*, No. 2:18-cv-14944, 2019 WL 1275060, at *2 (D.N.J.

Mar. 20, 2019) (citation omitted).  Additionally, because the claims involve the same factual issues, hearing RCN's claim against Rightscorp in this case satisfies the Federal Rules of Civil Procedure's mandate to secure the "just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  As Wright & Miller states, in determining whether to allow the joinder of parties and claims the Court is guided by the notion that the Rules are "to be read as broadly as possible whenever doing so is likely to promote judicial economy."  7 Charles Alan Wright, et al., Federal Practice & Procedure § 1653 (3d ed. 2015). Resolution of Plaintiffs' claims against RCN will necessarily require evidence of, and rulings relating to, Rightscorp's system and business practices.  Judicial economy is therefore served if RCN's claim against Rightscorp is heard in the same case as Plaintiffs' claims against RCN.  *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724 (1966) ("Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.").

In contrast, striking RCN's claim against Rightscorp would not promote judicial economy because RCN would simply refile its claim in this District[6] and

---

[6] As pleaded in RCN's Counterclaims, personal jurisdiction and venue are proper because, among other things, Rightscorp has directed its unfair and fraudulent activity toward this District.  Further, this Court would have subject matter jurisdiction over RCN's claim based on diversity jurisdiction.  RCN and Rightscorp are citizens of different states, and the amount of recovery sought by

move to consolidate the two cases, which would result in effectively the same procedural posture. Pursuant to Fed. R. Civ. P. 42(a)(2), "[i]f actions before the court involve a common question of law or fact, the court may . . . consolidate the actions . . . ." In line with Fed. R. Civ. P. 1, the purpose of consolidation is "to streamline and economize pretrial proceedings so as to avoid duplication of effort, and to prevent conflicting outcomes in cases involving similar legal and factual issues." *In re TMI Litig.*, 193 F.3d 613, 724 (3d Cir. 1999); *see also In re Mock*, 398 Fed. App'x. 716, 718 (3d Cir. 2010) (district courts have broad discretion in ordering consolidation). RCN therefore respectfully submits that consolidation would be appropriate here. *See, e.g.*, *Twin City*, 2019 WL 1275060, at *3 (refusing to sever and stay third-party claim pursuant to Rule 14, and instead consolidating the third-party claim, because "the convenience of the parties and judicial economy weigh against severing and staying the third-party action. While the two claims may present separate and distinct legal issues . . . the pertinent facts underlying the Declaratory Judgment action and the third-party claims are clearly interrelated.").

---

RCN (including the value of the case based on the injunction sought by RCN) would exceed $75,000. *See, e.g.*, *Columbia Gas Transmission Corp. v. Tarbuck*, 62 F.3d 538, 541 (3d Cir. 1995) ("Where a plaintiff in a diversity action seeks injunctive or declaratory relief . . . . , the amount in controversy is determined by the value of the object of the litigation.") (quotations & citations omitted).

Thus, in the event Plaintiffs' motion to strike is not moot, the Court should deny the request because joinder of RCN's claim against Rightscorp is proper under Rule 20 and serves the interest of judicial economy.

## V.   IF NECESSARY, LEAVE TO AMEND IS WARRANTED

For the reasons set forth above, if the Court finds that RCN has failed to allege sufficient facts to demonstrate standing under the UCL or to state a claim for injunctive relief, the Court should grant leave to amend.  Because this case is in the relatively early stages—with no depositions having been taken, no deadlines for expert discovery or dispositive motions, and no trial date—granting leave to amend is in the interests of justice.  *See* Fed. R. Civ. P. 15(a)(2).

## <u>CONCLUSION AND REQUEST FOR ORAL ARGUMENT</u>

For the foregoing reasons, the Court should deny Plaintiffs' and RIAA's Motion to Dismiss (ECF No. 122).  RCN respectfully requests that the Court hold oral argument concerning the instant Motion to Dismiss.

Dated:  December 7, 2020          */s/ Edward F. Behm, Jr*
                                  Edward F. Behm, Jr.
                                  ARMSTRONG TEASDALE LLP
                                  Attorney I.D. No. 017972002
                                  2005 Market Street
                                  29th Floor, One Commerce Square
                                  Philadelphia, PA 19103
                                  Telephone: 267.780.2000
                                  Fax: 215.405.907

                                  Richard L. Brophy (*pro hac vice*)
                                  Zachary C. Howenstine (*pro hac vice*)
                                  Margaret R. Szewczyk (*pro hac vice*)
                                  Abigail L. Twenter (*pro hac vice*)
                                  Kyle G. Gottuso (*pro hac vice*)
                                  ARMSTRONG TEASDALE LLP
                                  7700 Forsyth Blvd., Suite 1800
                                  St. Louis, Missouri 63105
                                  Telephone:  314.621.5070
                                  Fax:  314.621.5065