Edward F. Behm, Jr.
ARMSTRONG TEASDALE LLP
Attorney I.D. No. 017972002
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: 267.780.2000
Fax: 215.405.9070

Richard L. Brophy (*pro hac vice*)
Zachary C. Howenstine (*pro hac vice*)
Margaret R. Szewczyk (*pro hac vice*)
Abigail L. Twenter (*pro hac vice*)
Kyle G. Gottuso (*pro hac vice*)
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone:  314.621.5070
Fax:  314.621.5065

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UMG RECORDINGS, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>RCN TELECOM SERVICES, LLC, et al.,<br><br>Defendants.<br>and<br><br>RCN TELECOM SERVICES, LLC,<br><br>Counterclaim Plaintiff,<br><br>vs.<br><br>UMG RECORDINGS, INC., et al.,<br><br>Counterclaim Defendants;<br><br>RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.,<br><br>Counterclaim Defendant;<br><br>RIGHTSCORP, INC.,<br><br>Counterclaim Defendant. | No.  3:19-cv-17272-MAS-TJB<br><br><br>**DEFENDANTS' SECOND AMENDED ANSWER AND COUNTERCLAIMS**<br><br>**JURY TRIAL DEMANDED** |

Defendants RCN Telecom Services, LLC, RCN Telecom Services of New York, L.P., RCN Capital Corp., RCN Telecom Services of Philadelphia, LLC, RCN Telecom Services of Massachusetts, LLC, Starpower Communications, LLC, RCN Management Corporation, RCN ISP, LLC, RCN Digital Services, LLC, RCN NY LLC 1, RCN Telecom Services (Lehigh), LLC, RCN Telecom Services of Illinois, LLC, 21st Century Telecom Services, Inc., and RCN Cable TV of Chicago, Inc. (collectively, "RCN Defendants") state as follows for their Answer and Affirmative Defenses to the First Amended Complaint of Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, Sony Music Entertainment, Arista Records LLC, Arista Music, LaFace Records LLC, Sony Music Entertainment US Latin LLC, Volcano Entertainment III, LLC, Zomba Recording LLC, Atlantic Recording Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Maverick Recording Company, The All Blacks U.S.A., Inc., Warner Music Nashville LLC, Warner Records Inc., Warner Records/Sire Ventures LLC, and WEA International Inc. ("Plaintiffs").  Except to the extent expressly admitted herein, the RCN Defendants deny each and every allegation of the First Amended Complaint.  The numbered paragraphs below correspond to the numbered paragraphs in the First Amended Complaint.

1.     The RCN Defendants deny the allegations in Paragraph 1.

2.      The RCN Defendants admit that the Plaintiffs are record companies. The RCN Defendants otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 2 and therefore deny them.

3.      The RCN Defendants deny the allegations in the first two sentences of Paragraph 3.  The allegations in the third sentence of Paragraph 3 do not require a response because they pertain to a separate Defendant, Patriot, which has been dismissed from this action.

4.      The RCN Defendants deny the allegations in Paragraph 4.

5.      The RCN Defendants deny the allegations in Paragraph 5.

6.      The RCN Defendants deny the allegations in Paragraph 6.

7.      The RCN Defendants deny the allegations in Paragraph 7.

8.      The RCN Defendants deny the allegations in Paragraph 8.

9.      The RCN Defendants deny the allegations in Paragraph 9.

10.      The RCN Defendants admit that Plaintiffs have attempted to state claims under the copyright laws of the United States.  The RCN Defendants otherwise deny the allegations in Paragraph 10.

11.      The RCN Defendants admit the allegations in Paragraph 11.

12.      The RCN Defendants admit that this Court has personal jurisdiction over the RCN Defendants in this action, and that the RCN Defendants have a

corporate headquarters and other physical locations within this judicial district and division.

13.     The allegations in Paragraph 13 do not require a response because they pertain to a separate Defendant, Patriot, which has been dismissed from this action.

14.     The RCN Defendants admit that venue in this judicial district is proper.  The RCN Defendants otherwise deny the allegations in Paragraph 14.

15.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 15 and therefore deny them.

16.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 16 and therefore deny them.

17.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 17 and therefore deny them.

18.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18 and therefore deny them.

19.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19 and therefore deny them.

20.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20 and therefore deny them.

21.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 and therefore deny them.

22.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22 and therefore deny them.

23.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 and therefore deny them.

24.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24 and therefore deny them.

25.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 and therefore deny them.

26.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26 and therefore deny them.

27.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 27 and therefore deny them.

28.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 28 and therefore deny them.

29.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 29 and therefore deny them.

30.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30 and therefore deny them.

31.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 31 and therefore deny them.

32.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32 and therefore deny them.

33.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33 and therefore deny them.

34.     The RCN Defendants admit the allegations in Paragraph 34.

35.     The RCN Defendants admit the allegations in Paragraph 35.

36.     The RCN Defendants admit the allegations in Paragraph 36.

37.     The RCN Defendants admit the allegations in Paragraph 37.

38.     The RCN Defendants admit the allegations in Paragraph 38.

39.     The RCN Defendants admit the allegations in Paragraph 39.

40.     The RCN Defendants admit the allegations in Paragraph 40.

41.     The RCN Defendants admit the allegations in Paragraph 41.

42.     The RCN Defendants admit the allegations in Paragraph 42.

43.     The RCN Defendants admit the allegations in Paragraph 43.

44.     The RCN Defendants admit the allegations in Paragraph 44.

45.     The RCN Defendants admit the allegations in Paragraph 45.

46.     The RCN Defendants admit the allegations in Paragraph 46.

47.     The RCN Defendants admit the allegations in Paragraph 47.

48.     The allegations in Paragraph 48 do not require a response because they pertain to a separate Defendant, Patriot, which has been dismissed from this action.

49.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49 and therefore deny them.

50.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 50 and therefore deny them.

51.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 51 and therefore deny them.

52.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 52 and therefore deny them.

53.     The RCN Defendants state that the Copyright Act speaks for itself, and denies the allegations of Paragraph 53 to the extent they are inconsistent with the statute.

54.     The RCN Defendants state that the Copyright Act speaks for itself, and denies the allegations of Paragraph 54 to the extent they are inconsistent with the statute.

55.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 55 and therefore deny them.

56.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56 and therefore deny them.

57.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 57 and therefore deny them.

58.     The RCN Defendants admit that Rightscorp has sent copyright infringement allegations to RCN and has asked RCN to forward those allegations to subscribers.  The RCN Defendants otherwise deny the allegations in Paragraph 58.

59.     The RCN Defendants deny the allegations in Paragraph 59.

60.     The RCN Defendants deny the allegations in Paragraph 60.

61.     The RCN Defendants deny the allegations in Paragraph 61.

62.     The RCN Defendants admit the first sentence of Paragraph 62.  With respect to the remaining allegations in Paragraph 62, the RCN Defendants state that the information on RCN's website at the cited URL https://www.rcn.com/new-york/high-speed-internet/ speaks for itself, and deny the allegations in Paragraph 62 to the extent they are inconsistent with the cited material.

63.     The RCN Defendants deny the allegations in Paragraph 63.

64.     The RCN Defendants deny the allegations in Paragraph 64.

65.     The RCN Defendants deny the allegations in Paragraph 65.

66.     The RCN Defendants deny the allegations in Paragraph 66.

67.     The RCN Defendants deny the allegations in Paragraph 67.

68.     The RCN Defendants deny the allegations in the first sentence of Paragraph 68.  The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 68 and therefore deny them.

69.     The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 69 and therefore deny them.

70.     The RCN Defendants deny the allegations in Paragraph 70.

71.     The RCN Defendants deny the allegations in Paragraph 71.

72.     The RCN Defendants deny the allegations in Paragraph 72.

73.     The RCN Defendants deny the allegations in Paragraph 73.

74.     The RCN Defendants deny the allegations in Paragraph 74.

75.     The RCN Defendants deny the allegations in Paragraph 75.

76.     The RCN Defendants state that the provisions of 17 U.S.C. § 512(a) and 17 U.S.C. § 512(i)(1)(A) speak for themselves, and denies the allegations of Paragraph 76 to the extent they are inconsistent with the statute.

