Edward F. Behm, Jr.
ARMSTRONG TEASDALE LLP
Attorney I.D. No. 017972002
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: 267.780.2000
Fax: 215.405.9070

Richard L. Brophy (*pro hac vice*)
Zachary C. Howenstine (*pro hac vice*)
Margaret R. Szewczyk (*pro hac vice*)
Abigail L. Twenter (*pro hac vice*)
Kyle G. Gottuso (*pro hac vice*)
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone:  314.621.5070
Fax:  314.621.5065

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UMG RECORDINGS, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>RCN TELECOM SERVICES, LLC, et al.,<br><br>Defendants.<br><br>and<br><br>RCN TELECOM SERVICES, LLC,<br><br>Counterclaim Plaintiff,<br><br>vs.<br><br>UMG RECORDINGS, INC., et al.,<br><br>Counterclaim Defendants;<br><br>RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.,<br><br>Counterclaim Defendant;<br><br>RIGHTSCORP, INC.,<br><br>Counterclaim Defendant. | No.  3:19-cv-17272-MAS-TJB<br><br>**COUNTERCLAIM PLAINTIFF RCN TELECOM SERVICES, LLC'S OPPOSITION TO MOTIONS TO DISMISS (ECF NOS. 174 & 175)**<br><br>**ORAL ARGUMENT REQUESTED** |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ...............................................................................2

    A.    Rightscorp's "System" for Detecting Copyright Infringement ...........4

    B.    Plaintiffs' Partnership with Rightscorp .................................................6

ARGUMENT .......................................................................................................8

I.    RCN'S AMENDED COUNTERCLAIMS DEMONSTRATE THAT RCN
HAS STANDING UNDER THE UCL ........................................................ 8

    A.    RCN's Amended Counterclaims Remedy the Deficiencies
Identified by the Court. ........................................................................8

    B.    Plaintiffs Ignore RCN's Allegations in Claiming They Did Not
Control Rightscorp's Actions. .............................................................11

II.    RCN'S UCL CLAIMS AGAINST PLAINTIFFS ARE NOT PREEMPTED
BY THE DMCA ...................................................................................... 15

    A.    There Is a Strong Presumption against Preemption. ...........................15

    B.    The Copyright Code Forecloses Plaintiffs' Preemption
Argument. ...........................................................................................17

    C.    Implied Conflict Preemption Is Inapplicable. ....................................20

        1.    The DMCA does not comprehensively regulate the
relationship between copyright owners and ISPs. ....................20

        2.    The DMCA does not regulate the conduct at issue. .................21

III.    RCN HAS STATED A CLAIM THAT RIGHTSCORP VIOLATED THE
UCL ........................................................................................................27

    A.    RCN Has Alleged Unfair Conduct in Violation of the UCL. .............28

    B.    RCN Has Alleged Fraudulent Conduct in Violation of the UCL. ......33

    C.    RCN Has Alleged Unlawful Conduct in Violation of the UCL. ........34

IV.   RCN HAS STATED A CLAIM FOR INJUNCTIVE RELIEF AGAINST PLAINTIFFS ........................................................................... 37

V.   IF PLAINTIFFS' MOTION TO STRIKE IS NOT MOOT, IT SHOULD BE DENIED................................................................................... 38

VI.   IF NECESSARY, LEAVE TO AMEND IS WARRANTED ........................... 40

**CONCLUSION AND REQUEST FOR ORAL ARGUMENT..........................40**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A. v. Guerra Seijas*,
No. 1:13-cv-5200, 2015 WL 4496066 (S.D.N.Y. Mar. 26, 2015) ....................23

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) ..........................................................................15, 16, 17, 19

*Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*,
524 U.S. 214 (1998) ....................................................................................19

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,
No. 3:10-cv-5696, 2011 WL 2690437 (N.D. Cal. July 8, 2011) ......................25

*Arce v. Kaiser Found. Health Plan, Inc.*,
181 Cal. App. 4th 471 (2010) .......................................................................31

*Atl. Richfield Co. v. Christian*,
140 S. Ct. 1335 (2020) ................................................................................19

*Backus v. Gen. Mills, Inc.*,
122 F. Supp. 3d 909 (N.D. Cal. 2015) .............................................28, 29, 30, 31

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) ....................................................................................19

*In re Burlington Coat Factory*,
114 F.3d 1410 (3d Cir. 1997) .......................................................................33

*In re Charter Commc'ns, Inc.*,
393 F.3d 771 (8th Cir. 2005) ........................................................................24

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods.
Liability Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) ............................................................16

*Columbia Gas Transmission Corp. v. Tarbuck*,
  62 F.3d 538 (3d Cir. 1995) ................................................................40

*In re Commonwealth's Mot. to Appoint Counsel Against or Directed
  to Defender Ass'n of Philadelphia*,
  790 F.3d 457 (3d Cir. 2015) ......................................................15, 16

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000).............................................................20, 25, 26

*CTS Corp. v. Waldburger*,
  573 U.S. 1 (2014)..............................................................................16

*Emery v. VISA*,
  95 Cal. App. 4th 952 (2002) .............................................................14

*Facenda v. N.F.L. Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008) ...........................................................18

*In re Firearm Cases*,
  126 Cal. App. 4th 959 (2005) ...........................................................14

*Funk v. Belneftekhim*,
  No. 1:14-cv-376, 2018 WL 4006878 (E.D.N.Y. May 25, 2018) .......17

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000).........................................................................19

*Gianino v. Alacer Corp.*,
  No. 8:09-cv-1247, 2010 WL 11468710 (C.D. Cal. 2010)..................29

*Golan v. Pingel Enters., Inc.*,
  310 F.3d 1360 (Fed. Cir. 2002) ........................................................31

*Grace v. Apple Inc.*,
  No. 5:17-cv-551, 2017 WL 3232464 (N.D. Cal. July 28, 2017).......29

*Letizia v. Facebook Inc.*,
  267 F. Supp. 3d 1235 (N.D. Cal. 2017)............................................29

*McDonald v. Coldwell Banker*,
  543 F.3d 498 (9th Cir. 2008) ......................................................28, 30

*MD Mall Assocs., LLC v. CSX Transp., Inc.*,
  715 F.3d 479 (3d Cir. 2013) ................................................................17, 25, 26

*In re Mercedes-Benz Emissions Litig.*,
  No. 2:16-cv-881, 2019 WL 413541 (D.N.J. Feb. 1, 2019), *vacated
  on other grounds*, 797 F. App'x 695 (3d Cir. 2020) .........................................16

*In re Mock*,
  398 Fed. App'x. 716 (3d Cir. 2010) ...............................................................40

*Mometrix Media, LLC v. LCR Publishing, LLC*,
  No. 03-17-00570, 2018 WL 6072357 (Tex. Ct. App. Nov. 21,
  2018) ..........................................................................................................24

*Mosaid Techs. Inc. v. Samsung Elecs. Co.*,
  348 F. Supp. 2d 332 (D.N.J. 2004)................................................................37

*NE Hub Partners, L.P. v. CNG Transmission Corp.*,
  239 F.3d 333 (3d Cir. 2001) ..........................................................................15

*Olszewski v. Scripps Health*,
  69 P.3d 927 (Cal. 2003).................................................................................28

*Pemberton v. Nationstar Mortg. LLC*,
  331 F. Supp. 3d 1018 (S.D. Cal. 2018)......................................................29, 31

*People v. Toomey*,
  157 Cal. App. 3d 1 (1984) .............................................................................13

*Pirozzi v. Apple, Inc.*,
  966 F. Supp. 2d 909 (N.D. Cal. 2013)............................................................30

*PMC, Inc. v. Kadisha*,
  78 Cal. App. 4th 1368 (2000) ........................................................................13

*People ex rel. Renne v. Servantes*,
  86 Cal. App. 4th 1081 (Cal. Ct. App. 2001)....................................................30

*Rock River Commc'n, Inc. v. Universal Music Grp., Inc.*,
  No. 2:08-cv-635, 2011 WL 1598916 (C.D. Cal. Apr. 27, 2011) ...............22, 23

*Saunders v. Superior Court*,
  27 Cal. App. 4th 832 (1994) .....................................................................34, 37

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    622 F.3d 1035 (9th Cir. 2010) ...........................................................28

*Simoneau v. Stryker Corp.*,
    No. 3:13-cv-1200, 2014 WL 1289426 (D. Conn. Mar. 31, 2014).....................17

*Stardock Sys., Inc. v. Reiche*,
    No. 4:17-cv-7025, 2019 WL 8333514 (N.D. Cal. May 14, 2019) ....................25

*Starkey v. Covenant Care, Inc.*,
    2004 WL 206209 (Cal. Ct. App. Feb. 4, 2004) ...................................32

