# McElroy Deutsch

1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
**T:** 973.993.8100 | **F:** 973.425.0161
**MDMC-LAW.COM**

THOMAS R. CURTIN
Direct Dial: (973) 401-7117
tcurtin@mdmc-law.com

December 30, 2021

<u>VIA ECF</u>

Hon. Tonianne J. Bongiovanni, U.S.M.J.
Clarkson S. Fisher Federal Building
and U.S. Courthouse
402 E. State Street
Trenton, New Jersey 08608

    Re:    <u>*UMG Recordings, Inc. et al. v. RCN Telecom Services, LLC et al.*
           Civil Action No. 19-17272 (MAS) (TJB)</u>

Dear Judge Bongiovanni:

    This firm, Jenner & Block LLP, and Stein Mitchell Beato & Missner LLP jointly represent Plaintiffs in the above-referenced action. Pursuant to Local Civil Rule 37.1(a)(1), we submit this letter to raise two significant discovery disputes for resolution by the Court. In particular, Defendants RCN Telecom Services, LLC, *et al.* (collectively, "RCN") have:

- refused to search for and produce responsive documents from all relevant custodians, and
- withheld responsive documents based on unwarranted assertions of privilege.

    Plaintiffs have met and conferred with RCN many times over nearly four months regarding these disputes and have made every effort possible to narrow the scope of issues requiring the Court's attention. However, the parties have now reached an impasse, and accordingly, Plaintiffs seek relief from the Court. Plaintiffs request that the Court set a conference to hear and resolve these disputes.

## I.    Background

    Plaintiffs in this case are the three major record companies in the United States: Universal Music Group, Sony Music Entertainment, and Warner Music Group. Collectively, Plaintiffs produce and own the vast majority of legitimate commercial sound recordings in this country. RCN is an internet services provider ("ISP") that sells internet services to millions of customers, primarily in the northeastern United States. Plaintiffs initiated this lawsuit to seek redress for

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 2

RCN's actions in contributing to and profiting from the widespread infringement of Plaintiffs' copyrighted sound recordings by RCN's subscribers who use RCN's high-speed internet services. These infringements occurred when subscribers used RCN's services to access an anonymous peer-to-peer file-sharing network called BitTorrent.

The specific instances of infringement at issue in this case were discovered and documented by a third-party company called Rightscorp, Inc. Rightscorp developed a technology to monitor BitTorrent for copyright infringement. When that technology identified an infringement, Rightscorp recorded the relevant details (like the user's IP address and the infringing content, among other pieces of information), collected that information into copyright infringement notices, and sent those notices to the user's ISP.[1] Rightscorp also downloaded copies of infringing content made available on BitTorrent.

Multiple court decisions have considered Rightscorp's technology and concluded that the evidence it generates is admissible at trial, sufficient proof of copyright infringement to survive summary judgment, and capable of supporting a jury verdict. *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 972 (E.D. Va. 2016) (denying posttrial motion and crediting the "significant evidentiary value" of Rightscorp's infringement notices in supporting the jury verdict), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018); *see also UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 757-58 (W.D. Tex. 2019) (denying motion for summary judgment).

It is undisputed that since 2011, Rightscorp has sent millions of infringement notices to RCN. Rightscorp has also downloaded at least one infringing copy of every sound recording at issue in this case directly from an RCN subscriber's account. Yet rather than playing its unique and essential role of identifying the subscribers at issue and addressing the rampant infringement of Plaintiffs' copyrights committed by those subscribers, RCN ignored its legal obligations so that it could continue to collect its monthly service fees from the users at issue. That conduct led to this action.