77.     The RCN Defendants deny the allegations in Paragraph 77.

78.     The RCN Defendants deny the allegations in Paragraph 78.

79.     The RCN Defendants state that cited order speaks for itself, and denies the allegations in Paragraph 79 to the extent they are inconsistent with that order.

80.     The RCN Defendants deny the allegations in Paragraph 80.

81.     The allegations in Paragraph 81 do not require a response because they pertain to a separate Defendant, Patriot, which has been dismissed from this action.

82.     The allegations in Paragraph 82 do not require a response because they pertain to a separate Defendant, Patriot, which has been dismissed from this action.

11

83.    The allegations in Paragraph 83 do not require a response because they pertain to a separate Defendant, Patriot, which has been dismissed from this action.

**Count One – Alleged Contributory Copyright Infringement Against RCN**

84.    The RCN Defendants incorporate by reference their foregoing responses to the preceding Paragraphs.

85.    The RCN Defendants admit that they do not have any authorization, permission, license, or consent to exploit the Copyrighted Sound Recordings (as defined in the Amended Complaint).  The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 85 and therefore deny them.

86.    The RCN Defendants deny the allegations in Paragraph 86.

87.    The RCN Defendants deny the allegations in Paragraph 87.

88.    The RCN Defendants deny the allegations in Paragraph 88.

89.    The RCN Defendants deny the allegations in Paragraph 89.

90.    The RCN Defendants deny the allegations in Paragraph 90.

91.    The RCN Defendants deny the allegations in Paragraph 91.

92.    The RCN Defendants deny the allegations in Paragraph 92.

93.    The RCN Defendants deny the allegations in Paragraph 93.

94.    The RCN Defendants deny the allegations in Paragraph 94.

95.     The RCN Defendants deny the allegations in Paragraph 95.

**Count Two – Alleged Vicarious Copyright Infringement Against RCN**

96.     The RCN Defendants incorporate by reference their foregoing responses to the preceding Paragraphs.

97.     The RCN Defendants admit that they do not have any authorization, permission, license, or consent to exploit the Copyrighted Sound Recordings (as defined in the Amended Complaint).  The RCN Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 97 and therefore deny them.

98.     The RCN Defendants deny the allegations in Paragraph 98.

99.     The RCN Defendants deny the allegations in Paragraph 99.

100.    The RCN Defendants deny the allegations in Paragraph 100.

101.    The RCN Defendants deny the allegations in Paragraph 101.

102.    The RCN Defendants deny the allegations in Paragraph 102.

103.    The RCN Defendants deny the allegations in Paragraph 103.

104.    The RCN Defendants deny the allegations in Paragraph 104.

105.    The RCN Defendants deny the allegations in Paragraph 105.

106.    The RCN Defendants deny the allegations in Paragraph 106.

107.    The RCN Defendants deny the allegations in Paragraph 107.

**Count Three – Alleged Contributory Copyright Infringement Against Patriot**

[No response is required to Paragraphs 108–120 because this is a claim against a separate Defendant, Patriot, and further because this claim has been dismissed pursuant to the Court's August 31, 2020 Order, ECF No. 89]

**Count Four – Alleged Vicarious Copyright Infringement Against Patriot
17 U.S.C. §§ 101 *et seq.***

[No response is required to Paragraphs 121–132 because this is a claim against a separate Defendant, Patriot, and further because this claim has been dismissed pursuant to the Court's August 31, 2020 Order, ECF No. 89]

## PLAINTIFFS' REQUEST FOR RELIEF

The RCN Defendants deny that Plaintiffs are entitled to any of the requested relief.

## PLAINTIFFS' JURY DEMAND

The RCN Defendants state that this Paragraph contains no allegations that require a response.

## RCN DEFENDANTS' ADDITIONAL AND AFFIRMATIVE DEFENSES

The RCN Defendants assert the following additional and affirmative defenses:

1.      The First Amended Complaint and each count thereof fail to state a claim or cause of action upon which relief can be granted.

2.      Plaintiffs' claims are barred to the extent that Plaintiffs or their predecessors did not register copyrights before alleged infringements or within three months of first publication of published works, the failure to register timely bars Plaintiffs' claims for statutory damages and attorneys' fees.

3.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

4.      Plaintiffs' claims for damages are barred, in whole or in part, by their failure to mitigate damages.

5.      Plaintiffs' claims are barred, in whole or in part, by copyright misuse.

6.      The statute of limitations, 17 U.S.C. § 507(b), bars Plaintiffs' claims to the extent Plaintiffs allege liability for instances of alleged copyright infringement that occurred more than three years before Plaintiffs filed their Complaint in this matter.

7.      17 U.S.C. § 512(a) bars Plaintiffs' claims against the RCN Defendants. As service providers, the RCN Defendants have adopted and reasonably implemented, and have informed subscribers and account holders of, a policy that provides for the termination of internet service in appropriate circumstances of subscribers and account holders alleged to be repeat copyright infringers. The RCN Defendants' policy involves an escalating series of notifications and actions based upon continued receipt of compliant allegations of

15

copyright infringement that appear to implicate a particular subscriber account, which can culminate in termination of the affected subscriber's account.  The RCN Defendants have permanently terminated the accounts of subscribers identified pursuant to this policy.  The RCN Defendants accommodate and do not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works.

8.      The RCN Defendants were not aware, and had no reason to believe, that their acts (alleged or otherwise) constituted an infringement of a copyright, and accordingly any statutory damages should be reduced pursuant to 17 U.S.C. § 504(c)(2).

## <u>RESERVATION OF RIGHTS</u>

The RCN Defendants reserve the right to add any additional defenses that discovery may reveal.

## COUNTERCLAIMS AGAINST THE RECORD LABELS,<br>THE RIAA, AND RIGHTSCORP

Defendant and Counterclaim Plaintiff RCN Telecom Services, LLC, ("RCN") hereby asserts the following counterclaims against Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, Sony Music Entertainment, Arista Records LLC, Arista Music, LaFace Records LLC, Sony Music Entertainment US Latin LLC, Volcano Entertainment III, LLC, Zomba Recording LLC, Atlantic

16

Recording Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Maverick Recording Company, The All Blacks U.S.A., Inc., Warner Music Nashville LLC, Warner Records Inc., Warner Records/Sire Ventures LLC, and WEA International Inc. (collectively, the "Record Labels"), Rightscorp, Inc. ("Rightscorp"), and the Recording Industry Association of America, Inc. ("RIAA")  (collectively, "Counterclaim Defendants") as follows:

## <u>The Nature of the Case</u>

1.      RCN's counterclaims are based on Rightscorp's, the RIAA's, and the Record Labels' unlawful, unfair, and fraudulent business practices in generating and sending millions of unsupported emails accusing RCN's customers of BitTorrent-based copyright infringement, while intentionally destroying the evidence necessary to determine whether any of those accusations were true.

2.      Counterclaim Defendants' goal is to force internet service providers ("ISPs") to treat *all* copyright infringement accusations, no matter how flimsy, as legitimate.  In a sane world, only actual, verifiable evidence of copyright infringement would provide a sufficient basis for an ISP to terminate the internet access of a customer.  But that is not the world the Record Labels and the RIAA want to live in.  Instead of actually policing their copyrights—and identifying and proving claims of direct copyright infringement—Counterclaim Defendants seek to create an environment in which ISPs, including RCN, have no choice but to

indiscriminately terminate the internet access of every customer accused of copyright infringement, or face the wrath of the Record Labels and the RIAA.  The Record Labels and the RIAA are relying on Rightscorp's copyright infringement allegations not because they are true, but because the nature and volume of the accusations allow Counterclaim Defendants to use them for the improper purpose of gaining leverage over ISPs.  The unspoken threat is RCN's reality:  accept the new copyright regime or face the cost and burden of defending against a protracted secondary copyright infringement lawsuit seeking vast sums of damages.