*State Farm Fire & Cas. Co. v. Superior Court*,
    45 Cal. App. 4th 1093 (1996), *abrogated in part by Cel-Tech*, 20
    Cal. 4th 163 ................................................................28, 33

*Steel v. City of San Diego*,
    726 F. Supp. 2d 1172 (S.D. Cal. 2010)............................................35

*Stevens v. Vodka & Milk, LLC*,
    No. 1:17-cv-8603, 2018 WL 11222927 (S.D.N.Y. Mar. 15, 2018) .............22, 25

*Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*,
    204 U.S. 426 (1907)..............................................................19

*Tine Bak LLC v. Selkatz, Inc.*,
    No. 2:20-cv-5065, 2020 WL 9074806 (C.D. Cal. Nov. 30, 2020)
    (request to remove an allegedly infringing app from Apple's App
    Store was governed by section 512(c))............................................24

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) .....................................................39

*In re Tobacco II Cases*,
    207 P.3d 20 (Cal. 2009)..........................................................34

*Twin City Fire Ins. Co. v. Ovation Fund Servs., LLC*,
    No. 2:18-cv-14944, 2019 WL 1275060 (D.N.J. Mar. 20, 2019).................39, 40

*United Mine Workers of America v. Gibbs*,
    383 U.S. 715 (1966)..............................................................39

*Venice PI, LLC v. Doe*,
No. 2:17-cv-1075 (W.D. Wash.) (attached as Ex. A)....................................35, 36

**Statutes**

17 U.S.C. § 106.................................................................................................18, 20

17 U.S.C. § 301(a)..............................................................................................17, 19

17 U.S.C. § 301(b)(3)...............................................................................................18

17 U.S.C. § 512...............................................................................................2, 15, 18, 21

17 U.S.C. § 512(c)(1)................................................................................................21

17 U.S.C. § 512(f)................................................................................16, 22, 23, 26

**Other Authorities**

Fed. R. Civ. P. 15(a)(2)............................................................................................40

Fed. R. Civ. P. 20(a)(2)(A)–(B)...............................................................................39

Fed. R. Civ. P. 20(a)(2)(B) ......................................................................................38

Fed. R. Evid. 201(b)...................................................................................................35

Rule 9(b)......................................................................................................................34

Rule 12 ...................................................................................................................9, 29

Rule 14 .................................................................................................................39, 40

Rule 20 ........................................................................................................................39

Rule 42(a)(2) ..............................................................................................................39

Rules 19 and 20 .........................................................................................................39

## **INTRODUCTION**

Plaintiffs[1] and Rightscorp, Inc. (collectively, "Counterclaim Defendants"), previously moved to dismiss RCN's counterclaims under the California Unfair Competition Law ("UCL"). The Court granted their motions on standing grounds, finding that RCN had not alleged a cognizable injury. June 30, 2021 Mem. Op. ("Mem. Op.") at 10–11 (ECF No. 159). Specifically, the Court found that "RCN [had] not alleged sufficient details for the Court to determine that [certain] 'legal costs associated with evaluating the proper response to Rightscorp's notices' were not investigation conducted in preparation for filing the present counterclaim" (which would not have been a sufficient injury, in the Court's view). *Id.* at 10–11.

RCN has now alleged facts demonstrating that the costs in question were unrelated to the present counterclaims. 2nd Am. Answer & Counterclaims ("SAAC"), ¶ 130 (ECF No. 161). RCN began to incur these costs before this lawsuit was ever filed, and the costs would have been incurred irrespective of any threatened or pending litigation. *See id.* Additionally, RCN alleges new facts showing that RCN incurred non-legal costs because of Rightscorp's refusal to digitally sign its

---

[1] Plaintiffs and Counterclaim Defendant Recording Industry Association of America, Inc. ("RIAA") are referred to collectively as "Plaintiffs" for ease of reference. Plaintiffs and RIAA jointly moved to dismiss and have not raised any argument that relies on a distinction between their respective conduct.

voluminous copyright infringement complaints, which is also a cognizable injury under the UCL.  *Id.*, ¶ 131.

Thus, RCN has cured the issue that led to the previous dismissal of its UCL counterclaims.   Counterclaim Defendants' other arguments, which the Court declined to consider in its previous order, should likewise be rejected.  The Court should therefore deny Counterclaim Defendants' motions to dismiss.

## FACTUAL BACKGROUND

RCN is a general-purpose internet service provider ("ISP") that offers internet access to customers in several U.S. markets.  SAAC, ¶ 42.  RCN merely acts as a conduit, or gateway, for access to the internet.  *Id.*, ¶ 43.  RCN does not distribute software, host websites, or store content.  *Id.*, ¶ 44.

The DMCA, 17 U.S.C. § 512(a), provides "conduit" ISPs like RCN with a defense to copyright infringement claims in certain circumstances.  To qualify for the section 512(a) safe harbor, a conduit ISP is required, among other things, to implement a policy for terminating repeat copyright infringers "in appropriate circumstances"—commonly known as a "DMCA policy."  *See* § 512(i)(1)(A).

There is no law that affirmatively requires conduit ISPs to accept or respond to copyright infringement allegations directed at users of its network, and the DMCA does not provide for or purport to regulate how content owners should make conduit ISPs aware of these issues.  *See generally* 17 U.S.C. § 512.  Thus, one aspect of a

DMCA policy is to establish and publicly communicate how an ISP will receive and respond to such allegations.

RCN—like every other ISP, as far as RCN is aware—receives huge numbers of these accusations by email every year, in some years into the millions. SAAC, ¶ 48. In 2016, in connection with its DMCA policy, RCN began publicly informing content owners of how to provide RCN with actionable, proper notice of an instance of alleged copyright infringement on its network. *Id.*, ¶¶ 49–52.

RCN cannot verify whether a given accusation is accurate, either practically (due to the huge volume of accusations it receives) or technically (because RCN cannot examine past activity on its network and has no right to inspect its subscribers' internet-connected devices). *Id.*, ¶¶ 50–51. Thus, so that RCN can at least give itself some comfort that a specific accusation *may* be legitimate, it has requirements for copyright infringement notices sent by email. *Id.*, ¶ 52. Among other things, RCN requires that the email be in a PGP (Pretty Good Privacy) encryption format and digitally signed, which allows RCN to verify that the sender is who they claim to be. *Id.*, ¶¶ 52, 102. This requirement is industry-standard, is observed by virtually every entity that sends a meaningful number of such emails, and is consistent with the provisions of the Automated Content Notice System ("ACNS"), developed by Plaintiff Universal Music Group. *Id.*, ¶¶ 52-53, 102, 104.

As part of its overall DMCA policy, and subject to the above requirements, RCN has developed and implemented an automated, graduated-response DMCA system that processes copyright infringement complaints. *Id.*, ¶ 54–56. RCN's system ingests emails regarding copyright issues, associates them with a subscriber's account, sends escalating notifications to the subscriber as threshold numbers of complaints are received, and if the complaints continue unabated, triggers permanent termination of the subscriber's account. *Id.*, ¶ 55. In discovery in this case, RCN has produced records of the subscriber accounts RCN has terminated pursuant to its DMCA policy.

## A. Rightscorp's "System" for Detecting Copyright Infringement

Since roughly 2011, Defendant Rightscorp, Inc. has been in the business of sending copyright infringement complaints to ISPs, including RCN, ostensibly on behalf of copyright owners. *Id.*, ¶ 68. Rightscorp's emails to ISPs regarding alleged instances of copyright infringement are generated by a software system, which Rightscorp claims can detect offers to upload copyrighted content over the peer-to-peer file sharing protocol BitTorrent. *Id.*, ¶ 66.

As initially conceived, Rightscorp's business model was to send these notices, extract small settlements (*e.g.*, $20) from accused infringers, and then split the proceeds with the copyright owners. *Id.*, ¶ 69–70. As a result, Rightscorp was incentivized to make huge numbers of accusations, and it developed a reputation for

engaging in harassment and other unlawful conduct, such as making illegal robocalls to accused infringers. *Id.*, ¶¶ 70–73.

The concerns that informed RCN's DMCA policy—how to know whether a given complaint is legitimate and from a credible party—are front and center with Rightscorp. None of Rightscorp's emails to RCN complied with RCN's DMCA policy, specifically the digital signature requirement, even though Rightscorp had actual knowledge of the requirement by September 2016. *Id.*, ¶¶ 101–103, 105. RCN's DMCA system generated bounce-back emails that informed Rightscorp of RCN's policy, but Rightscorp simply ignored them. *Id.*, ¶ 105.