Plaintiffs seek to hold RCN liable under two well-established theories of secondary copyright liability: contributory infringement and vicarious infringement. RCN moved to dismiss both theories. However, Judge Shipp denied RCN's motion and held that each theory stated a valid claim. *See* Dkt. 88. To prevail on these claims, Plaintiffs must prove:

---

[1] Although BitTorrent users operate anonymously, Rightscorp can track a user's IP address and then can use that address to match the user to his or her ISP. It is well known that only an ISP is capable of identifying a specific subscriber based on that subscriber's IP address. *See, e.g., BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 967 n.8 (E.D. Va. 2016) (recognizing that "[o]nly the ISP knows the identity of the subscriber associated with an IP address"), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018).

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 3

- For their contributory infringement claim, that (1) third parties "directly infringed" Plaintiffs' copyrights; (2) RCN "knew" that the third parties were directly infringing; and (3) RCN "materially contributed to or induced" the infringement. *Id.* at 15 (quoting *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 387 (3d Cir. 2016)). For the knowledge element, actual knowledge "is not required" and the element can be satisfied with proof that RCN was "willfully blind" to the infringing conduct. *Id.* at 16 (internal quotations omitted).
- For their vicarious infringement claim, that RCN (1) had "the right and ability to supervise or control" the infringement; and (2) had a "direct financial interest" in the infringement. *Id.* at 22 (quoting *Leonard*, 834 F.3d at 388).

After its motion to dismiss was denied, RCN answered Plaintiffs' claims and asserted multiple affirmative defenses. *See* Dkt. 96.[2] Among them was an assertion that Plaintiffs cannot recover monetary damages because RCN is entitled to a safe harbor defense under 17 U.S.C. § 512, enacted as part of the Digital Millennium Copyright Act ("DMCA"). To be entitled to that defense, RCN must prove, among other things, that it "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). RCN claims that it implemented such a policy—which it calls its "DMCA Policy"—in or around June 2016.

RCN's alleged decision to implement its DMCA Policy at that specific moment in time is very significant to the issues in this case. Rightscorp and other copyright monitoring companies began sending RCN infringement notices *five years* before then. Throughout that time, RCN could have implemented a repeat infringer termination policy and attempted to avail itself of the DMCA safe harbor defense against any claims of copyright infringement on its network. Yet it chose to prioritize its own profits over its obligation to address noticed infringements on its network. However, in December 2015, the risks created by RCN's decision escalated dramatically. That month, a music publishing company called BMG Rights Management (which is not a party to this case) won a $25 million jury verdict against another ISP, Cox Communications, on claims for secondary copyright infringement built on Rightscorp's evidence. Like RCN, Cox had received millions of infringement notices from Rightscorp dating back to 2011 but had not implemented a reasonable repeat infringer policy and thus was not eligible for the DMCA safe harbor defense.

A few months after the verdict, BMG sent a letter to RCN requesting a meeting to discuss the widespread infringement also occurring on RCN's network. RCN responded in June 2016 by finally adopting a DMCA Policy and by suing BMG, seeking a declaratory judgment of non-

---

[2] RCN has since filed an amended answer and a second amended answer, both of which asserted the same affirmative defenses. *See* Dkt. 104, 161.

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 4

infringement. *See generally RCN Telecom Services, LLC v. BMG Rights Mgmt. (US) LLC*, No. 16-cv-4417 (S.D.N.Y.).

In March 2017, BMG and RCN settled their dispute for a confidential amount. However, Rightscorp continued to detect and document widespread infringement on RCN's network. Plaintiffs sued RCN in 2019 because RCN *still* had not adequately addressed these issues despite being aware of them for nearly a decade.

Given that background, one primary focus of Plaintiffs' discovery requests was documents and communications within RCN's possession, custody, or control related to the development and implementation of its DMCA Policy, as well as documents and communications related to RCN's awareness of copyright infringement on its network.[3] Such documents are critical to Plaintiffs' ability to test RCN's assertion of the DMCA safe harbor defense and to prove that RCN had knowledge of or was willfully blind to its subscribers' infringing conduct. Aware that such documents played a significant role in BMG's litigation against Cox, *Cox*, 199 F. Supp. 3d at 967, RCN implemented a discovery strategy in this case to avoid a similar result, as detailed below.