3.      As part of their work toward this goal, the RIAA and the Record Labels have partnered with Rightscorp to assert copyright infringement claims against RCN.  These claims are being brought by the Record Labels, who fund the RIAA's activities.

4.      The Record Labels' claims against RCN are based on emails Rightscorp sent to RCN regarding alleged instances of copyright infringement by users of its network, and allegedly infringing audio files that Rightscorp claims to have downloaded from those persons.

5.      Rightscorp's process for detecting copyright infringement is a sham built on shoddy business practices, the willful destruction of evidence, and a cavalier approach to—if not outright disregard for—the truth.

6.      Rightscorp starts with nothing more than lists of songs provided by its clients.  Rightscorp does not vet that its clients actually own rights in the songs; does not determine what its clients' copyrights (if they own any) actually cover; and does not verify that the songs are the subject of a registered U.S. copyright.

7.      Next, Rightscorp claims to obtain data enabling it to identify music files being shared over BitTorrent that are copies of the target song, and to identify BitTorrent users who are sharing those files on a particular ISP's network.  But after identifying the potential infringers, Rightscorp deletes all of the data so that no one can ever question (1) how Rightscorp actually determined that the alleged copy was in fact a copy—if it made that effort at all or (2) how it identified potential infringers on the ISP's network.

8.      Then, Rightscorp says that it connects with the potential infringers over BitTorrent and receives data demonstrating that they actually possess the target music file and are offering to share it with others.  Rightscorp deletes all of that data too, even though it is the actual evidence of copyright infringement (according to its own theory of infringement).

9.      Finally, Rightscorp sends a conclusory email to the accused infringer's ISP, representing that the accused infringer downloaded, uploaded, or offered to upload copyrighted content over BitTorrent.  Rightscorp fails to mention

that its technology is unable to detect the download or upload of files over BitTorrent.

10.     Although Rightscorp has sent ***millions*** of these emails to RCN, not a single one included any actual evidence of copyright infringement.  Rightscorp could not even be bothered to digitally sign its emails to verify its identity, even though RCN expressly requires digital signatures and has repeatedly attempted to notify Rightscorp of its noncompliance.

11.     After the fact, Rightscorp claims to "confirm" its accusations by downloading infringing content from some subset of accused infringers. Conveniently, however, Rightscorp has also destroyed: (1) all evidence of how regularly it attempted these downloads, (2) all evidence of when and from whom it downloaded the files, and (3) all evidence of when and how often its download attempts failed—*i.e.*, the instances when Rightscorp proved that its own allegations were false.

12.     As a result, neither RCN nor any of the accused infringers—RCN's customers—can test the accuracy of any of Rightscorp's copyright infringement allegations.

13.     The RIAA and the Record Labels have known all of this for years. Nevertheless, they have allowed Rightscorp to continue sending suspect emails accusing RCN's customers of copyright infringement while destroying all of the

evidence on which those accusations are based.  At the same time, the RIAA and the Record Labels have pursued copyright infringement claims against ISPs in which they benefit from Rightscorp's spoliation of evidence, because it shields their allegations of infringement from meaningful scrutiny.

14.     Counterclaim Defendants' intentional destruction of evidence that supports or contradicts millions of conclusory and unsupported accusations of copyright infringement against users of RCN's network, and their scheme to wield that evidence against RCN and others solely for monetary gain, significantly harms competition, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers and competition.  These business practices are in violation of the California Business & Professions Code § 17200 *et seq.*

15.     Additionally, Rightscorp's collection of evidence for use in court proceedings is an unlawful business practice because, on information and belief, Rightscorp and its representatives have been acting as private investigators without a license, in violation of California and New Jersey law.  And on information and belief, the RIAA and Record Labels hired Rightscorp in order to benefit from its unlawful business practices despite knowing that Rightscorp and its representatives are unlicensed.  These unlawful business practices are in violation of the California Business & Professions Code § 17200 *et seq.*

## Parties, Jurisdiction, and Venue

16.     Counterclaim Defendant Rightscorp is a Delaware corporation with a principal place of business in Santa Monica, California.

17.     This Court has personal jurisdiction over Rightscorp.  Rightscorp purports to monitor the internet activity of New Jersey residents who access the internet via the network of RCN, whose operations are headquartered in Princeton, New Jersey.  According to Rightscorp, its monitoring activities include the collection of data from New Jersey residents.  Based on these alleged monitoring activities, Rightscorp has sent millions of emails to RCN accusing users of RCN's network of copyright infringement, and those emails were received by RCN in New Jersey.  RCN's claim against Rightscorp arises out of Rightscorp's conduct in generating and sending those emails to RCN, and otherwise in aiding the Record Labels in their prosecution of their claims against RCN.

18.     Counterclaim Defendant the RIAA is a New York nonprofit corporation with a principal place of business in Washington, D.C.  The RIAA is a trade organization whose members include most of the major music companies in the United States, including the Record Labels.  According to its website, "nearly 85% of all legitimate recorded music produced and sold in the United States is created, manufactured or distributed by RIAA members."

19.     This Court has personal jurisdiction over the RIAA.  The RIAA and the Record Labels represent that the RIAA has a common interest with the Record Labels in the prosecution of their claims against RCN.  Since at least August of 2019, Rightscorp has been accusing New Jersey-based users of New Jersey-based RCN of infringing copyrights of RIAA member organizations with the RIAA's knowledge and consent, on behalf of itself and its member companies.  The Record Labels' claims in this action are based on evidence the RIAA purchased and supplied to the Record Labels, and RCN's counterclaims concern the RIAA's business practices in obtaining and authorizing the collection of this evidence, and in authorizing the destruction of other evidence bearing on the Record Labels' claims against RCN.  Additionally, in-house attorneys for RIAA have provided and are providing legal assistance to the Record Labels in connection with bringing and prosecuting their claims against RCN.  RCN's claim against the RIAA arises out of the RIAA's involvement in this action in New Jersey, including its involvement in procuring and authorizing the collection of the Rightscorp evidence on which the Record Labels' claims are based.

20.     On information and belief, Counterclaim Defendant UMG Recordings, Inc. is a Delaware corporation with its principal place of business in Santa Monica, California.

21.     On information and belief, Counterclaim Defendant Capitol Records, LLC is a Delaware limited liability company with its principal place of business in Santa Monica, California.

22.     On information and belief, Counterclaim Defendant Sony Music Entertainment is a Delaware partnership with its principal place of business in New York, New York.

23.     On information and belief, Counterclaim Defendant Arista Records LLC is a Delaware limited liability company with its principal place of business in New York, New York.

24.     On information and belief, Counterclaim Defendant Arista Music is a New York partnership with its principal place of business in New York, New York.

25.     On information and belief, Counterclaim Defendant LaFace Records LLC is a Delaware limited liability company with its principal place of business in New York, New York.

26.     On information and belief, Counterclaim Defendant Sony Music Entertainment US Latin LLC is a Delaware limited liability company with its principal place of business in New York, New York.

27.     On information and belief, Counterclaim Defendant Volcano Entertainment III, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

28.     On information and belief, Counterclaim Defendant Zomba Recording LLC is a Delaware limited liability company with its principal place of business in New York, New York.

29.     On information and belief, Counterclaim Defendant Atlantic Recording Corporation is a Delaware corporation with its principal place of business in New York, New York.

30.     On information and belief, Counterclaim Defendant Bad Boy Records LLC is a Delaware limited liability company with its principal place of business in New York, New York.

31.     On information and belief, Counterclaim Defendant Elektra Entertainment Group Inc. is a Delaware corporation with its principal place of business in New York, New York.

32.     On information and belief, Counterclaim Defendant Fueled by Ramen LLC is a Delaware limited liability company with its principal place of business in New York, New York.