There are also ***many*** issues with Rightscorp's system, the "notices" it generates, and the "evidence" it collects. *See, e.g.*, *id.*, ¶¶ 77–92, 96, 108–120. Most significantly, Rightscorp systematically destroys all of the data that would show whether an accused infringer actually possessed, *or* was willing to share, the allegedly copyrighted content identified in Rightscorp's "notices." *Id.*, ¶¶ 83–85. Rightscorp has also destroyed virtually every other category of data or evidence regarding the operation of its system, including (just as a few examples) evidence of how it matched allegedly infringing content with a copyrighted work (*id.*, ¶ 79), evidence of how it identified alleged infringers on RCN's network (*id.*, ¶¶ 80–82), evidence of changes to the criterion governing whether the system flagged conduct as "infringing" (*id.*, ¶¶ 86–87), and evidence of how often Rightscorp was unable to

download allegedly infringing content after sending a notice of infringement (which would conclusively demonstrate that the notice was false) (*id.*, ¶¶ 88–91). Put simply, Rightscorp systematically deleted the evidence that would reveal false allegations against RCN's subscribers. *See id.*, ¶¶ 92, 96.

Rightscorp's "notices" to RCN are also entirely conclusory. They contain no evidence of infringement, no verifiable information, and no evidence that the email was sent on behalf of a legitimate rights-holder or concerned a registered U.S. copyright. *Id.*, ¶ 108–115.

### B. Plaintiffs' Partnership with Rightscorp

Although Plaintiffs now trumpet the supposed reliability of Rightscorp's detections, internally, Plaintiffs discussed Rightscorp's efforts "to milk consumers," expressing concern that "[t]o the average user, it looks like us" and asking if there is "any way to block this activity if we don't support and don't benefit." *Id.*, ¶ 72. Sony's Vice President of Content Protection advised that he did not "see how we can prevent this, except to prevent [Rightscorp] from giving the impression that they're doing this on [Sony's] behalf." *Id.*

Yet instead of speaking out or taking steps to stop Rightscorp, Plaintiffs devised a way to benefit from Rightscorp's conduct while maintaining the fiction that Rightscorp is not acting on their behalf. Since at least 2016, Plaintiffs have been aware that Rightscorp has been sending copyright infringement accusations to RCN,

regarding Plaintiffs' copyrighted works, while destroying any underlying evidence it collected. *See id*, ¶¶ 97-98. In 2019, Plaintiffs entered into a formal agreement under which Plaintiffs paid Rightscorp to supply the "evidence" that is the basis of this case. *Id.* Since that time, Rightscorp has continued to send RCN copyright notices, which Rightscorp is contractually obligated to provide to Plaintiffs for use in this case. *Id.*, ¶ 98. Rightscorp has continued to destroy the evidence underlying its notices, with Plaintiffs' knowledge and consent. *See id.*

This arrangement allows Plaintiffs to benefit from Rightscorp's conduct by relying on Rightscorp's accusations in court. At the same time, Plaintiffs avoid the unsavory association with Rightscorp, as Rightscorp is not permitted to identify Plaintiffs as the relevant content owners in its notices. *Id.*, ¶¶ 124-125. Instead, Rightscorp sends its notices ostensibly on behalf of entities with overlapping copyright interests (*e.g.*, music publishers), and in many instances does not identify any copyright owner at all. *Id.*, ¶¶ 74–76, 110–111.

At all relevant times, Plaintiffs have known that Rightscorp is spoliating evidence and is refusing to send copyright infringement complaints that comply with RCN's DMCA policy. *Id.*, ¶¶ 95–99, 107, 122–126. Rightscorp has continued to engage in this conduct with Plaintiffs' approval, in violation of Plaintiffs' duties to preserve relevant evidence, and as part of a concerted effort to inundate RCN with

copyright infringement complaints that RCN has no way of verifying or meaningfully evaluating.  *See id.*

## ARGUMENT

I.    **RCN'S AMENDED COUNTERCLAIMS DEMONSTRATE THAT RCN HAS STANDING UNDER THE UCL**

A.    **RCN's Amended Counterclaims Remedy the Deficiencies Identified by the Court.**

The Court previously dismissed RCN's UCL claims for two reasons, both of which are directly addressed by RCN's amended allegations.

***First***, the Court found that RCN's allegations regarding costs associated with designing and maintaining its DMCA system were inadequate because RCN did not allege that "Rightscorp's infringement notifications imposed any additional costs on RCN."  Mem. Op. at 8–9.  Now, RCN specifically alleges:

> RCN has . . . been forced to devote resources, in the form of additional employee work hours, to designing, modifying, and maintaining its DMCA System so that it is equipped to process and maintain appropriate records of Rightscorp's non-compliant copyright infringement complaints.  This includes expenditures of time and effort that would have been avoided if Rightscorp digitally signed the copyright infringement complaints it sent to RCN, as required by RCN's DMCA policy.

SAAC, ¶ 131.  It is understandable and logical that RCN would incur costs from processing Rightscorp's non-compliant emails, given that Rightscorp sends huge volumes of complaints to RCN—roughly five million total, or tens of thousands per month.  *See, e.g.*, *id.*, ¶ 10; Am. Compl., ¶ 5 (ECF No. 9).  RCN also alleges new

8

facts regarding Rightscorp's refusal to comply with RCN's digital signature requirement, including that (1) Rightscorp has known of it since at least September 2016 and (2) it is a component of the Automated Content Notice System ("ACNS"), an industry standard **developed by Plaintiff Universal Music Group** for the processing of copyright infringement complaints by ISPs. SAAC, ¶¶ 103–07. Thus, RCN has alleged facts demonstrating that "Rightscorp's infringement notifications imposed . . . additional costs on RCN." Mem. Op. at 8.

Rightscorp claims this was a "self-inflicted injury," but that is no basis for dismissal. Rightscorp's Mem. at 11 (ECF No. 175-1). Under Rule 12, Rightscorp cannot dispute RCN's allegation that it incurred costs because of Rightscorp's failure to digitally sign its complaints. SAAC, ¶ 131. Rightscorp also cannot dispute that it has willfully refused to comply with RCN's policy since 2016, that Plaintiffs promoted the need for copyright complaints to be digitally signed, or that virtually every other sender of copyright complaints uses digital signatures to verify their identity. *Id.*, ¶¶ 101–06. Rightscorp offers no authority indicating that these facts are insufficient to support a UCL claim as a matter of law.

**Second**, applying the principle that "the *Noerr-Pennington* doctrine precludes litigation costs as a basis for UCL standing," the Court previously found that RCN had "not alleged sufficient details for the Court to determine that [its] 'legal costs associated with evaluating the proper response to Rightscorp's notices' were not

investigation conducted in preparation for filing the present counterclaim." Mem.

Op. at 10–11.  Now, RCN specifically alleges:

> Separate from any litigation costs, RCN has incurred legal costs from engaging outside attorneys to analyze the nature and content of Rightscorp's copyright infringement complaints, assist with the development of RCN's DMCA policy (including specifically the digital signature requirement), analyze the legal significance of Rightscorp's refusal to comply with RCN's digital signature requirement, and evaluate potential responses to Rightscorp's conduct and allegations.  This includes legal costs RCN incurred in and around 2016, years before this lawsuit was filed.  RCN would have incurred these legal costs even if it had never been involved in or threatened with litigation arising out of Rightscorp's copyright infringement complaints.

SAAC, ¶ 130.  In other words, RCN expressly alleges facts demonstrating that these

legal costs (1) were directly caused by the business practices at issue in RCN's

counterclaims, (2) were not related to the filing of RCN's counterclaims, and (3)

were not related to any litigation whatsoever, and would have been incurred

irrespective of whether any litigation subsequently ensued.  *See id.*  Thus, RCN's

new allegations make clear that these legal costs "were not investigation conducted

in preparation for filing the present counterclaim."  Mem. Op. at 10–11.

Considering these allegations, Counterclaim Defendants' arguments for

dismissal are meritless.  Rightscorp is wrong that RCN has simply alleged that it

incurred "pre-litigation expenses" (Rightscorp's Mem. at 9–10)—RCN alleges that

it would have incurred these costs irrespective of any subsequent litigation.  SAAC,

¶ 130.   Rightscorp is likewise wrong that these alleged costs are not "due to Rightscorp's alleged misconduct in particular" (Rightscorp's Mem. at 10)—among other things, RCN clearly alleges that the costs arose from "analyz[ing] . . . Rightscorp's copyright infringement complaints," "Rightscorp's refusal to comply with RCN's digital signature requirement," and "evaluat[ing] potential responses to Rightscorp's conduct and allegations."  SAAC, ¶ 130.  Additionally, there is a direct connection between these injuries and Rightscorp's spoliation of evidence, in that Rightscorp was emboldened to send so many complaints to RCN precisely because it knew its allegations could never be vetted.  *Id.*, ¶ 117.