The first indication that something was amiss was the striking fact that RCN failed to make any meaningful production of internal communications related to these critical subject matters. Because the notion that no such documents existed was not remotely credible, Plaintiffs undertook extensive efforts to negotiate with RCN regarding the scope of its production and the process by which RCN preserved, collected, and searched for responsive communications. Those efforts included numerous emails, multiple meet and confer telephone calls, and even a Rule 30(b)(6) deposition regarding RCN's preservation and collection efforts. That process revealed that RCN employed a multi-pronged strategy to shield its relevant documents from disclosure. First, RCN refused to collect and search the custodial email files that it knows contain materials responsive to Plaintiffs' requests. Second, RCN has inappropriately asserted that the overwhelming majority of internal communications it did find are privileged, even though more than 100 of those communications included no attorney involvement at all. Because RCN continues to inappropriately prevent potentially case-altering documents from being produced, Plaintiffs seek the Court's assistance in ensuring that RCN complies with its discovery obligations.

---

[3] *See* Ex. 1, Plaintiffs' First Set of Requests for Production (Mar. 13, 2020), Request Nos. 4 & 6 (awareness of copyright infringement), 10 & 11 (implementation of DMCA policy). To avoid burdening the Court with unnecessary papers, Exhibit 1 is a compilation of all Plaintiffs' document requests relevant to this letter.

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 5

## II.     Issues Requiring Judicial Resolution

Plaintiffs seek an order compelling RCN to (a) collect and search 4 additional custodial email files known to have responsive documents, produce any responsive, non-privileged documents that are found, and log any responsive documents that RCN claims are privileged[4]; and (b) produce documents identified on RCN's privilege log for which no colorable basis for privilege exists, either because they are communications with no attorneys at all, communications that only nominally include attorneys, or are clearly unprivileged attachments that RCN did not analyze separately from the emails to which they were attached. Each issue is discussed below.

### A.     RCN's Insufficient Document Searches

One prong of RCN's strategy to avoid producing its communications about the DMCA or copyright infringement on its network was to exclude the key high-ranking employees who had such communications from its list of email file custodians. These employees include corporate executives (including RCN's CEO, Jim Holanda) and in-house attorneys (in particular, RCN's general counsel, Jeff Kramp).[5] By not collecting the custodial email files of these employees, RCN could claim that it had produced or logged all the responsive communications that it technically reviewed. RCN maintained this position even after being confronted with evidence conclusively demonstrating that these employees had relevant communications that RCN did not disclose in discovery.

Indeed, it is beyond dispute that these unsearched custodial email accounts contain non-duplicative communications that are responsive to Plaintiffs' document requests. As described below, third parties have produced such communications in response to Plaintiffs' subpoenas that were never produced or even identified by RCN. The fact that RCN has continued to refuse to collect and search the email files of its senior management and counsel despite dispositive evidence showing that the unsearched custodians have responsive documents underscores how critical this limitation of custodians is to RCN's strategy to secrete damaging evidence.

The documents of which Plaintiffs are aware were disclosed by third-party private equity firms that bought and sold RCN during the time period relevant to this litigation. In 2010, a firm called Abry Partners acquired RCN for $1.2 billion.[6] In 2016, Abry sold RCN and another ISP called Grande Communications to another private equity firm called TPG Capital for $2.25

---

[4] Plaintiffs reserve the right to challenge any such assertions of privilege.

[5] In total, four RCN employees are at issue: CEO Jim Holanda, in-house attorneys Jeff Kramp and James Hill, and paralegal Deborah Rankin.

[6] *See, e.g.*, Reuters, *Private Equity Firm Acquires Broadband Provider* (March 5, 2010), *available at* https://www.nytimes.com/2010/03/06/technology/06cable.html.