33.     On information and belief, Counterclaim Defendant Maverick Recording Company is a California general partnership with its principal place of business in Los Angeles, California.

34.     On information and belief, Counterclaim Defendant The All Blacks U.S.A., Inc. is a Delaware corporation with its principal place of business in New York, New York.

35.     On information and belief, Counterclaim Defendant Warner Music Nashville LLC is a Tennessee limited liability company with its principal place of business in Nashville, Tennessee.

36.     On information and belief, Counterclaim Defendant Warner Records Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

37.     On information and belief, Counterclaim Defendant Warner Records/SIRE Ventures LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

38.     On information and belief, Counterclaim Defendant WEA International Inc. is a Delaware corporation with its principal place of business in New York, New York.

39.     This Court has personal jurisdiction over the Record Labels because they filed this lawsuit against RCN in this District and consented to jurisdiction in this Court.

40.     This is a civil action seeking injunctive relief under the California Business & Professions Code § 17200 *et seq.* based on Rightscorp's, the RIAA's, and the Record Labels' unfair and fraudulent business practices.  The Court has supplemental subject matter jurisdiction over this claim under 28 U.S.C. § 1367. RCN's claims against the Counterclaim Defendants are so related to the underlying claims asserted by the Record Labels in this action that they form part of the same case or controversy under Article III of the U.S. Constitution, and arise out of common facts, transactions, or occurrences.  Joinder of the RIAA and Rightscorp as Counterclaim Defendants in this action is proper under Rules 13 and 20 of the Federal Rules of Civil Procedure.

41.     Venue is proper under 28 U.S.C. § 1391(b) because, as detailed herein, a substantial part of the events giving rise to RCN's claim occurred in New Jersey.

### RCN's ISP Business

42.     RCN is an internet service provider ("ISP") that offers internet access to millions of customers in the United States, primarily in the northeastern United States.

43.     RCN merely acts as a conduit, or gateway, for access to the internet.

44.     RCN does not distribute software used for peer-to-peer file sharing over the internet.  RCN does not host websites that support or facilitate peer-to-peer file sharing, such as torrent websites that index or offer files used in connection with BitTorrent file-sharing.  In fact, RCN does not distribute *any* software, host *any* websites, or store *any* content on behalf of customers.

45.     Providing internet access is an essential service.  Internet access is indispensable for hundreds of millions of Americans, who rely on it to work from home, pay bills, access financial and banking information, communicate with friends and family, obtain healthcare, and attend school.  In the modern media environment, wide swathes of the population also rely on the internet for access to entertainment, including to stream music, television programs, and movies.

46.     Due to the importance of internet access, having one's internet access terminated or suspended can have severe consequences.  For example, a person who works from home may lose their job if they no longer have internet access.  In the current COVID-19 pandemic environment, students required to attend school remotely would be unable to participate without internet access.  The Supreme Court held in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) that a statute preventing individuals from accessing *only social media websites* was "a prohibition unprecedented in the scope of First Amendment speech it burdens."

47.     RCN does not supervise or control what users of its network do on the internet.  RCN does not attempt to restrict its customers' access to any specific websites or content.  RCN also does not track what websites they visit or record what content they stream or download.  If RCN did so, it would be an invasion of its customers' privacy.

## RCN's Digital Millennium Copyright Act Policy

48.     Every year, RCN receives thousands of emails—in some years, more than a million—claiming that someone using RCN's network has committed copyright infringement.

49.     RCN is committed to making reasonable efforts to prevent abuse or unlawful activity from occurring on its network.  As part of this effort, and despite serious misgivings about the manner and frequency with which accusations of copyright infringement are made, RCN implemented a Digital Millennium Copyright Act ("DMCA") policy in 2016, under which RCN has permanently terminated the internet access of many customers accused of copyright infringement.

50.     As a practical matter, RCN cannot verify the legitimacy of copyright infringement accusations it receives.  Without conducting an exhaustive, labor-intensive investigation, which may be inconclusive in any event, RCN cannot verify that the sender is who they say they are, that the sender has authority to

enforce any copyright allegedly infringed, or that the copyright at issue is valid or enforceable.

51.     Additionally, no amount of investigation would enable RCN to determine whether the infringing conduct actually occurred as alleged—for example, whether a particular internet user offered to upload a song at a particular time.  RCN only learns of the alleged infringing conduct after the fact, when it receives an accusation by email.  There is no way for RCN to examine past activity on its network to determine whether a network user possessed, shared, or offered to share a digital file with another internet user.  RCN also has no right or ability to inspect internet-connected devices on its network (*i.e.*, computers, phones, tablets, and the like) to determine whether a network user possesses or possessed specific digital content.

52.     Thus, to establish certain minimum requirements aimed at determining whether an email alleging copyright infringement *may* be legitimate, RCN's DMCA policy requires that each such email: (1) contain a physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed; (2) identify the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single email, a representative list of such works at that site; (3) identify the material that is claimed to be infringing or to be the subject of

infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material; (4) provide information reasonably sufficient to permit RCN to contact the sender; (5) contain a statement that the sender has a good faith belief that the use of the material is not authorized by the copyright owner; (6) contain a statement that the information in the email is accurate and under penalty of perjury that the sender is authorized to act on behalf of the owner; and (7) be in a PGP (Pretty Good Privacy encryption) format or a compatible standard and digitally signed to verify the identity of the sender. These requirements are posted publicly on RCN's website.

53.    These requirements are reasonable under the circumstances and, on information and belief, reflect industry-standard practices.

54.    Unless an email alleging copyright infringement meets these requirements, RCN will not consider the accusation in determining whether to take the drastic step of permanently terminating a customer's internet access.

55.    To deal with the huge volume of email RCN receives regarding alleged instances of copyright infringement, RCN designed and implemented a system for processing, cataloguing, and informing customers of such allegations ("DMCA System"). Among other things, RCN's DMCA System ingests infringement-related email, determines if the email complies with RCN's DMCA

31

policy, and attempts to associate the email with a customer account. This enables RCN to inform affected customers of copyright infringement allegations and, in certain circumstances, permanently terminate their internet access.

56.     In the event the email does not comply with RCN's DMCA policy, RCN contacts the sender of the email to inform the sender that the email was non-compliant and directs the sender to RCN's DMCA policy. Non-compliant emails are nevertheless catalogued in RCN's DMCA System.

57.     RCN has incurred—and continues to incur—substantial expense in connection with its DMCA System. The design and implementation of RCN's DMCA System required a significant investment of employee time and other resources, and there are substantial ongoing costs associated with operating and maintaining the System.

### Copyright Alert System (CAS)

58.     In July 2011, most of the major record companies, movie studios, and industry associations in the United States, and five of the largest ISPs in the United States, entered into the Copyright Alert System Memorandum of Understanding ("CAS MOU") to establish a "Copyright Alert System" ("CAS").

59.     The RIAA and the Record Labels were parties to the CAS MOU.

60.     RCN was not asked to be a party to the CAS MOU.

61.     The purpose of the CAS was to implement agreed protocols that ISPs would use when receiving and acting upon copyright infringement allegations directed at users of their networks.

62.      Pursuant to the CAS, an ISP was required to accept and process only a certain number of infringement-related emails per month, and an ISP could stop processing emails once that threshold was reached.

63.     Under the CAS, an ISP was not required to inform a given subscriber of copyright infringement allegations more than once per week, and an ISP was never required to permanently terminate a subscriber's internet access.

64.     Although the CAS MOU is no longer in place and, on information and belief, has not been replaced by any new agreement or understanding with the ISPs who signed the CAS MOU, neither the Record Labels nor any of their affiliated companies have pursued copyright infringement claims against any of those ISPs.