In sum, RCN has alleged facts demonstrating that (1) "Rightscorp's infringement notifications imposed . . . additional costs on RCN" and (2) RCN's alleged legal costs "were not investigation conducted in preparation for filing the present counterclaim."  Mem. Op. at 8–11.  RCN has therefore stated claims under the UCL.

### B.   Plaintiffs Ignore RCN's Allegations in Claiming They Did Not Control Rightscorp's Actions.

In its previous Memorandum Opinion, the Court declined to consider Plaintiffs' argument that RCN's injuries are not attributable to Plaintiffs because Rightscorp ostensibly sent copyright complaints to RCN on behalf of other

rightsholders.[2]  Plaintiffs' argument was meritless the first time, and it is even less so now, considering the new allegations in RCN's amended counterclaims.

RCN alleges numerous facts regarding Plaintiffs' control over and participation in Rightscorp's unlawful, unfair, and fraudulent business practices:

- "On information and belief,[3] since at least 2016, the Record Labels and the RIAA have had de facto control over whether Rightscorp sends copyright infringement complaints to RCN, over the nature and quantity of such complaints, and over all other Rightscorp activities aimed at identifying, obtaining, or generating evidence of alleged copyright infringement by users of RCN's network, including Rightscorp's spoliation of evidence."  SAAC, ¶ 126.

- "Since at least 2019, Rightscorp has been acting as an agent of the RIAA and the Record Labels with respect to Rightscorp's activities in sending copyright infringement complaints to RCN and otherwise identifying, obtaining, or generating evidence of alleged copyright infringement by users of RCN's network, to be used as evidence in this case."  *Id.*, ¶ 127.

- "On information and belief, Rightscorp is financially dependent on the Record Labels and the RIAA and, without their financial assistance, Rightscorp would not have been able to continue its business operations, including but not limited to the unlawful, fraudulent, and unfair business practices described herein.  On information and belief, as a result of Rightscorp's financial dependence on the Record Labels and the RIAA, Rightscorp is subject to their unbridled control."  *Id.*, ¶ 128.

- "Rightscorp has been sending emails to RCN regarding alleged copyright infringement on its network with the knowledge and consent of [Plaintiffs].

---

[2] RCN has repeatedly pressed Rightscorp to produce evidence that it had authority from a copyright owner to send the complaints at issue.  Rightscorp has agreed to produce any such evidence that exists but to date it has produced nothing.

[3] RCN makes certain allegations regarding the relationship between Plaintiffs and Rightscorp on information and belief.  This is because the parties have not yet taken any depositions, and Plaintiffs and Rightscorp are withholding every substantive communication between them on privilege grounds.

This includes emails regarding alleged infringement of the works in suit and other works owned by [Plaintiffs]." *Id.*, ¶ 97.

- Since entering into a formal agreement with Plaintiffs regarding this litigation in 2019, "Rightscorp has continued to send emails to RCN regarding alleged infringement of Plaintiffs' copyrighted sound recordings, and Rightscorp has provided these emails to [Plaintiffs] for use against RCN in this case." *Id.*, ¶ 98.

- Due to the relationship between Plaintiffs and Rightscorp, Plaintiffs had an independent duty to preserve evidence pertaining to Rightscorp's copyright infringement complaints, which were sent in anticipation of litigation and with Plaintiffs' knowledge. *Id.*, ¶ 99.

- "On information and belief, [Plaintiffs] authorized Rightscorp to continue sending copyright infringement complaints to RCN without a digital signature." *Id.*, ¶ 107.

- Since at least 2016, Plaintiffs have known that Rightscorp was spoliating evidence yet did nothing to prevent it, despite having the ability to do so. *Id.*, ¶¶ 123–24.

These allegations are more than sufficient to show Plaintiffs' "personal participation in the unlawful practices." *See People v. Toomey*, 157 Cal. App. 3d 1, 14–15 (1984); *see also PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1380 (2000) ("[P]articipation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts."). While Plaintiffs suggest that RCN must plead that Plaintiffs had "unbridled control" over Rightscorp's activities, *Toomey* actually holds that such "unbridled control" is sufficient, but not necessary, for UCL liability. 157 Cal. App. 3d at 15 ("[I]f the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under sections 17200 and 17500 can be imposed.").

In any event, RCN *does* now allege that Plaintiffs had "unbridled control" over Rightscorp's activities.  SAAC, ¶¶ 126, 128.

The cases cited by Plaintiffs—neither of which concerned a motion to dismiss—do not suggest that RCN has failed to state a claim.  In those cases, the defendant neither participated in nor controlled the unlawful conduct.  *See Emery v. VISA Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002) ("Unlike Mr. Toomey, VISA exercised no control over the preparation or distribution of the solicitations, nor did it have any relationship with the merchants who did."); *In re Firearm Cases*, 126 Cal. App. 4th 959, 985 (2005) ("It is important to emphasize that the evidence presented did not show that any defendant had actual knowledge that specific retailers were illegally supplying guns to the crime gun market or took any action to aid or encourage such activity.").

Additionally, under the UCL, a principal may be liable for the unlawful conduct of its agent.  *See, e.g.*, *Emery*, 95 Cal. App. 4th at 960–62.  RCN expressly alleges that Rightscorp is and has been Plaintiffs' agent.  SAAC, ¶ 127; *see also* ¶¶ 97–98 & 126 (alleging that Rightscorp sent copyright complaints to RCN, regarding works owned by Plaintiffs, with Plaintiffs' knowledge and consent and subject to Plaintiffs' control).  Moreover, Plaintiffs are claiming privilege over virtually every communication they have had with Rightscorp since 2016, on grounds that Rightscorp is their "consultant" with respect to this and another pending litigation.

14

*See* Pls.' Ltr re Discovery Dispute at 4–5 (ECF No. 105).  This further shows an agency relationship between Rightscorp and Plaintiffs.  The Court should therefore deny Plaintiffs' motion.

## II.   RCN'S UCL CLAIMS AGAINST PLAINTIFFS ARE NOT PREEMPTED BY THE DMCA

Rightscorp concedes that RCN's claim against Rightscorp is not preempted by the DMCA, 17 U.S.C. § 512.  Rightscorp did not move to dismiss RCN's UCL claim on preemption grounds and did not otherwise join Plaintiffs' request for dismissal on that basis.  *See generally* Rightscorp's Memo. (ECF No. 175-1).

Nevertheless, Plaintiffs rehash their old preemption argument, which the Court previously declined to consider.  Mem. Op. at 11.  Specifically, Plaintiffs make the narrow argument that implied conflict preemption applies because RCN's UCL claim "stands as an obstacle" to Congress's purposes in enacting the DMCA.[4]  *See* Pls.' 1st Mem. at 13 (ECF No. 122-1).  Plaintiffs are wrong for several reasons.

### A.   There Is a Strong Presumption against Preemption.

"When addressing questions of express or implied pre-emption," federal courts begin their "analysis with the assumption that the historic police powers of

---

[4] Plaintiffs do not rely on express preemption, field preemption, or the type of implied conflict preemption that arises where there is a conflict between state and federal law.  *See In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, 790 F.3d 457, 476 (3d Cir. 2015); *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 348 (3d Cir. 2001).

the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up).  This presumption against preemption "applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Id.*; *see also In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 476 (3d Cir. 2015).

The presumption applies here.  17 U.S.C. § 512(f)—the DMCA provision that Plaintiffs contend preempts RCN's claim—provides for certain causes of action where a party suffers injury from relying on a "material misrepresentation" made under the DMCA's procedures.  Thus, in enacting section 512(f), Congress legislated in a field historically and commonly regulated by the states: tort law, specifically the regulation of fraud and fraudulent business practices.

Indeed, because tort law is so clearly a field regulated by the states, Plaintiffs bear an exceedingly heavy burden to demonstrate that section 512(f) preempts the California UCL.  *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014) ("The presumption has greatest force when Congress legislates in an area traditionally governed by the States' police powers. ***In our federal system, there is no question that States possess the traditional authority to provide tort remedies to their citizens as they see fit***.") (cleaned up) (emphasis added); *In re Mercedes-Benz Emissions Litig.*, No. 2:16-cv-881, 2019 WL 413541, at *20 (D.N.J. Feb. 1, 2019) (applying

16

presumption in finding that EPA emissions standards did not preempt state consumer fraud claims), *vacated on other grounds*, 797 F. App'x 695 (3d Cir. 2020); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1001 (N.D. Cal. 2018) ("consumer protection" is an "area falling within the traditional powers of the state"); *Funk v. Belneftekhim*, No. 1:14-cv-0376, 2018 WL 4006878, at *1 (E.D.N.Y. May 25, 2018) ("This presumption against federal law preempting state law is particularly strong when Congress legislates in a field traditionally occupied by the states, such as tort law."); *Simoneau v. Stryker Corp.*, No. 3:13-cv-1200, 2014 WL 1289426, at *4 n.5 (D. Conn. Mar. 31, 2014) (applying presumption where plaintiff was seeking "relief for her injury by recourse to traditional state tort law").