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 6

billion.[7]  TPG then consolidated RCN, Grande, and two additional ISPs (called Wave and enTouch) into a collective called Astound Broadband. In November 2020, TPG announced that it was selling Astound to a third private equity firm, called Stonepeak Infrastructure Partners, for $8.1 billion.[8]

The timing of Abry's sale of RCN to TPG in 2016 is of particular importance to Plaintiffs' claims. In 2016, RCN (a) was aware of BMG's trial victory against Cox in December 2015, (b) received BMG's cease-and-desist letter, (c) allegedly developed and implemented its DMCA Policy, and (d) sued BMG seeking a declaration of non-infringement. At the same time, the equity firm that owned RCN was negotiating a sale of the company. Thus, there can be no good faith dispute that Abry and TPG both considered and discussed RCN's potential liability before finalizing their transaction. Any communications between RCN and either Abry or TPG about that potential liability or the issues supporting it are undoubtedly relevant to Plaintiffs' claims.

Accordingly, Plaintiffs requested that RCN produce all communications it had with any of the private equity firms involved with RCN related to the DMCA or copyright infringement on RCN's network.[9] Plaintiffs also served subpoenas on each of Abry, TPG, and Stonepeak, seeking, among other things, all their communications related to these same subject matters. Abry and TPG each disclosed the existence of some relevant communications they had with RCN.[10] However, RCN has neither produced any communications it had with these entities, nor

---

[7] *See, e.g.*, RCN, *TPG Capital to Acquire RCN Telecommunications and Grande Communications for $2.25 billion* (Aug. 15, 2016), *available at* https://www.rcn.com/hub/about-rcn/newsroom/2016-press-releases/tpg-capital-to-acquire-rcn-telecommunications-and-grande-communications-for-225-billion/.

[8] *See, e.g.*, RCN, *Stonepeak Announces Agreement to Acquire Astound Broadband from TPG for $8.1 Billion* (Nov. 1, 2020), *available at* https://www.rcn.com/business/insights-and-news/insights-news-and-press/stonepeak-announces-agreement-to-acquire-astound-broadband-from-tpg-for-8-billion/.

[9] *See* Ex. 1, Plaintiffs' Request No. 87. Through Request No. 87, Plaintiffs expressly sought RCN's communications with Abry and TPG. At the time Plaintiffs served their document requests, Stonepeak's purchase of Astound Broadband from TPG was not yet publicly announced. Nevertheless, RCN's relevant communications with Stonepeak are responsive to Plaintiffs' broader document requests seeking RCN's communications more generally related to these subject matters. *See id.*, Request Nos. 10, 11 (regarding copyright infringement on RCN's network). RCN has never argued otherwise.

[10] Abry and TPG also disclosed the existence of relevant communications they or their counsel had with each other, but they refused to produce such communications on the theory that they are protected by a common interest privilege. Stonepeak has thus far refused to comply with

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 7

has it disclosed the existence of any such documents on its privilege log. The only possible explanation is that RCN has failed to adequately search its records to comply with Plaintiffs' discovery requests.

Through their subpoenas, Plaintiffs learned the following documents exist:

- On November 14, 2016, Mr. Holanda emailed a copy of an RCN litigation strategy memorandum regarding the RCN-BMG litigation to Abry. Mr. Holanda cc'd Mr. Kramp on the email.
- On January 11, 2017, RCN's outside counsel emailed a copy of a draft settlement agreement with BMG to TPG. RCN's outside counsel—the same outside counsel representing RCN in this litigation—cc'd Mr. Kramp on the email.[11]

These communications demonstrate (a) that RCN's DMCA Policy and copyright infringement were in fact major topics during negotiations to purchase RCN, and (b) that RCN's senior management and in-house counsel were the parties conducting those negotiations. Those facts eliminate the possibility that RCN's refusal to collect and search the email files of any of these individuals was either innocent or immaterial.