65.     RCN's current DMCA policy, which has been in place since 2016, is more stringent than the CAS.

### Rightscorp's Partnership with the RIAA and the Record Labels

66.     Rightscorp operates a detection system that is allegedly capable of detecting copyright infringement taking place on the Internet.  Specifically, Rightscorp claims it can identify specific BitTorrent users who are offering to share a particular piece of a copyrighted content—*e.g.*, a specific song—on the

network of a specified ISP.  Then, Rightscorp sends an email to the ISP that services the IP address associated with that activity, alleging that the ISP's customer has committed copyright infringement.

67.     Rightscorp's operations are headquartered in or around Santa Monica, California.  On information and belief, that is where all or virtually all of Rightscorp's conduct, as alleged herein, took place.

68.     Rightscorp began sending copyright infringement allegations to ISPs in or around 2011.  Since that time, Rightscorp has sent millions of emails to RCN regarding alleged instances of copyright infringement.

69.     In its emails, Rightscorp asks RCN to forward the email to the affected customer.  Rightscorp does this with knowledge that the customer and the accused infringer may be—and often are—different people.  According to Rightscorp, its emails identify the internet connection (*i.e.*, the IP address) used for the alleged infringement—for example, the IP address for the modem in a residential customer's residence.  So, for example, if an ISP forwards an accurate allegation to an affected customer after associating that IP address with a customer account, then the ISP may be notifying a customer of copyright infringement committed by the customer's roommate or family member, or by any other person able to access the customer's WiFi network.

70.     Rightscorp's emails direct the accused infringer to contact Rightscorp. Rightscorp then invites the accused infringer to "settle" the copyright infringement allegation by paying as little as $20.  On information and belief, once an accused infringer pays a small sum to settle one "claim," Rightscorp, armed with that individual's contact information, will harass them into settling more and more claims.  On information and belief, Rightscorp has obtained settlements from individuals who did not commit the alleged copyright infringement and/or despite not having authority from the copyright owner to settle the claim.  Additionally, on information and belief, Rightscorp leads accused infringers to believe that a payment will conclusively resolve the matter, when in fact there may be other rights-holders who could still assert a copyright infringement claim based on the same alleged conduct.

71.     In 2016, Rightscorp paid $450,000 to settle a class action alleging that Rightscorp made illegal robocalls to accused infringers.  In that lawsuit, Rightscorp was also accused of abuse of process, based on the sending of over one hundred legally invalid subpoenas to ISPs seeking customer information.

72.     In internal emails, employees of the Sony Record Labels discussed Rightscorp's efforts "to milk consumers," expressing concern that "[t]o the average user, it looks like us" and asking if there is "any way to block this activity if we don't support and don't benefit."  Sony's Vice President of Content Protection

advised that he did not "see how we can prevent this, except to prevent [Rightscorp] from giving the impression that they're doing this on [Sony's] behalf."

73.     In another internal email, a Special Technology Advisor responsible for content security for the Warner Record Labels took note of "Rightscorp's terrifying extortion script," which was described as "breathtaking in its sleaze."

74.     Since it was founded in or around 2011, Rightscorp has marketed its services to the RIAA on several occasions, including by submitting formal responses to requests for proposals from the RIAA.  On each occasion, the RIAA declined to hire Rightscorp to monitor ISPs' networks for infringements of the Record Labels' copyrights.

75.     Rightscorp has also marketed its services to the Record Labels directly.  The Record Labels have never hired Rightscorp to monitor ISPs' networks for infringements of their copyrights.

76.     Despite these misgivings about Rightscorp and its business practices, the RIAA entered into an agreement with Rightscorp in August of 2019 under which it is paying Rightscorp to assist the Record Labels in bringing this lawsuit against RCN.  Specifically, in exchange for payment from the RIAA, Rightscorp has provided the Record Labels with emails it sent to RCN on behalf of other

alleged rights-holders, and with audio files Rightscorp claims to have downloaded from users of RCN's network.

### Rightscorp's Spoliation of Evidence

77.     According to Rightscorp, its process for identifying alleged infringements begins with obtaining lists of songs (*i.e.*, song title and artist name) from its clients.  Rightscorp does not vet that its clients actually own rights in the songs; does not determine what its clients' copyrights (if any) actually cover; and does not verify that the songs are actually the subject of a registered U.S. copyright.

78.     Rightscorp allegedly uses those lists of songs to locate one or more publicly-available "torrents" that may include a song Rightscorp is monitoring. Rightscorp then downloads the target files to determine whether they do in fact contain the song, either manually (an employee listening to the file) or with audio fingerprinting software.

79.     Rightscorp no longer possesses the results of any analysis identifying a copy of a copyrighted work by comparing an allegedly downloaded song with an original copyrighted sound recording.  The RIAA and the Record Labels knew that when they entered into their agreement with Rightscorp to collaborate on this lawsuit against RCN.  On information and belief, Rightscorp intentionally destroyed those records.

80.     According to Rightscorp, its next step is to identify specific BitTorrent users who are participating in a "swarm" of BitTorrent users sharing a file that Rightscorp has determined is a copy of a copyrighted sound recording.  To accomplish this, Rightscorp communicates with a BitTorrent tracker that shares information about particular BitTorrent users, or "peers," that may be willing to offer one or more pieces of the file of interest.

81.     Rightscorp claims that the information provided by these trackers is how Rightscorp identifies potential infringers, including any users of RCN's network whom Rightscorp has accused of copyright infringement.

82.     Rightscorp no longer possesses any tracker information used to identify potential infringers on RCN's network.  The RIAA and the Record Labels knew that when they entered into their agreement with Rightscorp to collaborate on this lawsuit against RCN.  On information and belief, Rightscorp intentionally destroyed that data.

83.     After identifying potential infringers, Rightscorp software allegedly opens a connection with each peer to determine whether they actually possess the file of interest.  During this process, Rightscorp obtains various categories of data from the peer, including "bitfield" data that provides information about what pieces of the file (if any) reside on the peer's computer, and "choke" data that reflects whether the peer is actually willing to share the subject file.

84.     According to Rightscorp, it relies solely on bitfield data in determining whether to send a notice of alleged copyright infringement to an ISP. In other words, once Rightscorp determines (in its view) that a peer possesses some or all of the file of interest, that peer is (again, in Rightscorp's view) an infringer.  Despite receiving choke data, Rightscorp ignores that information and will therefore accuse a peer of infringement even if the peer is unwilling to share the song.

85.     Rightscorp no longer possesses bitfield or choke data corresponding to any of the emails it sent to RCN regarding alleged instances of copyright infringement.  Rightscorp intentionally destroyed all of that data.  The RIAA and the Record Labels knew that when they entered into their agreement with Rightscorp to collaborate on this lawsuit against RCN.

86.     For a period of time, Rightscorp manually executed code that caused infringement emails to be sent for every file within a torrent payload (*e.g.*, all 10 songs in a 10-song album) if the peer possessed as little as 10% of the payload. For example, a peer with one song from a 10-song torrent file, or with pieces of several different songs from a 10-song torrent file, might receive an infringement email for all 10 songs, even though the peer was specifically reporting that it did not have all ten songs or even a complete copy of a single song.  In other words, this 10% threshold could have caused—and certainly did cause—Rightscorp to

accuse a peer of downloading, sharing, or offering to share a song that the peer did not even possess.

87.     Rightscorp no longer possesses any documentary evidence or data that would confirm the period of time in which this 10% threshold was in place, or that would otherwise identify any period of time in which Rightscorp used a threshold value of less than 100%.  The RIAA and the Record Labels knew that when they entered into their agreement with Rightscorp to collaborate on this lawsuit against RCN.  On information and belief, Rightscorp intentionally destroyed that evidence and/or intentionally took steps to ensure that the use of thresholds lower than 100% was not documented.

88.     Separate from (and subsequent to) its processes for generating and sending notices to ISPs, Rightscorp contends that its system is also capable of downloading audio files directly from accused infringers.