In applying this presumption, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria*, 555 U.S. at 77 (cleaned up). "In the end, preemption applies only if it is the clear and manifest purpose of Congress in enacting the law in question." *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 489 (3d Cir. 2013) (cleaned up).

## B. The Copyright Code Forecloses Plaintiffs' Preemption Argument.

By its express terms, the Copyright Code—Title 17, which includes the DMCA—only preempts state law to the extent state law purports to grant or regulate

equivalent rights in works of authorship.   17 U.S.C. § 301(a) ("[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by this title.").   The DMCA therefore has no preemptive effect; it does not purport to grant or modify any such rights, and instead is principally concerned with providing *defenses* to copyright infringement claims.  *See generally* 17 U.S.C. § 512.

Moreover, section 301(b)(3) expressly provides that state laws regarding non-copyright matters, like the California UCL, are ***not*** preempted.  Section 301 "is not meant to 'annul or limit' any rights in works outside the subject matter of copyright under state law." *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1026 (3d Cir. 2008). In other words, no cause of action to vindicate a legal right—other than a right equivalent to one of the exclusive rights of a copyright owner under 17 U.S.C. § 106—is preempted by Title 17.  *Id.* ("[F]or a state-law claim to be preempted by copyright law, it must protect (1) an exclusive right in (2) a work within copyright's subject matter.").

While section 512 extends certain copyright infringement *defenses* to online service providers, those rights are of an entirely different character than "the exclusive rights within the general scope of copyright as specified by section 106." 17 U.S.C. § 301(b)(3).  Unlike section 106, section 512 does not purport to create or modify any rights in works of authorship.

Indeed, a finding that the DMCA preempts a state-law claim would read section 301(b)(3) out of the Copyright Code altogether.  At a bare minimum, the existence of section 301(b)(3) forecloses the conclusion that Congress "clearly and manifestly" intended for the DMCA to preempt RCN's state-law UCL claim.  *Altria*, 555 U.S. at 77; *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) ("Even if Dow had offered us a plausible alternative reading of § 136v(b)—indeed, even if its alternative were just as plausible as our reading of that text—we would nevertheless have a duty to accept the reading that disfavors pre-emption.").

Plaintiffs misstate the law in claiming that savings clauses like section 301(b) are irrelevant to conflict preemption.  ***First***, as discussed above, the preemptive reach of 17 U.S.C. § 301(a) does not touch state law tort claims like RCN's UCL claim. Thus, RCN's UCL claim is not preempted, irrespective of the savings clauses in section 301(b).  ***Second***, in the cases cited by Plaintiffs—unlike this one—a lack of preemption would have fundamentally undermined the federal statute.  *See Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1355 (2020) (absence of preemption would "prove absolutely inconsistent with the provisions of the act in which [the savings clause is] found.") (cleaned up); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870 (2000) ("would upset the careful regulatory scheme established by federal law"); *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 227 (1998) ("would be absolutely inconsistent with the provisions of the act"); *Tex. & Pac. Ry.*

*Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446 (1907) (same).  Here, allowing RCN to pursue a UCL in no way undermines the rights and remedies afforded by the DMCA.  Furthermore, none of the cited cases indicate that courts are prohibited from considering a savings clause when determining whether Congress clearly intended for the statute to have preemptive effect.  The Court should therefore deny Plaintiffs' motion.

### C.   Implied Conflict Preemption Is Inapplicable.

#### 1.   The DMCA does not comprehensively regulate the relationship between copyright owners and ISPs.

Plaintiffs rely on one specific type of implied conflict preemption—the type that applies where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000); Pls.' 1st Mem. at 13–14 (ECF No. 122-1).  Under this standard, Plaintiffs contend that RCN's UCL claim is preempted because the DMCA constitutes "comprehensive federal regulation of the relationship between copyright owners and [ISPs] . . . that operate networks on or through which copyrighted material is distributed online."  Pls.' Mem. at 11 (ECF No. 174-1).

It is obvious that the DMCA does not "comprehensively regulate" the relationship between ISPs and copyright owners.  In this case, Plaintiffs are suing RCN for copyright infringement ***under 17 U.S.C. § 106***, not for violations of the

DMCA.  In other words, the rights Plaintiffs are asserting against RCN do not arise under the DMCA.  Thus, there are plainly laws other than the DMCA that govern the respective rights of Plaintiffs and RCN, specifically as to copyright matters.

2.    <u>The DMCA does not regulate the conduct at issue.</u>

RCN's counterclaims concern the copyright infringement complaints that Rightscorp, acting in concert with Plaintiffs, sent to RCN.  The DMCA does not purport to regulate those sorts of complaints.  Specifically, the DMCA says nothing about whether or how a copyright owner may give notice to a section 512(a) "conduit" ISP that the ISP's customer has committed an act of copyright infringement.  *See generally* 17 U.S.C. § 512.

Instead, the "notice and takedown" procedures in the DMCA, set forth in section 512(c), only pertain to online service providers who—***unlike RCN***—store, "at the direction of a user," content "on a system or network controlled or operated by or for the service provider."  *See* 17 U.S.C. § 512(c)(1).  Typical examples of these providers are social media companies that allow users to post content for public consumption (like Facebook) or companies that otherwise store and provide access to user-supplied content (like Google's YouTube).

Because a section 512(c) service provider stores the allegedly infringing content, the service provider can, upon receiving the notice, identify and remove the infringing content—hence the "notice and takedown" moniker.  Section 512(c)

establishes these "notice and takedown" procedures, including detailed requirements regarding the service provider's designation of an agent to receive such notices (§ 512(c)(2)) and the content of the notices (§ 512(c)(3)).  Thus, for example, if a copyright owner identifies infringing content on Facebook, the copyright owner can look up Facebook's designated agent under section 512(c)(2), send the agent a section 512(c)(3)-compliant "notice," and then Facebook can review the social media post and, if warranted, carry out a "takedown."

Section 512(f)—the provision that Plaintiffs contend preempts RCN's UCL claims—provides for a cause of action where a service provider suffers injury from relying on misrepresentations in these "notices."  That is, section 512(f) only pertains to notices **under § 512(c)**.  *See, e.g.*, *Stevens v. Vodka & Milk, LLC*, No. 1:17-cv-8603, 2018 WL 11222927, at *2 (S.D.N.Y. Mar. 15, 2018) ("DMCA takedown notices, and the system of which they are a part, are creations entirely of federal law.").  If a notice does not fall under section 512(c), section 512(f) does not apply because the misrepresentation is not a misrepresentation "under the DMCA."  *See Rock River Commcn's, Inc. v. Universal Music Grp., Inc.*, No. 2:08-cv-635, 2011 WL 1598916, at *16 (C.D. Cal. Apr. 27, 2011) ("[T]he 'take down letter' at issue is not a take-down letter as described in section 512(c) because it does not address claimed infringement 'by reason of the storage at the direction of a user.'  Because the 'notification' at issue is not a notification pursuant to the DMCA, no claim under

section 512(f) can stand."); *Distribuidora de Discos Karen C. por A. v. Guerra Seijas*, No. 1:13-cv-5200, 2015 WL 4496066, at *6 (S.D.N.Y. Mar. 26, 2015) (same).[5]

*Rock River* is directly on point.  There, the plaintiff attempted to bring a state-law tortious interference claim and a section 512(f) claim, based on Universal Music Group ("UMG") sending letters to music retailers, including Apple, accusing the plaintiff of copyright infringement.  2011 WL 1598916, at *12–*14.   However, because Apple's iTunes music store does not store content at the direction of users—Apple decides what music to market and sell—the court accepted UMG's argument that its letter to Apple was "not a take-down letter as described in section 512(c)" and therefore "not a notification pursuant to the DMCA." [6]  *Id.* at *16.  Thus, "because the Court [found] that the DMCA is not applicable to the instant dispute, it conclude[d] that the DMCA [did] not preempt the tort action."  *Id.* at *15.

The same reasoning applies here: because RCN indisputably does not store any allegedly infringing content "at the direction of a user," Rightscorp's "notices"

---

[5] As these cases make clear, it is immaterial whether the notice *purports* to be a section 512(c) notice.  The question is whether the notice actually addresses alleged conduct within the scope of section 512(c).