When Plaintiffs raised these brazen deficiencies with RCN, it became clear that even though RCN knew which of its employees or agents had communications with these entities on these subjects, it had structured its document collection efforts in a way that enabled it to avoid collecting or searching the most critical email files. Accordingly, while RCN "agreed" to produce or log communications with Abry, TPG, or Stonepeak, it stated that its "search for such emails [was] based on the custodians and search terms used for email discovery." RCN had made sure that those custodians did not include Mr. Holanda, Mr. Kramp, any of RCN's outside counsel, or anyone else likely to have communicated with those entities. Plaintiffs requested that RCN add such custodians to their document production, but RCN refused to do so.

While counsel tried to excuse the cover-up by self-servingly asserting that it had "discussions with people involved" in the TPG-Stonepeak transaction to ask if they had any relevant documents, such "discussions" (even if they were comprehensive good faith discussions—and there is no way to test such a self-serving assertion) are not a valid legal alternative for a proper email search. RCN even conceded that its "investigation" for relevant

---

Plaintiffs' subpoena. Plaintiffs intend to challenge all three parties' responses to their subpoenas after RCN has made a complete production of its communications with those entities. The Court's ruling on Plaintiffs' instant motion against RCN may narrow the scope of Plaintiffs' disputes with Abry, TPG, and Stonepeak.

[11] RCN's outside counsel also had other communications with TPG, but did not copy Mr. Kramp on those emails.

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 8

communications was "separate from the custodial email collection" it had undertaken. The inescapable conclusion is that RCN was well aware that its list of email custodians did not include the individuals who actually communicated with these third parties on these subjects.

RCN's refusal to collect and search the emails of its corporate executives and in-house attorneys may also explain why other aspects of RCN's overall document production are obviously lacking. As noted above, on April 14, 2016, RCN received BMG's cease and desist letter. Not surprisingly, after that date, RCN generated thousands of internal communications about copyright infringement. As far as Plaintiffs are presently aware, RCN has disclosed the existence of these communications to Plaintiffs.[12]

By contrast, RCN has disclosed the existence of just 27 internal business emails from *before* April 14, 2016 regarding copyright infringement by users on its network.[13] Thus, RCN claims that it had effectively no internal communications about these issues before it received BMG's letter.

That position is manifestly not credible. As detailed above, RCN had ample reason to discuss the presence and consequences of copyright infringement on its network well before April 2016. Rightscorp began detecting infringement on RCN's network and sending notices to RCN in 2011. Further, in November 2014, BMG filed its lawsuit against Cox based on Rightscorp notices. That case was tried in December 2015, and a jury found Cox liable for $25 million. Throughout that litigation, Rightscorp continued to send infringement notices to RCN that were substantively identical to those at issue in BMG's case against Cox. The notion that RCN—particularly its executives and counsel—was not monitoring the Cox litigation and discussing its own potential liability based on virtually identical evidence is simply not believable.

Plaintiffs submit that the evidence cited above conclusively demonstrates that RCN has intentionally refused to collect emails from key relevant employees in an attempt to minimize its liability in this action. Accordingly, Plaintiffs seek an order compelling RCN to collect these employees' custodial email files, search them for documents responsive to Plaintiffs' discovery requests, and produce or log any responsive documents found.[14] It is well within the Court's power to issue such an order. *See City of Sterling Heights Gen. Employees' Retirement Sys. v. Prudential Financial, Inc.*, No. 12-cv-5275-MCA-LDW, 2015 WL 5055241, at *3 (D.N.J. Aug.

---

[12] As explained above, RCN has *produced* virtually none of these communications because it claims they are privileged.

[13] RCN has produced 20 of these documents and has identified the other seven on its privilege log. For the reasons stated above, Plaintiffs do not believe any of these seven documents are actually privileged. RCN also produced 50 automated emails from before April 14, 2016.

[14] Plaintiffs reserve the right to review and challenge any privilege assertions RCN makes.