89.     Despite claiming to have downloaded infringing audio files from users of RCN's network, Rightscorp does not possess any documentary evidence or data demonstrating when or from whom Rightscorp downloaded those files. The RIAA and the Record Labels knew that when they entered into their agreement with Rightscorp to collaborate on this lawsuit against RCN.  On information and belief, Rightscorp intentionally destroyed that evidence.

90.     Rightscorp admits that its software is not always successful when it attempts to download an allegedly infringing audio file from an accused infringer. Such a failure would occur, for example, if an accused infringer did not actually possess the target file, or if the accused infringer possessed the target file but was not offering to share it with other BitTorrent users.

91.     Rightscorp does not possess any documentary evidence or data reflecting failed download attempts.  The RIAA and the Record Labels knew that when they entered into their agreement with Rightscorp to collaborate on this lawsuit against RCN.  On information and belief, Rightscorp intentionally destroyed that evidence and/or intentionally took steps to ensure that no record was made of failed download attempts.

92.     If RCN had asked Rightscorp, the RIAA, or the Record Labels about the legitimacy of any email sent to RCN by Rightscorp, they would have been unable to provide any evidence or data obtained from the alleged infringer that formed the basis for Rightscorp's accusation of copyright infringement.

93.     The RIAA does not permit Rightscorp to send copyright infringement complaints to RCN or any other ISP in which any of the Record Labels is identified as the copyright owner.  Instead, the RIAA engages a company or business unit called MarkMonitor, now known as OpSec Security or OpSec Online, to perform services similar to those offered by Rightscorp.

94.    On information and belief, the RIAA requires MarkMonitor/OpSec to preserve certain data in the form of "evidence packages" for use in any subsequent litigation.  On information and belief, the evidence the RIAA requires MarkMonitor/OpSec to obtain and preserve includes, among other things:

   a.    The percentage of file shared;

   b.    All network packets exchanged with the target IP address during communication session;

   c.    A log of all control communication with the target; and

   d.    All bitfield data.

95.    Rightscorp did not preserve any of the information listed in the preceding paragraph in connection with its alleged detections of copyright infringement on RCN's network.  The RIAA and the Record Labels knew that when they entered into their agreement with Rightscorp to collaborate on this lawsuit against RCN.

96.    On information and belief, Rightscorp no longer possesses evidence sufficient to determine the accuracy of any individual accusation of copyright infringement it has made toward a user of RCN's network.  In other words, because of Rightscorp's destruction of or failure to preserve evidence, there is no way to know if any of its copyright infringement accusations were true.

97.     Rightscorp has been sending emails to RCN regarding alleged copyright infringement on its network with the knowledge and consent of the RIAA and the Record Labels.  This includes emails regarding alleged infringement of the works in suit and other works owned by the Record Labels.

98.     With the knowledge and consent of the RIAA and the Record Labels, Rightscorp has continued to destroy or failed to preserve all of the foregoing categories of evidence.  This knowledge and consent dates at least to 2016, when the RIAA and Rightscorp began discussing potential copyright infringement litigation against RCN.  The RIAA and Rightscorp then entered into a formal agreement regarding this litigation in 2019.  Since entering into this agreement, Rightscorp has continued to send emails to RCN regarding alleged infringement of Plaintiffs' copyrighted sound recordings, and Rightscorp has provided these emails to the Record Labels and the RIAA for use against RCN in this case.

99.     The RIAA, the Record Labels, and Rightscorp had a duty to preserve any evidence pertaining to Rightscorp's copyright infringement allegations against users of RCN's network.  Rightscorp's emails were sent to RCN in anticipation of litigation.  Rightscorp's emails threatened litigation against accused infringers and offered to settle such claims to avoid litigation, with the purported authorization of the copyright owner.  Rightscorp's destruction of this evidence violated the RIAA's, the Record Labels', and Rightscorp's duties to preserve relevant evidence.

### The Unreliability of, and Misrepresentations Contained in, Rightscorp's Copyright Infringement Emails

100.   The RIAA, the Record Labels, and Rightscorp have collaborated in seeking to force RCN to take action against its customers based on facially deficient, unverifiable, and misleading allegations of copyright infringement.

101.   None of Rightscorp's emails to RCN regarding alleged copyright infringement complied with RCN's DMCA policy.

102.   On its website (https://www.rcn.com/hub/about-rcn/policies-and-disclaimers/dmca-policy-and-procedure/), RCN informs senders of such emails that "each notification [must] be in a PGP format or a compatible standard and must be digitally signed to verify the identity of the sender."  This requirement is important because it helps ensure that the sender of the email is who they claim to be.  Other than Rightscorp, all or virtually all entities that send RCN a meaningful number of emails regarding copyright infringement issues comply with this requirement.

103.   Rightscorp was aware of the digital signature requirement in RCN's DMCA policy no later than September 2016.

104.   RCN's digital signature requirement is consistent with the provisions of version 2.0 of the Automated Content Notice System ("ACNS").  The ACNS was developed in 2003 by NBC Universal and Universal Music Group, a plaintiff in this case, to help facilitate the efficient handling of copyright infringement

notices at ISPs.  Pursuant to the ACNS, in the United States, all DMCA notices must be physically or digitally signed, and because notices are intended for automated handling, the de facto standard is a digital signature.  The ACNS also strongly recommends digital signatures as a best practice even where the DMCA does not apply.

105.   None of Rightscorp's emails to RCN complied with RCN's digital signature requirement.  As a result, Rightscorp's emails to RCN resulted in a response email from RCN informing Rightscorp that the email was non-compliant and directing Rightscorp to RCN's DMCA policy.  Rightscorp began to receive these emails from RCN in or around September of 2016.  Nevertheless, Rightscorp has continued to send RCN non-compliant email allegations to this day.

106.   Rightscorp has no legitimate, good faith reason for refusing to comply with RCN's DMCA policy.

107.   Since at least 2016, the RIAA and the Record Labels knew or should have known that none of Rightscorp's copyright infringement complaints to RCN were digitally signed, in violation of RCN's DMCA policy.  On information and belief, the RIAA, on behalf of the Record Labels, has authorized Rightscorp to continue sending copyright infringement complaints to RCN without a digital signature.

108.   Rightscorp's emails to RCN regarding alleged copyright infringement contained nothing more than conclusory allegations.  None of Rightscorp's emails contained, disclosed, or attached any evidence of copyright infringement.  None of Rightscorp's emails contained, disclosed, or attached any data or information obtained from the accused infringer.

109.   Although all of Rightscorp's emails to RCN threatened a lawsuit for damages against the accused infringer, none of Rightscorp's emails identified a copyright registration number.  Registration is a prerequisite to any copyright infringement lawsuit, and the timing of the registration can affect the remedies available to the copyright owner.

110.   On information and belief, Rightscorp never verified that a given song was the subject of a registered U.S. copyright prior to sending copyright infringement allegations to RCN that expressly threatened a lawsuit for damages.

111.   Many of Rightscorp's emails to RCN did not identify the copyright owner whose copyright Rightscorp claimed to be enforcing.  On information and belief, Rightscorp does not possess evidence that the emails it sent to RCN were sent with the authorization of the owner of a relevant copyright.  On information and belief, Rightscorp has sent such emails to RCN without the authorization of the owner of a relevant copyright.

112.   On information and belief, Rightscorp never verified that its clients actually owned any relevant copyrights prior to sending copyright infringement allegations to RCN on its clients' behalf.

113.   Rightscorp's emails to RCN, which were addressed to the alleged direct infringer, asserted that "[y]our ISP account has been used to download, upload or offer for upload copyright content . . . ."  This allegation was misleading, at best.  Rightscorp is unable to detect the download or upload of files by BitTorrent users.   Nevertheless, Rightscorp affirmatively alleged that it could (and did) detect instances of the download and upload of files.