[6] Obviously, the position UMG took in *Rock River*—that section 512(f) only applies to section 512(c) notices—is directly contrary to the position it is taking now.  *See* UMG's Memo. of Points & Authorities ISO Mot. for Summ. J. at 24–25 (ECF No. 295), Case No. 2:08-cv-635 (N.D. Cal.) (filed Dec. 21, 2010).

to RCN were not governed by sections 512(c) and (f).  Indeed, both parties' allegations make clear that Rightscorp's notices exclusively concerned BitTorrent (*i.e.*, peer-to-peer sharing) activity on RCN's network—as a "conduit" ISP, RCN does not distribute any software and does not host or store any content whatsoever. SAAC, ¶¶ 42–44 (ECF No. 161); Am. Compl., ¶ 57–58 (ECF No. 9).  In other words, not only does RCN not store the allegedly infringing content "at the direction of a user," RCN also does not "control" or "operate" any "system or network" on which allegedly infringing content "resides."  *See id*.; *In re Charter Commc'ns, Inc.*, 393 F.3d 771, 776 (8th Cir. 2005) (the section 512(c) "notice and takedown" provisions do not apply to section 512(a) service providers "because the ISP has no ability to remove the infringing material from its system or disable access to the infringing material").  RCN's UCL claim therefore is not preempted.  *See also Mometrix Media, LLC v. LCR Publ'g, LLC*, No. 03-17-00570, 2018 WL 6072357, at *4–*5 (Tex. Ct. App. Nov. 21, 2018) (tortious interference claim could only be preempted by the DMCA if the defendant's complaints were governed by section 512(c)).

In contrast, the DMCA preemption cases cited by Plaintiffs are distinguishable because they involved attempts to bring state law claims regarding section 512(c) notices.  This includes the supposed "new" authority cited in Plaintiffs' renewed motion to dismiss. *Tine Bak LLC v. Selkatz, Inc.*, No. 2:20-cv-5065, 2020 WL 9074806, at *4–*5 (C.D. Cal. Nov. 30, 2020) (request to remove an

24

allegedly infringing app from Apple's App Store was governed by section 512(c));

*Stevens*, 2018 WL 11222927, at *2 (collecting cases where preemption was found

"based on the wrongful use of *DMCA takedown notices*") (emphasis added);

*Stardock Sys., Inc. v. Reiche*, No. 4:17-cv-7025, 2019 WL 8333514, at *4 (N.D. Cal.

May 14, 2019) (same); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. 3:10-

cv-5696, 2011 WL 2690437, at *3 (N.D. Cal. July 8, 2011) (same).  For example, in

*Stevens*, the court reasoned that preemption applied because the DMCA provides

"an express remedy for the very wrong that counterclaimants here allege."  2018 WL

11222927, at *2.  That is not the case here.

In contrast, RCN is aware of ***no case*** in which a court found that the DMCA

preempted a claim arising out of copyright infringement allegations not governed by

section 512(c).  In such a case, there is no implied or potential conflict between the

DMCA and the state law claim.  The DMCA does not purport to regulate how rights-

holders should notify section 512(a) "conduit" ISPs of copyright infringement

issues, and so permitting RCN to pursue this UCL claim would in no way "frustrate"

the DMCA or "refuse[] [the] natural effect" of its provisions.  *See Crosby*, 530 U.S.

at 373; *MD Mall*, 715 F.3d at 495 ("[T]he principle is thoroughly established that

the exercise by the state of its police power, which would be valid if not superseded

by federal action, is superseded only where the repugnance or conflict is so direct

and positive that the two acts cannot be reconciled or consistently stand together.")

(cleaned up).

### D. Conflict Preemption Would Be Inapplicable Even If RCN Were Entitled to Bring a Section 512(f) Claim.

Even if the DMCA can preempt state law, and even if the emails sent to RCN

were governed by the DMCA, section 512(f) still would not preempt RCN's claim.

That is because section 512(f) only purports to regulate "material

misrepresentations" made in DMCA notices, and RCN's UCL claim does not

depend on proof of any specific misrepresentation in a copyright infringement

allegation made by Plaintiffs and Rightscorp.  *See supra* Factual Background.

Rather, the thrust of RCN's claim is that Plaintiffs and Rightscorp engaged in unfair

business practices by making millions of such accusations while destroying all of

the evidence needed to assess their accuracy—*i.e.*, the evidence needed to *identify*

specific misrepresentations.[7]  *See, e.g.*, SAAC, ¶¶ 94–99.  Because RCN's UCL

claim does not require it to prove a misrepresentation in a DMCA notice, allowing

RCN's claim to proceed would not frustrate or impair the effect of any provision of

the DMCA.  *See Crosby*, 530 U.S. at 372–73; *see also MD Mall*, 715 F.3d at 495

("The mere fact of 'tension' between federal and state law is generally not enough

---

[7] To be sure, RCN does contend that the allegations it received contained misrepresentations, but RCN's UCL claim does not rise or fall on the existence of any material misrepresentation.

to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power.").

The relief RCN is seeking also does not pose any actual or potential conflict with the provisions of the DMCA.  RCN is seeking an order enjoining Plaintiffs and Rightscorp from continuing to send copyright infringement notices to RCN without (1) complying with RCN's policy regarding the form and content of those notices and (2) storing and preserving all evidence upon which the accusation is based.  *See* SAAC at ¶ 52.  This relief would not frustrate the purpose or effect of the DMCA because, again, the DMCA does not purport to regulate any aspect of copyright infringement notices sent to section 512(a) service providers regarding peer-to-peer file sharing.  Considering the strong presumption against preemption, the Court should therefore deny Plaintiffs' motion to dismiss.

## III.  RCN HAS STATED A CLAIM THAT RIGHTSCORP VIOLATED THE UCL

Plaintiffs do not dispute that RCN has sufficiently alleged that Plaintiffs engaged in "unlawful, unfair, or fraudulent" conduct in violation of the UCL, California Business & Professions Code § 17200.  *See generally* Pls.' Mem.  Thus, the question before the Court is whether RCN has adequately alleged that ***Rightscorp*** violated the UCL.  The answer is clearly yes.

27

## A.     RCN Has Alleged Unfair Conduct in Violation of the UCL.

"Courts are reluctant to grant motions to dismiss 'unfair' UCL claims . . . , because the test involves weighing evidence that is not yet properly before the court." *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 929 (N.D. Cal. 2015).  Under the UCL, "'[u]nfair' simply means any practice whose harm to the victim outweighs its benefits." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010) (cleaned up); *Olszewski v. Scripps Health*, 69 P.3d 927, 947 (Cal. 2003) (unfair conduct need not violate any law).  Instead, "[a]n unfair business practice is one that either 'offends an established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008).

Because this is not an action between competitors (and does not need to be),[8] the traditional *State Farm* balancing test for unfair conduct under the UCL applies. Under *State Farm*'s "intentionally broad" balancing test, "[t]he test of whether a business practice is unfair involves an examination of that practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093,

---

[8] *See* RCN's Resp. to Rightscorp's Mot. to Dismiss at 11–13 (ECF No. 143) (addressing Rightscorp's prior erroneous argument to the contrary).

1103–04 (1996), *abrogated in part by Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999).

Because the balancing test requires courts to weigh the evidence, district courts rarely dismiss these claims at the pleading stage. *See Backus*, 122 F. Supp. 3d at 929; *Pemberton v. Nationstar Mortg. LLC*, 331 F. Supp. 3d 1018, 1051 (S.D. Cal. 2018) ("The balancing test should not be a particularly difficult test to satisfy at the motion to dismiss stage."); *Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1246–47 (N.D. Cal. 2017) (denying motion to dismiss because the court was "not equipped with enough factual evidence to conduct a proper balancing test"); *Grace v. Apple Inc.*, No. 5:17-cv-551, 2017 WL 3232464, at *15 (N.D. Cal. July 28, 2017) (whether alleged conduct was "unfair" was "a factual determination that cannot be made at this stage of the proceedings"); *Gianino v. Alacer Corp.*, No. 8:09-cv-1247, 2010 WL 11468710, at *4 (C.D. Cal. 2010) ("[T]he issue of whether Plaintiffs have properly supported their claim under the UCL's unfairness prong is more appropriately considered on a motion for summary judgment.").