McElroy, Deutsch, Mulvaney & Carpenter, LLP
4552370_1

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 9

21, 2015) (compelling party to collect, search, and produce emails from 10 additional custodians when there was a "fair inference" those custodians had non-duplicative responsive documents). Indeed, courts in this district have long rejected parties' "gotcha" efforts to avoid their discovery obligations by setting unduly narrow ESI search parameters. *See, e.g.*, *Younes v. 7-Eleven, Inc.*, 312 F.R.D. 692, 708 (D.N.J. 2015) (compelling defendant to produce responsive documents it knew existed even though they did not hit on plaintiff's requested search terms); *Montana v. Cnty. Of Cape May Bd. of Freeholders*, No. 09-cv-755-NLH-JS, 2013 WL 11233748, at *9 (D.N.J. Sept. 2013) (same).

### B.   RCN's Unjustified Privilege Assertions

The second prong of RCN's strategy to avoid producing damaging communications about its knowledge of infringement on its network was to claim that any document passing through an attorney's inbox is privileged, regardless of the substance of the communication or even whether the attorney participated in the conversation. RCN extended this strategy even to some communications that did not include any attorneys at all.

RCN first served its privilege log on May 12, 2021. That log had multiple threshold deficiencies, including that it did not distinguish between attorneys and non-attorneys and was not presented in chronological order. After Plaintiffs raised these issues, RCN served an amended privilege log on June 4, 2021.

RCN's amended privilege log contained 1,617 entries, most of which appeared to relate to discussions about how to address allegations of copyright infringement on RCN's network. By contrast, at that time RCN had produced, in total, just 427 internal, non-automated communications on *any* subject matter. Thus, Plaintiffs suspected that RCN was attempting to cloak its discussions about how to address copyright infringement on its network under the guise of privilege, without regard to whether colorable privilege claims existed for individual communications. Plaintiffs confirmed this suspicion when they reviewed RCN's amended privilege log in detail. It included numerous patently baseless privilege assertions: for example, it listed more than 100 emails that included no attorney at all, it listed more than 500 emails where an attorney was merely cc'd, and it failed to distinguish between emails and their attachments.

Plaintiffs raised these issues with RCN in a letter on July 27, 2021. As a result, RCN agreed to re-review its privilege assertions, and ultimately served a second amended privilege log on October 12, 2021. In that log, RCN withdrew its privilege assertions over just 48 documents. That log also included technical deficiencies, including missing descriptions for certain documents. RCN agreed to correct those technical deficiencies, and it served a third amended

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 10

privilege log on November 18, 2021.[15] However, RCN's third amended privilege log left in place the vast majority of privilege assertions that Plaintiffs dispute.

RCN has the burden of proving that the documents it seeks to withhold as privileged are actually privileged. *See In re Grand Jury*, 705 F.3d 133, 160 (3d Cir. 2012). It has not met that burden with regard to hundreds of documents, which Plaintiffs now seek to compel.[16]

### 1.   Communications With No Attorneys

The Third Circuit has long held that for a communication to be protected by the attorney-client privilege, it must, among other things, be between a client and "a member of the bar of a court, or his subordinate." *In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir. 1979). Yet RCN claims privilege over 106 communications that do not include any attorneys at all.[17] Because these communications are not privileged, they should be produced.

### 2.   Communications Only Nominally Including Attorneys

RCN also claims privilege over 674 communications, across 199 email chains or standalone emails, that included lawyers who never participated in the discussion.[18] These communications are not privileged and should be produced.

The attorney-client privilege protects only communications made "for the purpose" of obtaining or providing a legal opinion, legal services, or assistance in a legal proceeding. *In re Grand Jury Investigation*, 599 F.3d at 1233. Thus, when an email includes multiple recipients, some of whom are attorneys and some of whom are not, it cannot be privileged unless it is "directed to" or "sent by" the attorney. *Shipyard Assocs., L.P. v. City of Hoboken*, No. 14-cv-

---

[15] A copy of RCN's third amended privilege log—which is its operative privilege log—is attached hereto as Exhibit 2.