114.   Rightscorp also represented in its emails to RCN that it "represent[s] the copyright owner" and that the email "is an offer of settlement."  These claims were likewise misleading.  Rightscorp has no way of knowing whether it represented a copyright owner, because it took no steps to determine, and had no evidence of, who owned any copyrights to the songs at issue.  At most, Rightscorp represented *a* copyright owner, whose claim Rightscorp may have had authority to settle.  But Rightscorp failed to disclose that there may be other parties with rights in the work, and therefore that a settlement with Rightscorp may not, in fact, settle the matter.

115.   Although Rightscorp's emails included an email address and telephone number for contacting Rightscorp with any questions, on information

47

and belief, Rightscorp has not monitored the corresponding email inbox and voicemail box for at least several years.

116.   On information and belief, some portion of the Rightscorp copyright infringement complaints cited in Plaintiffs' original and amended complaints are false or fraudulent.  On information and belief, the RIAA and the Record Labels knew or should have known prior to filing suit against RCN that at least some of Rightscorp evidence they are relying on is false or fraudulent.

117.   On information and belief, Rightscorp's practices of destroying evidence, and failing to make copyright infringement allegations that can be independently evaluated or subsequently verified, enabled Rightscorp to send more and more copyright infringement complaints to RCN.  In other words, because Rightscorp knew that its individual allegations could never be vetted, it was emboldened to make allegations it could never prove and allegations that it knew were false.  Thus, there is a direct relationship between Rightscorp's spoliation of evidence and the volume of copyright infringement complaints it has sent to RCN.

118.   Rightscorp's allegations are known to be unreliable, yet the RIAA and the Record Labels continue to rely on them to attempt to force RCN and other ISPs to indiscriminately terminate the accounts of accused infringers and to obtain damages in lawsuits against ISPs.

119.    Studies have shown that copyright infringement emails sent by third

parties to ISPs, including those sent by Rightscorp, are unreliable and prone to

error.  A 2016 study examined a sample of 288,675 copyright infringement notices

that were sent to online service providers between May 1, 2013, and October 31,

2013.  Jennifer Urban, et al., *Notice and Takedown in Everyday Practice* (2016)

("Urban Study") (available online at

https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID2938642_code1788303.pdf?a

bstractid=2755628&mirid=1.  The Urban Study found that 4.2% of the

infringement claims examined "were fundamentally flawed because they targeted

content that clearly did not match the identified infringed work."  *Id.* at 88.  The

Urban Study also found that 28.4% of notices that the Urban Study examined "had

characteristics that raised clear questions about their validity," including notices

with "multiple potential issues." *Id.*

120.    The sample analyzed in the Urban Study included allegations from

Rightscorp and allegations sent by or on behalf of the RIAA.

121.    The Urban Study recognized that ISPs incur costs in processing

copyright infringement allegations.  For instance, the Urban Study addressed the

fact that although Rightscorp's emails were invalid and "systematically deleted" by

ISPs, processing Rightscorp's notices "can still come at some cost."  A respondent

that reported 12 million notices a year described *manually* deleting thousands of

notices per day after individually verifying that none of them complied with the
DMCA.

122.   The RIAA, the Record Labels, and Rightscorp are aware that
Rightscorp's system can result in false positives and clear mismatches.

123.   The RIAA and the Record Labels are collaborating with Rightscorp in
bringing this case and endorsing Rightscorp's business practices, despite their prior
knowledge of Rightscorp's spoliation of evidence and the facially deficient,
unverifiable, and misleading nature of Rightscorp's copyright infringement emails.

124.   Since at least as early as 2016, the Record Labels and the RIAA knew
or should have known of all the facts set forth herein, including the fact that it is
impossible to verify the accuracy of any of Rightscorp's individual copyright
infringement complaints due to Rightscorp's destruction of evidence.  The RIAA
and the Record Labels did not attempt to prevent Rightscorp from continuing its
unfair and fraudulent business practices, and instead devised a way to benefit from
Rightscorp's conduct while maintaining the fiction that Rightscorp is not acting on
their behalf.

125.   The arrangement between the Record Labels and the RIAA on the one
hand, and Rightscorp on the other hand, allows the Record Labels and the RIAA to
benefit from RIAA's conduct by relying on Rightscorp's accusations while at the
same time avoiding any public association with Rightscorp, as Rightscorp is not

permitted to identify the Record Labels as the relevant content owners in its emails.

126.   On information and belief, since at least 2016, the Record Labels and the RIAA have had de facto control over whether Rightscorp sends copyright infringement complaints to RCN, over the nature and quantity of such complaints, and over all other Rightscorp activities aimed at identifying, obtaining, or generating evidence of alleged copyright infringement by users of RCN's network, including Rightscorp's spoliation of evidence.  On information and belief, the foregoing activities by Rightscorp have been coordinated with the RIAA and the Record Labels, to advance the RIAA's and the Record Labels' aims in this litigation.

127.   Since at least 2019, Rightscorp has been acting as an agent of the RIAA and the Record Labels with respect to Rightscorp's activities in sending copyright infringement complaints to RCN and otherwise identifying, obtaining, or generating evidence of alleged copyright infringement by users of RCN's network, to be used as evidence in this case.

128.   On information and belief, Rightscorp is financially dependent on the Record Labels and the RIAA and, without their financial assistance, Rightscorp would not have been able to continue its business operations, including but not limited to the unlawful, fraudulent, and unfair business practices described herein.

On information and belief, as a result of Rightscorp's financial dependence on the Record Labels and the RIAA, Rightscorp is subject to their unbridled control.

129.   RCN has been damaged by the conduct of Rightscorp, the RIAA, and the Record Labels, as described herein.

130.   Separate from any litigation costs, RCN has incurred legal costs from engaging outside attorneys to analyze the nature and content of Rightscorp's copyright infringement complaints, assist with the development of RCN's DMCA policy (including specifically the digital signature requirement), analyze the legal significance of Rightscorp's refusal to comply with RCN's digital signature requirement, and evaluate potential responses to Rightscorp's conduct and allegations.  This includes legal costs RCN incurred in and around 2016, years before this lawsuit was filed.  RCN would have incurred these legal costs even if it had never been involved in or threatened with litigation arising out of Rightscorp's copyright infringement complaints.

131.   RCN has also been forced to devote resources, in the form of additional employee work hours, to designing, modifying, and maintaining its DMCA System so that it is equipped to process and maintain appropriate records of Rightscorp's non-compliant copyright infringement complaints.  This includes expenditures of time and effort that would have been avoided if Rightscorp

digitally signed the copyright infringement complaints it sent to RCN, as required by RCN's DMCA policy.

132.   Additionally, RCN has incurred and continues to incur substantial legal expenses in evaluating and defending against Rightscorp's copyright infringement allegations, including its defense of the Record Labels' claims in this matter, which are based at least in part on evidence that the Record Labels, the RIAA, and Rightscorp know is false or fraudulent, or was unlawfully obtained.

### Rightscorp is Unlawfully Acting as a Private Investigator Without a License in Violation of California and New Jersey Law

133.   California Business & Professions Code § 7521 defines a private investigator as a person "who, for any consideration whatsoever . . . engages in business or accepts employment to furnish, or agrees to make, or makes, any investigation for the purpose of obtaining, information with reference to . . . [s]ecuring evidence to be used before any court, board, officer, or investigating committee."

134.   California Business and Professions Code § 7523(a) provides that, with certain exceptions not applicable to Rightscorp or any of its relevant representatives, "no person shall engage in the business of private investigator, as defined in Section 7521, unless that person has applied for and received a license to engage in that business pursuant to this chapter."

135.   Section 7523(b) provides that "[a]ny person who violates any provision of this chapter or who conspires with another person to violate any provision of this chapter, relating to private investigation licensure, or who knowingly engages a nonexempt unlicensed person is guilty of a misdemeanor punishable by a fine of five thousand dollars ($5,000) or by imprisonment in the county jail not to exceed one year, or by both that fine and imprisonment."