As in the above-cited cases, RCN's allegations of unfair conduct cannot be resolved under Rule 12. RCN alleges that Rightscorp made millions of conclusory allegations of copyright infringement against users of RCN's network, and that Rightscorp has shielded the legitimacy of those allegations from scrutiny by destroying any actual evidence of copyright infringement it ever possessed. *See,*

29

*e.g.*, SAAC, ¶¶ 1–14, 77–92, 96, 108.  In other words, Rightscorp either engaged in the systematic spoliation of evidence or made millions of utterly baseless accusations—and possibly both.  Separately, RCN alleges that Rightscorp engaged in unfair conduct by deliberately refusing to comply with RCN's public-facing policy requiring that any copyright infringement allegations be digitally signed to verify the sender's identity.  *See id.*, ¶¶ 52–54, 101–106.

RCN has also stated a claim for unfair conduct under the public policy test. RCN alleges that Rightscorp and its employees were acting as unlicensed private investigators, in violation of state law.  SAAC, ¶¶ 133–44; *McDonald*, 543 F.3d at 506 ("[a]n unfair business practice is one that . . . 'offends an established public policy'"); *Backus*, 122 F. Supp. 3d at 930 (alleged violation of state law stated "an 'unfair' UCL claim under the public policy test"); *see also infra* Section III.C.

Rightscorp offers no argument or authority that would permit the Court to find these allegations insufficient as a matter of law to state a claim for unfair conduct in violation of the UCL.  The UCL is "intentionally broad to give the court maximum discretion to control whatever new schemes may be contrived, even though they are not yet forbidden by law." *People ex rel. Renne v. Servantes*, 86 Cal. App. 4th 1081, 1095 (Cal. Ct. App. 2001); *see also Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013) ("The UCL's coverage is sweeping, and its standard for wrongful business conduct is intentionally broad.") (quotations & citations omitted).

Rightscorp's conduct fits squarely within this rubric. *See e.g.*, *Servantes*, 86 Cal. App. 4th at 1095 ("unethical and unscrupulous" practices in operating vehicle towing company); *Golan v. Pingel Enters., Inc.*, 310 F.3d 1360, 1370–74 (Fed. Cir. 2002) (false allegations of patent and trademark infringement); *Arce v. Kaiser Found. Health Plan, Inc.*, 181 Cal. App. 4th 471, 489–90 (2010) (systematic breaches of contracts).

Furthermore, Rightscorp cannot offer any legitimate justification for intentionally destroying evidence or refusing to comply with RCN's digital-signature requirement—conduct that a factfinder could reasonably find to be unethical, oppressive, unscrupulous, and/or substantially injurious to RCN and its customers. *McDonald*, 543 F.3d at 506. Rightscorp's attorney argument to the contrary is not a basis for dismissal. Again, ***Plaintiffs themselves*** promulgated the ACNS, the industry standard under which virtually every complainant digitally signs their notices. SAAC, ¶ 104. Considering these allegations, the Court cannot resolve the UCL balancing test in Rightscorp's favor under Rule 12. *See, e.g.*, *Pemberton*, 331 F. Supp. 3d at 1052 (denying motion to dismiss because the court had "no basis" to conclusively determine that utility of challenged practice outweighed the alleged harm); *Backus*, 122 F. Supp. 3d at 930 (same).

Finally, Rightscorp is wrong to suggest that RCN's UCL claim is the equivalent of a standalone spoliation claim. Rightscorp's Mem. at 17. RCN alleges

that Rightscorp did far more than just intentionally destroy evidence. RCN's claim is based on the spoliation of evidence *coupled with* Rightscorp making millions of copyright infringement allegations that directly implicate the spoliated evidence, refusing to comply with RCN's digital signature requirement, and acting as a private investigator without a license—all in order to further Plaintiffs' goal of forcing RCN (and other ISPs) to treat conclusory and unverifiable copyright infringement complaints as fact. *See, e.g.*, SAAC, ¶¶ 1–14, 77–92, 96–99, 101–120, 133–144.

RCN's claim is broader than a spoliation claim in other ways as well. RCN alleges that Rightscorp intentionally destroyed evidence pertaining to all copyright infringement complaints it sent to RCN, not only the notices at issue in this case. *Id.*, ¶¶ 79–92. Thus, the relevant facts go beyond the facts that are germane to Plaintiffs' infringement claims. Relatedly, RCN is seeking injunctive relief requiring Rightscorp to preserve all evidence relating to any future accusations of copyright infringement it may send to RCN—relief that is not available to RCN as a sanction for discovery misconduct. *See, e.g.*, *id.*, ¶¶ 95–99. As a result, the only case Rightscorp relies on—concerning allegations of litigation misconduct in other, still-pending litigation—is plainly distinguishable. *See Starkey v. Covenant Care, Inc.*, 2004 WL 206209, at *5–*6 (Cal. Ct. App. Feb. 4, 2004).

**B.     RCN Has Alleged Fraudulent Conduct in Violation of the UCL.**

Rightscorp's argument that RCN has failed to allege fraudulent conduct requires Rightscorp to ignore controlling case law.  "[T]he 'fraud' contemplated by section 17200's third prong bears little resemblance to common law fraud or deception."  *State Farm*, 45 Cal. App. 4th at 1105.  "The test is whether the public is likely to be deceived."  *Id.* (citation omitted).  "This means that a section 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage."  *Id.*

Each year, Rightscorp accuses thousands of users of RCN's internet service of copyright infringement through email "notices" that identify the accused infringer by IP address and threaten litigation if the accused infringer refuses to pay Rightscorp to settle the claim.  SAAC, ¶¶ 68–70, 99.  These allegations are calculated to make the recipients believe they are in serious legal jeopardy.  *See id.*  In fact, however, Rightscorp makes accusations regarding types of copyright infringement it is unable to detect, has no actual evidence that the accused has infringed any copyright, has no authority or ability to pursue litigation for copyright infringement, and can only settle a claim on behalf of one of multiple potential rightsholders (if any).  *Id.*, ¶¶ 70, 92, 96, 108–114.  Additionally, it is a virtual certainty that some of Rightscorp's allegations were false, but Rightscorp destroyed all evidence that would be necessary to verify the accuracy of individual accusations.  *Id.*, ¶¶ 79-92,

33

96-98.  These allegations are more than sufficient to show that Rightscorp's conduct is likely to deceive RCN and accused infringers.  *See also In re Burlington Coat Factory*, 114 F.3d 1410, 1418 (3d Cir. 1997) (Rule 9(b) is relaxed "where the factual information is peculiarly within the defendant's knowledge or control").

RCN has also alleged that it suffered injury by relying on Rightscorp's copyright complaints.  On this point, it is irrelevant whether RCN forwarded Rightscorp's notices to accused infringers because RCN specifically alleges that it incurred costs in designing and maintaining a system capable of processing and evaluating Rightscorp's notices *in order to determine* that they did not comply with RCN's DMCA policy.  SAAC, ¶¶ 52, 55–57, 102, 130–131; *see also supra* Section I.A.  As such, Rightscorp's claim that RCN has not alleged reliance is simply inaccurate.  *See also In re Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009) ("[T]he plaintiff is not required to allege that [the defendant's] misrepresentations were the sole or even the decisive cause of the injury-producing conduct.").

## C.    RCN Has Alleged Unlawful Conduct in Violation of the UCL.

All that is necessary to state a claim under the "unlawful" prong of the UCL is an allegation that the defendant engaged in a business practice "forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838–39 (1994).

RCN has therefore alleged unlawful conduct because it alleges that Rightscorp and its employees were acting as unlicensed private investigators in violation of California and New Jersey law.[9]  Collecting and generating evidence of peer-to-peer file sharing activity for use in litigation, in exchange for payment, plainly constitutes "engag[ing] in business" to make an "investigation for the purpose of . . . [s]ecuring evidence to be used before [a] court."  Cal. Bus. & Prof. Code §§ 7521, 7523(a-b); SAAC, ¶¶ 133–44.  Rightscorp's argument therefore requires the Court to ignore the plain language of the statute.[10]

Courts have recognized that these PI licensure requirements apply to businesses that gather peer-to-peer file sharing data.  *See* Jan. 8, 2018 Order at 2–3 (cautioning plaintiff's counsel for "a serious breach of his ethical duties" by not informing the court that the company that collected evidence of alleged file sharing "might be committing a crime by engaging in unlicensed surveillance of Washington citizens")  (ECF No. 39), *Venice PI, LLC v. Doe*, No. 2:17-cv-1075 (W.D. Wash.) (attached as Ex. A).  Furthermore, alleging a violation of California's PI licensure

---

[9] The Court need not reach Rightscorp's claim that a violation of New Jersey law cannot support a UCL claim, because RCN has alleged a violation of California law. Also, the fact that Rightscorp was flouting the laws of multiple jurisdictions further demonstrates that Rightscorp's conduct was unfair.  *Supra* Section III.A.