[16] Because RCN's privilege log spans 258 pages, Plaintiffs attach for the Court's benefit Exhibit 3, which is a summary chart listing the email chains (and standalone emails) on RCN's privilege log that are limited to either nominal attorney involvement or no attorney involvement at all. The chart does not contain any email chains that include emails from attorneys or emails that are sent only to attorneys.

[17] Of these 106 communications, 59 are listed in Exhibit 3. *See* Ref. Nos. 1-30, 129-131. The other 47 consist of communications found on email chains that elsewhere purportedly reflect attorney involvement. *See* Exhibit 2 at RCNPriv0008, 0043-0046, 0198-0201, 0203, 0205-0206, 0227, 0231, 0236-0238, 0324, 0332, 0353-0354, 0396, 0398, 0401, 0419-0422, 0448-0449, 0478-0479, 0481, 0741, 1148-1149, 1202, 1295-1297, 1376-1377, 1379, 1420, 1431, 1563, 1583.

[18] *See* Exhibit 3 at Ref. Nos. 16-210.

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 11

1145-CCC-MF, 2015 WL 4623470, at *5 (D.N.J. Aug. 3, 2015) (internal quotations omitted). In other words, such an email is not privileged if the attorney "(1) is a mere recipient of that email; and (2) did not actively participate in providing legal advice as part of that email." *Dejewski*, 2021 WL 118929, at *1. If the rule were otherwise, corporate parties could systematically ensure that no documents are ever produced in litigation "by simply copying an attorney on all company-generated emails to protect them from discovery, regardless of whether legal services were sought or who the other recipients of the email were." *Id.*

RCN appears to have employed exactly this strategy with regard to the creation and implementation of its DMCA Policy. Indeed, while RCN's privilege log includes 1,057 emails, only 84 of those emails—just 8%—were sent *by* attorneys. Emails including Mr. Kramp, RCN's general counsel, illustrate this dynamic. As just one example, from at least October 2016 to February 2017, RCN's director of telecommunications, Robert Rusinko, sent daily emails to multiple RCN recipients with the subject line "DMCA Offered Calls Profile." From October 2016 to December 11, 2016, Mr. Rusinko did not send these emails to any RCN attorneys, and RCN appropriately produced them.[19] However, on December 12, 2016, Mr. Rusinko added Mr. Kramp to his distribution list. Mr. Kramp never responded to any of these emails. Nevertheless, RCN withheld all 63 of the emails that were sent to Mr. Kramp, claiming they "reflect[]" legal advice.[20]

That action speaks volumes. The only relevant difference between Mr. Rusinko's "DMCA Offered Calls Profile" emails before December 12, 2016 and after that date is the fact that Mr. Rusinko added a lawyer to his distribution list. That fact alone does not transform Mr. Rusinko's non-privileged emails into privileged emails. *See, e.g.*, *Dejewski*, 2021 WL 118929, at *1. More importantly, the fact that RCN chose to withhold clearly responsive non-privileged documents on this basis casts serious doubt on the bona fides of RCN's other privilege assertions.

However, Plaintiffs are not yet in a position to evaluate many of those assertions. Mr. Rusinko's emails stand out because RCN has produced virtually no documents at all related to the development of its DMCA Policy or its awareness of copyright infringement on its network. Thus, Plaintiffs largely lack the ability to compare documents RCN has produced against documents it has withheld to analyze whether RCN's privilege assertions are reasonable. Right now, all Plaintiffs know is that RCN has implausibly asserted privilege over entire subject matters that are critical to Plaintiffs' claims.

The starting place to address this issue is RCN's decision to withhold 674 communications that clearly lack any attorney involvement. These communications, including

---

[19] *See* Exhibit 2 at RCN0040352-480.
[20] *See id.* at RCNPriv0633-34, 0674, 0675, 0703-40, 0742-55, 0758-809, and 0812-23.