136.   Rightscorp has generated and sent copyright infringement complaints to RCN, and has purported to obtain copies of copyrighted content from users of RCN's network, for the purpose of investigating and obtaining purported evidence of copyright infringement to be used before the Court in this case.  Rightscorp has also engaged in substantially similar activities to provide purported evidence of copyright infringement on other ISP networks, to be used in other federal court proceedings.

137.   On information and belief, neither Rightscorp nor its relevant representatives, including Christopher Sabec, Robert Steele, Gregory Boswell, and Cecil Bond Kyte, has received a license in California to act as a private investigator with respect to the conduct of Rightscorp's operations.

138.   On information and belief, Rightscorp knew or should have known that none of its relevant representatives were licensed to engage in the business of private investigator in California.

139.    Rightscorp and/or its representatives have therefore violated California Business and Professions Code § 7523.

140.    The RIAA and the Record Labels knew or should have known that Rightscorp was acting as an unlicensed private investigator in California and New Jersey at least as early as 2016.  By partnering with Rightscorp to receive evidence from Rightscorp for use in this case, the RIAA and the Record Labels conspired to violate California Business and Professions Code § 7523 and/or knowingly engaged nonexempt unlicensed persons to conduct the business of private investigator in violation of Section 7523.

141.    The efforts of Rightscorp and its representatives to obtain and provide evidence regarding activity on RCN's network, as described herein, also constitute the unlicensed conduct of "private detective business" under New Jersey law, in violation of N.J.S.A. § 45:19-10.

142.    The RIAA and the Record Labels have endorsed and supported Rightscorp's unlicensed private investigations, and they seek to benefit from Rightscorp's unlawful behavior by using evidence obtained from Rightscorp in this case.

143.    Rightscorp, the RIAA, and the Record Labels have therefore engaged in unlawful business acts or practices in violation of California Business and Professions Code § 17200.

144.   RCN has been damaged by this conduct.  On information and belief, Rightscorp, and in turn the RIAA and the Record Labels, would not have engaged in the unfair and fraudulent business practices described herein had Rightscorp and its representatives undertaken and been subject to the training and licensure requirements for private investigators in California and/or New Jersey.  As alleged herein, these unfair and fraudulent business practices caused RCN to suffer economic injury.

### COUNT I – UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 *ET SEQ.* (Against the Record Labels, the RIAA, and Rightscorp)

145.   RCN incorporates by reference the preceding allegations.

146.   RCN asserts this claim of unfair competition against the Record Labels, the RIAA, and Rightscorp under California Business & Professions Code § 17200.

147.   As alleged herein, RCN has suffered, and continues to suffer, an injury in fact through the loss of money and property as a result of Counterclaim Defendants' unlawful, unfair, and fraudulent business practices.  Counterclaim Defendants' behavior is an immediate cause of RCN's injury.  RCN incurred legal expenses and expended additional company resources as a direct result of the conduct described herein.

148.   As alleged herein, Counterclaim Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200 *et seq.*

149.   As alleged herein, Counterclaim Defendants' unlawful, unfair, and fraudulent conduct violates the letter, policy, and spirit of one or more laws, is immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and significantly threatens or harms competition and the consuming public.

150.   As alleged herein, Counterclaim Defendants' generation of and reliance on spurious copyright infringement allegations that willfully do not comply with RCN's public DMCA policy, and corresponding destruction of all underlying evidence, has resulted and continues to result in substantial economic injury to RCN, to competition, and to the consuming public, and those injuries are not outweighed by any countervailing benefit to consumers or competition.

151.   As alleged herein, Rightscorp has been acting, and continues to act, as a private investigator without a license in violation of California and New Jersey law, with the assistance and endorsement of the RIAA and the Record Labels. Counterclaim Defendants' business practices therefore additionally constitute unlawful business practices under California Business & Professions Code § 17200 and N.J.S.A. § 45:19-10.

152.    Even if some of Rightscorp's allegations may be legitimate, Rightscorp has created a "boy who cries wolf" scenario by making an overwhelming number of allegations while intentionally refusing to comply with RCN's DMCA policy and intentionally destroying the evidence on which its allegations were purportedly based.  As a result, RCN's attention is taken away from potentially legitimate copyright infringement notifications that comply with RCN's DMCA policy.  Counterclaim Defendants' conduct knowingly poses the risk that RCN may terminate the internet access of a customer unjustly and without cause, and/or without any opportunity for RCN or the customer to meaningfully and fairly dispute the allegation.  Rightscorp's inundation of RCN with non-compliant emails draws and has drawn RCN's resources away from RCN's other business activities, resulting in economic injury.

153.    As alleged herein, the injury(ies) caused by Counterclaim Defendants' unlawful, unfair, and fraudulent conduct could not reasonably have been avoided.

154.    The unlawful, unfair, and fraudulent conduct of Counterclaim Defendants alleged herein is continuing.  RCN continues to receive copyright infringement allegations from Rightscorp with the Record Labels' and the RIAA's knowledge and consent, and there is no indication that Rightscorp will discontinue such activity in the future.  Counterclaim Defendants' unlawful, unfair, and

fraudulent business practices will continue, and will continue to injure RCN and the public, unless enjoined by the Court.

155.   RCN has suffered irreparable injury as a result of Counterclaim Defendants' conduct as alleged herein, including but not limited to continued harm to RCN's reputation and harm to the public and RCN's customers.  Remedies available to RCN other than injunctive relief are inadequate to make RCN whole and to protect RCN's reputation and other irreparable injury.

156.   If Counterclaim Defendants' unlawful, unfair, and fraudulent business practices are not enjoined, RCN and the public interest will not be served as Counterclaim Defendants will continue sending copyright infringement emails without complying with RCN's public DMCA policy or preserving the data underlying those emails, as discussed herein.  Rightscorp, with the assistance and endorsement of the RIAA and the Record Labels, will also continue to act as unlicensed private investigator.  The severe hardships RCN would be subjected to if no injunction issues against Counterclaim Defendants' business practices far outweigh any potential hardship the Counterclaim Defendants would be subjected to if RCN's requested injunction is awarded.

## REQUEST FOR RELIEF

WHEREFORE, having fully answered and having stated its Counterclaims, RCN respectfully requests that the Court enter judgment in favor of Defendants

and Counterclaim Plaintiffs and against the Plaintiffs and Counterclaim Defendants as follows:

A.  Judgment against Plaintiffs and in favor of RCN on Plaintiffs' claims set forth in Plaintiffs' First Amended Complaint and dismissal of such claims with prejudice;

B.  Judgment against Counterclaim Defendants and in favor of RCN on RCN's counterclaims set forth above;

C.  An order under California Business & Professions Code § 17203 permanently enjoining Counterclaim Defendants from sending, or consenting to, directing, or otherwise authorizing the sending of, copyright infringement allegations to RCN without (1) complying with RCN's DMCA policy with respect to each email containing an allegation of copyright infringement, (2) storing and preserving all information or data upon which such allegation is based, at least until the right to pursue any corresponding legal claim has expired, and (3) obtaining all necessary licenses to conduct the business of private investigator in all applicable jurisdictions, including California and New Jersey.

D.  Awarding RCN reasonable attorneys' fees, costs, and expenses in connection with this action; and

E.    Granting such other and further relief to RCN as the Court may deem

just and proper.

## **DEMAND FOR JURY TRIAL**

RCN requests a trial by jury on all issues so triable.

Dated:  July 20, 2021              */s/ Edward F. Behm, Jr.*
                                   Edward F. Behm, Jr.
                                   ARMSTRONG TEASDALE LLP
                                   Attorney I.D. No. 017972002
                                   2005 Market Street
                                   29th Floor, One Commerce Square
                                   Philadelphia, PA 19103
                                   Telephone: 267.780.2000
                                   Fax: 215.405.907

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the below date, I caused a true and correct copy of the foregoing SECOND AMENDED ANSWER AND COUNTERCLAIMS to be filed via the ECF system and served on all counsel of record.


Dated:  July 20, 2021                     */s/ Edward F. Behm, Jr.*
                                          Edward F. Behm, Jr.