[10] The Court should reject Rightscorp's frivolous suggestion that the Court "take judicial notice of other decisions finding Rightscorp's system to be valid."  *See* Rightscorp's Memo. at 21 n.8.  *See, e.g.*, Fed. R. Evid. 201(b) (facts "not subject to reasonable dispute" may be judicially noticed).  RCN was not a party in those cases, and as Rightscorp tacitly concedes, this issue was not litigated in either case.

requirements is sufficient to state a UCL claim. *Steel v. City of San Diego*, 726 F. Supp. 2d 1172, 1186–87 (S.D. Cal. 2010) ("Because employing an unlicensed private investigator is a business practice and such practice is considered unlawful, Plaintiff has adequately stated a [UCL] claim.").

In contrast, the cases Rightscorp cites are readily distinguishable. In *Malibu Media, LLC v. Doe*, the allegedly unlicensed investigator was a witness who compared copyrighted content to allegedly infringing copies. No. 2:16-cv-1733, 2017 WL 840652, at *4–5 (E.D. Cal. Mar. 3, 2017). There was no suggestion that the witness collected any of the underlying evidence, and moreover, the court questioned whether the California statute even applied because the witness was in Germany. *See id.* In *Manufacturing Automation & Software Systems v. Hughes*, the alleged investigator was an employee of the plaintiff, who posed as someone else to communicate with the defendant while the litigation was pending. Dec. 1, 2017 Order at 9–13, 24–26 (ECF No. 106), No. 2:16-cv-8962 (C.D. Cal.). These cases are irrelevant to the issues before the Court.

RCN was injured by Rightscorp's decision to ignore California's licensure requirements, as discussed *supra* in Section I.A. *See also* SAAC, ¶ 144. It is certainly plausible to infer that if Rightscorp and its employees had received private investigator training, Rightscorp (1) would have implemented procedures for collecting and maintaining forensically sound records underlying its accusations of

copyright infringement, (2) would have preserved records of how its detection software operated at all times, (3) would not have engaged in the rampant, systematic spoliation of evidence, and/or (4) would have complied with RCN's digital signature requirement, which is industry-standard and which Rightscorp had actual knowledge of in September 2016. *See* SAAC, ¶¶ 52, 54, 79–92, 96–98, 101–105, 133–144.

Finally, RCN's allegations regarding Rightscorp's spoliation of evidence are also sufficient to state a claim under the unlawful prong. The prohibition on the spoliation of evidence is "court-made" law. *Saunders*, 27 Cal. App. 4th at 838–39; *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004). Rightscorp violated this "court-made law" by destroying evidence related to its email notices of alleged copyright infringement, which were sent in anticipation of litigation. *See* SAAC, ¶ 99. RCN's spoliation allegations are actionable under the UCL because they are broader than mere litigation misconduct. *Supra* Section III.A.

## IV.  RCN HAS STATED A CLAIM FOR INJUNCTIVE RELIEF AGAINST PLAINTIFFS

Rightscorp does not dispute that RCN has alleged sufficient facts to support a claim for injunctive relief. Plaintiffs' pursuit of this argument is simply a rehash of Plaintiffs' baseless attempt to litigate, at the pleading stage, how much control they have over Rightscorp's conduct. *See supra* Section I.B.

As set forth above, RCN alleges that Plaintiffs and Rightscorp acted in concert—and continue to act in concert—in flooding RCN with unverifiable

copyright infringement allegations. *See, e.g.*, SAAC, ¶¶ 13, 19, 97. RCN alleges that this conduct will continue unless enjoined by the Court. *See id.*, ¶¶ 154–56. RCN alleges that it has suffered and continues to suffer irreparable harm, and that the balance of hardships and the public interest also weigh in favor of granting injunctive relief. *See id.*, ¶¶ 155–56. Nothing more is required at this stage.

If RCN proves these allegations, then RCN will have demonstrated that Plaintiffs exercised control over Rightscorp's conduct and, therefore, the requested injunctive relief will be warranted. Furthermore, RCN's requested injunction is targeted at notices sent by Plaintiffs as well—not only those sent by Rightscorp. *See* Am. Answer & Counterclaims at 51. If the injunction were directed only at Rightscorp, then Plaintiffs could continue the same abusive practices by sending notices to RCN themselves or through a different vendor. RCN has stated a claim to injunctive relief, and the Court should deny Plaintiffs' motion.

## V.   IF PLAINTIFFS' MOTION TO STRIKE IS NOT MOOT, IT SHOULD BE DENIED

In the event the Court grants Plaintiffs' motion to dismiss but denies Rightscorp's, Plaintiffs ask the Court to strike RCN's claim against Rightscorp. In other words, Plaintiffs implicitly acknowledge that if RCN has stated UCL claims against Plaintiffs and Rightscorp, then RCN's UCL claim against Rightscorp is procedurally proper. *See* Fed. R. Civ. P. 20(a)(2)(B).

Even if the Court were to dismiss RCN's claim as to Plaintiffs, RCN's claim against Rightscorp would still be properly before this Court.  Rule 13(h) provides that "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim."  Rule 20 provides that "[p]ersons . . . may be joined in one action as defendants if (A) any right to relief is asserted against them . . . with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2)(A)–(B).  Here, it is obvious from the parties' motion to dismiss briefing that RCN's claim against Rightscorp satisfies both standards.  Thus, joinder is also consistent with Rule 14, the purpose of which "is to avoid circularity of action and multiplicity of litigation."  *Twin City Fire Ins. Co. v. Ovation Fund Servs., LLC*, No. 2:18-cv-14944, 2019 WL 1275060, at *2 (D.N.J. Mar. 20, 2019) (citation omitted); *see also United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724 (1966).

In contrast, striking RCN's claim against Rightscorp would not promote judicial economy because RCN would simply refile its claim in this District and move to consolidate the two cases under Rule 42(a)(2).[11]  *See In re TMI Litig.*, 193

---

[11] Personal jurisdiction and venue are proper because, among other things, Rightscorp has directed its unfair and fraudulent activity toward this District.  There is also diversity jurisdiction because RCN and Rightscorp are citizens of different states, and the value of the requested injunctive relief exceeds $75,000.  *See, e.g.*, *Columbia Gas Transmission Corp. v. Tarbuck*, 62 F.3d 538, 541 (3d Cir. 1995)

F.3d 613, 724 (3d Cir. 1999) (The purpose of consolidation is "to streamline and economize pretrial proceedings so as to avoid duplication of effort, and to prevent conflicting outcomes in cases involving similar legal and factual issues."); *In re Mock*, 398 Fed. App'x. 716, 718 (3d Cir. 2010) (district courts have broad discretion in ordering consolidation); *Twin City*, 2019 WL 1275060, at *3 (refusing to sever and stay third-party claim pursuant to Rule 14, and instead consolidating the third-party claim in the interest of judicial economy).

## VI.   IF NECESSARY, LEAVE TO AMEND IS WARRANTED

In the event the Court finds that RCN's allegations are insufficient in some respect not addressed in the Court's previous Memorandum Opinion, RCN respectfully requests leave to amend. This case is still in its relatively early stages— with no depositions having been taken, no deadlines for expert discovery or dispositive motions, and no trial date—and granting leave to amend is therefore in the interests of justice. *See* Fed. R. Civ. P. 15(a)(2).

## <u>CONCLUSION AND REQUEST FOR ORAL ARGUMENT</u>

For the foregoing reasons, the Court should deny Counterclaim Defendants' Motions to Dismiss (ECF Nos. 174 & 175). RCN respectfully requests oral argument.

Dated:  October 11, 2021            */s/ Edward F. Behm, Jr.*
                                    Edward F. Behm, Jr.
                                    ARMSTRONG TEASDALE LLP
                                    Attorney I.D. No. 017972002
                                    2005 Market Street
                                    29th Floor, One Commerce Square
                                    Philadelphia, PA 19103
                                    Telephone: 267.780.2000
                                    Fax: 215.405.907

                                    Richard L. Brophy (*pro hac vice*)
                                    Zachary C. Howenstine (*pro hac vice*)
                                    Margaret R. Szewczyk (*pro hac vice*)
                                    Abigail L. Twenter (*pro hac vice*)
                                    Kyle G. Gottuso (*pro hac vice*)
                                    ARMSTRONG TEASDALE LLP
                                    7700 Forsyth Blvd., Suite 1800
                                    St. Louis, Missouri 63105
                                    Telephone:  314.621.5070
                                    Fax:  314.621.5065

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the below date, I caused a true and correct copy of the foregoing OPPOSITION TO MOTIONS TO DISMISS to be filed via the ECF system and served on all counsel of record.


Dated:  October 11, 2021          */s/ Edward F. Behm, Jr.*
                                  Edward F. Behm, Jr.