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 12

but not limited to Mr. Rusinko's emails described above, span 199 email chains (or standalone emails) that do not contain any emails from attorneys or emails sent only to attorneys.[21] Of the privilege assertions Plaintiffs challenge:

- There are 475 total emails, found in 151 email chains, that merely "cc'd" attorneys.[22] No attorney ever responded to any email in these chains.
- There are 199 total emails, found in 82 email chains, in which attorneys were included among multiple recipients in the "to" field, but no attorney ever participated in any of those chains.[23]

Because no attorney "actively participate[d]" in any of these communications, they are not privileged and should be produced. *Dejewski*, 2021 WL 118929, at *1. Further, Plaintiffs request leave to raise additional challenges to RCN's privilege log once they are able to review these documents and compare them to any remaining communications over which RCN asserts privilege.

### 3. Communications With Unprivileged Attachments

In its privilege log, RCN did not analyze the vast majority of email attachments separately from the parent emails to which they were attached. That approach is contrary to black-letter privilege law in this district. Accordingly, RCN must be compelled to produce email attachments that are not privileged, regardless of whether the emails to which they are attached are themselves privileged.

Many courts in this district—including this one—have recognized that email attachments can be withheld as privileged only if they "individually satisfy the criteria" for privilege. *RLI Ins. Co. v. Greater N.Y. Mut. Ins. Co.*, No. 10-cv-6032-PGS-TJB, 2011 WL 13150167, at *2 (D.N.J. Dec. 2, 2011) (quoting *Spiniello Cos. v. Hartford Fire Ins. Co.*, No. 07-cv-2689-DMC-MF, 2008 WL 2775643, at *2 (D.N.J. July 14, 2008)); *see also Leonen v. Johns-Manville*, 135 F.R.D. 94, 98 (D.N.J. 1990) (same). Each attachment must be analyzed independently from its parent email, as the act of attaching a document even to a privileged email does not "make the attachment privileged." *Leonen*, 135 F.R.D. at 98.

RCN did not make independent privilege determinations for email attachments. Rather, RCN treated any attachment as privileged if it claimed the parent email was privileged. Thus, RCN must produce the following attachments regardless of whether they were attached to privileged communications:

---

[21] *See* Exhibit 3 at Ref. Nos. 12-210.
[22] *See id.* at Ref. Nos. 16-128, 132-169.
[23] *See id.* at Ref. Nos. 129-210.

# McElroy Deutsch

Hon. Tonianne J. Bongiovanni, U.S.M.J.
December 30, 2021
Page 13

- 56 documents that appear to be sample infringement notices attached to emails that have no input from attorneys;[24] and
- at least 19 documents that appear to reflect underlying factual information concerning RCN's knowledge of the copyright infringement notices it received from third parties, including periodic notification lists, "DMCA raw data" spreadsheets, and termination lists, among other attachments.[25]

RCN must produce such attachments—and any other non-privileged attachments—regardless of whether they were attached to privileged communications.

### III. Conclusion

Plaintiffs respectfully request that the Court grant the above-requested relief.

Respectfully submitted,

McElroy, Deutsch, Mulvaney & Carpenter, LLP

*s/ Thomas R. Curtin*

Thomas R. Curtin

Attachments
cc: All counsel (via ECF and e-mail)

---

[24] The vast majority of the parent emails for these attachments merely cc attorneys. *See* Exhibit 2 at RCNPriv0119-138, 144-145, 157-159, 229, 328, 355, 409-410, 530-539, 621-623, 628-629, 825, and 827. Some were sent directly "to" an attorney. *See id.* at RCNPriv1016-1017, 1028-1029, and 1032-1033. The others are attached to emails with no attorneys at all. *See id.* at RCNPriv0326, 0341-0342.

[25] *See id.* at RCNPriv0295, 302, 438, 492, 494 (periodic notification lists); RCNPriv0429, 0436 (DMCA raw data); RCNPriv0477, 580, 1549 (termination lists); RCNPriv0547, 657-658, 660-661, 663-0664, 1564-1565 (other).