**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

UMG RECORDINGS, INC. *et al*,

          Plaintiffs,

     v.

RCN TELECOM SERVICES, LLC *et al.*,

          Defendants.

Civil Action No. 19-17272 (MAS) (TJB)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

      This matter comes before the Court on two Motions to Dismiss Counterclaim. The first is Plaintiffs UMG Recordings, Inc.; Capitol Records, LLC; Sony Music Entertainment; Arista Records LLC; Arista Music; LaFace Records LLC; Sony Music Entertainment US Latin LLC; Volcano Entertainment III, LLC; Zomba Recording LLC; Atlantic Recording Corporation; Bad Boy Records LLC; Elektra Entertainment Group Inc.; Fueled By Ramen LLC; Maverick Recording Company; The All Blacks U.S.A., Inc.; Warner Music Nashville LLC; Warner Records Inc.; Warner Records/Sire Ventures, Inc.; WEA International Inc.; and Counterclaim Defendant Recording Industry Association of America, Inc.'s ("RIAA") (collectively "Industry Plaintiffs") Motion to Dismiss Counterclaim. (ECF No. 174.) Defendants RCN Telecom Services, LLC; RCN Telecom Services of New York, L.P.; RCN Capital Corp.; RCN Telecom Services of Philadelphia, LLC; RCN Telecom Services of Massachusetts, LLC; Starpower Communications, LLC; RCN Management Corporation; RCN ISP, LLC; RCN Digital Services, LLC; RCN NY LLC 1; RCN Telecom Services (Lehigh), LLC; RCN Telecom Services of Illinois, LLC; 21st Century Telecom

Services, Inc.; and RCN Cable TV of Chicago, Inc. (collectively "Internet Providers") opposed (ECF No. 183), and Industry Plaintiffs replied (ECF No. 187).

The second motion is Counterclaim Defendant Rightscorp, Inc.'s ("Rightscorp") Motion to Dismiss Counterclaim. (ECF No. 175.) Internet Providers opposed (ECF No. 183), and Rightscorp replied (ECF No. 186). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants Industry Plaintiffs' and Rightscorp's Motions.

I.  **BACKGROUND**

This is a case about copyright infringement and the interaction between the parties that allegedly facilitated the infringement, those who identified it, and those prosecuting it. Currently before the Court is a narrow slice of the story involving Internet Providers' counterclaim against Industry Plaintiffs and Rightscorp for unfair competition. Indeed, this is the second time the Court addresses these motions, and it hereby incorporates and adopts by reference the background section of its prior Memorandum Opinion. *See UMG Recordings, Inc. et al. v. RCN Telecom Servs. LLC et al*, No. 19-17272, 2021 WL 2810145, at *1-3 (D.N.J. June 30, 2021), ECF No. 159. Having been here before, the Court provides only those facts necessary to resolve the instant motions.

Internet Providers offer internet access to customers throughout the United States, with a focus on the northeastern market. (Defs.' Answer and Countercompl. ("Countercompl.") ¶ 42, ECF No. 161.) According to Internet Providers, they do "not supervise or control what users of [their] network do on the internet," but rather act as a mere "conduit, or gateway, for access to the internet." (Countercompl. ¶¶ 42-43, 47.) Congress imposed limitations on Internet Providers' passivity, however, in passing the Digital Millennium Copyright Act in 1998 (the "Act"). Pub. L. No. 105-304, 112 Stat. 2860, § 1. The Act accelerated U.S. copyright laws "squarely into the digital age" by, among other things, imposing a framework for when internet service providers may be

liable for copyright infringement. *See* Report of the Senate Comm. on the Judiciary, S. Rep. No. 105-190, at 2, 7 (1998). One avenue of liability is when companies providing internet services have actual or constructive knowledge that their subscribers are infringing copyrighted work. *See* 17 U.S.C. § 101 *et seq.*; *Arista Recs., Inc. v. Flea World, Inc.*, No. 03-2670, 2006 WL 842883, at *14 (D.N.J. Mar. 31, 2006). This type of internet service provider liability forms the basis of this suit, as Industry Plaintiffs bring claims against Internet Providers for contributory and vicarious copyright infringement. (Am. Compl. ¶¶ 3-10 (citing 17 U.S.C. § 101 *et seq.*), ECF No. 9.)

But Congress provided a safe harbor for companies such as Internet Providers to avoid liability for contributory or vicarious copyright infringement should they adopt and implement a policy for repeat infringers using their services, among meeting certain other requirements. *See* 17 U.S.C. §§ 512(a), 512(i)(1)(A). In response to the Act's safe harbor provision, Internet Providers established a policy in 2016 to process and handle infringement notifications they received from third parties (the "DMCA Policy"). (Countercompl. ¶ 49.)

Generally, Internet Providers do not patrol or supervise their network to detect subscriber infringement. (*Id.* ¶ 47.) So, if knowledge of infringement is the touchstone for vicarious liability, how are Internet Providers notified? One way comes from infringement notification emails from outside entities like Rightscorp. (*Id.* ¶¶ 16-17.) Rightscorp is a Delaware company that operates out of California and deals in the business of detecting online copyright infringement throughout the U.S., including in New Jersey. (*Id.*) It utilizes detection technology to identify suspected infringement on the internet and subsequently sends notifications to the relevant internet service providers. (*Id.* ¶ 66.) In these notifications, Rightscorp includes the IP address associated with suspected infringement and requests that Internet Providers "forward the email to the affected customer." (*Id.* ¶¶ 66-70, 108.) In addition to notifying Internet Providers, Rightscorp also notifies

the copyright holders. (*See, e.g., id.* ¶ 76.) Rightscorp is not the only entity that notifies Internet Providers that their subscribers may be infringing copyrighted materials, however. (*See id.* ¶ 102.) Although there are several other third parties that provide similar notifications, Internet Providers claim that "all or virtually all" of the other entities that send infringement emails comply with their DMCA Policy. (*Id.*) Rightscorp, on the other hand, ignores that DMCA Policy altogether. (*Id.* ¶ 101.)

According to Internet Providers, Industry Plaintiffs partnered with Rightscorp in August 2019 to jointly identify infringing internet service providers, which led to this lawsuit. (*Id.* ¶ 76.) Internet Providers now assert a counterclaim against Rightscorp, alleging its infringement notification system violates California's unfair competition law (UCL). (Countercompl. ¶¶ 145-56 (citing California Business & Professions Code § 17200).) In addition, Internet Providers allege that Industry Plaintiffs are complicit with Rightscorp's unsavory conduct by consenting to their infringement notification process and assert a UCL counterclaim against them, as well. (*Id.* ¶ 154.) What are Internet Providers' alleged damages from receiving infringement notifications? They claim that Rightscorp's noncompliant infringement emails caused them substantial expenses, including sustaining additional operating costs to maintain appropriate systems (*id.* ¶ 57); investing "significant" employee time and resources into addressing these notifications (*id.*); incurring "substantial legal expenses in evaluating and defending against" infringement lawsuits, including this one (*id.* ¶ 130, 132); and further developing their DMCA Policy (*id.* ¶ 131).

Both Rightscorp and Industry Plaintiffs previously moved to dismiss Internet Providers' counterclaim, and the Court dismissed without prejudice in June 2021 for want of statutory standing. (ECF No. 160.) With leave of the Court, Internet Providers submitted an amended

4

counterclaim, adding additional facts to support its California UCL claim. (*E.g.*, Countercompl. ¶¶ 94-156.) Rightscorp and Industry Plaintiffs responded with the present motions.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). In ruling on a motion to dismiss a counterclaim under Rule 12(b)(6), district courts use the same standard as ruling on a motion to dismiss a complaint. *See Cnty. of Hudson v. Janiszewski*, 351 F. App'x 662, 667 (3d Cir. 2009).

A district court conducts a three-part analysis when considering a motion to dismiss under Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a [counter-plaintiff] must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all counter-plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the non-moving party. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Courts, however, may ignore legal conclusions or factually unsupported accusations that merely state "the-[moving-party]-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the Court must determine whether "the facts alleged in the [counterclaims] are sufficient to show that the [counter-plaintiff] has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the [counter-]defendant is liable for the misconduct alleged." *Id.* at

---

[1] Hereafter, references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure.

5

210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the moving party "bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## III.    DISCUSSION

Before the Court are Rightscorp and Industry Plaintiffs' similar motions, both moving to dismiss Internet Providers' counterclaim under Rule 12(b)(6) on the grounds that their UCL claim is without merit and, further, that Internet Providers lack statutory standing to bring the claim. (*See generally* Rightscorp's Mot. to Dismiss, ECF No. 175; Industry Plaintiffs' Mot. to Dismiss, ECF No. 174.)

The UCL provides a cause of action for "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Parties only have standing to sue if they "suffered injury in fact and . . . lost money or property as a result of such unfair competition." *Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227-28 (Cal. 2006) (quoting Cal. Bus. & Prof. Code § 17204). The statute imposes a more stringent standing requirement in that claimants must establish a loss or deprivation of money or property sufficient to qualify as injury in fact (*i.e.*, economic injury) and demonstrate that that economic injury was the result of or caused by the alleged unfair business practice. (*See id.* (noting that the relevant statutory language was amended "by deleting the language that had formerly authorized suits by any person 'acting for the interests of itself, its members or the general public,' and by replacing it with the phrase, 'who has suffered injury in fact and has lost money or property as a result of unfair competition.'").)

As an initial matter, the Court notes that "[u]nlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of . . . statutory standing is properly granted under Rule 12(b)(6)." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011) (citation omitted). As Rightscorp and Industry Plaintiffs

6

only challenge Internet Providers' statutory standing under California law, the Court examines the counterclaim under Rule 12(b)(6).[2] The Court considers each motion in turn.

### A.     The Court Grants Rightscorp's Motion to Dismiss

Previously, the Court found that Internet Providers "fail[ed] to adequately allege [statutory] standing as to either Rightscorp or [Industry Plaintiffs] because" they did not plead "a cognizable economic injury under the UCL." *UMG Recordings, Inc.*, 2021 WL 2810145, at *4. This was because Internet Providers were required to demonstrate that they "lost money or property sufficient to constitute an injury in fact under Article III of the Constitution" and also required to demonstrate a "causal connection between [counter-defendants'] alleged UCL violation and [their] injury in fact." *Janovich v. Wells Fargo Bank, N.A.*, No. 21-402, 2022 WL 891277, at *5 (E.D. Cal. Mar. 25, 2022). Internet Providers alleged that Rightscorp's infringement notification process caused them monetary harm: Rightscorp's flagrant disregard for Internet Providers' DMCA Policy racked up unnecessary expenses. (*E.g.*, Countercompl. ¶ 150.) This, in turn, led Internet Providers to remodel and upgrade their infringement notification systems, increase employee expenses to address Rightscorp's noncompliant infringement notification emails, and expend additional legal costs to respond to such emails. (*See generally* Countercompl.)  In their amended counterclaim, Internet Providers allege the same examples of economic harm, but this time add additional facts. (*Id.*) Thus, the Court revisits each of Internet Providers' alleged harms to determine whether they now have statutory standing. In doing so, the Court finds they still do not.

---

[2] In any event, evaluating the motions under Rule 12(b)(6) places Internet Providers in the more advantageous position of not having the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991) ("A plaintiff may be prejudiced if what is, in essence, a Rule 12(b)(6) challenge to the complaint is treated as a Rule 12(b)(1) motion. When subject matter jurisdiction is challenged under Rule 12(b)(1), the [non-movant] must bear the burden of persuasion. . . . On the other hand, under Rule 12(b)(6) the [movant] has the burden of showing no claim has been stated.").

First, the Court looks to Internet Providers' claim that they directed additional resources into upgrading and maintaining their DMCA Policy. (Countercompl. ¶ 131.) Embedded in these costs were "additional employee work hours" to handle Rightscorp's "noncompliant copyright infringement complaints." (*Id.*) Such costs, Internet Providers allege, were avoidable had Rightscorp simply followed their policies. (*See id.*) The Court finds these alleged additional costs insufficient to confer statutory standing for several reasons.

As an initial matter, Internet Providers elected to design their infringement system for their own benefit—to avail themselves of the Act's protective safe harbor provision. *See* 17 U.S.C. §§ 512(c), 512(i). They were under no legal obligation to implement a policy and, important here, the safe harbor provision does not specify how to implement a policy, only that it must be "adopted and reasonably implemented." *Id.* § 512(i)(1)(A). Internet Providers chose to establish several "minimum requirements" that third-party "email[s] alleging copyright infringement" must follow, including an electronic signature, specific information about the claimed infringement, and specific formatting. (Countercompl. ¶ 52.) To demonstrate any added costs were not self-inflicted, then, Internet Providers must demonstrate that they were unable to reasonably modify these self-selected requirements, but such allegations are noticeably absent from Internet Providers' counterclaim. *In Def. of Animals v. Sanderson Farms, Inc.*, No. 20-5293, 2021 WL 4243391, at *4 (N.D. Cal. Sept. 17, 2021) ("If the defendant's conduct did not *force* the plaintiff to divert resources, the only injury comes from the plaintiff's own actions. This self-inflicted injury would not be fairly traceable to the defendant." (emphasis added)). To be sure, Internet Providers also fail to identify any statutory or legal authority that requires Rightscorp to format its infringement notifications in accordance with Internet Providers' preferences. Even if Rightscorp could have saved Internet Providers "time and effort" by following their DMCA Policy, any additional costs

8

to Internet Providers are based on how they *chose* to design their system. Consequences of that personal choice are not damages meant to be addressed by the UCL. *See Red v. Gen. Mills, Inc.*, No. 15-2232, 2015 WL 9484398, at *4 (C.D. Cal. Dec. 29, 2015) ("[S]elf-inflicted harm doesn't satisfy the basic requirements for standing."); *Mendia v. Garcia*, 768 F.3d 1009, 1013 n.1 (9th Cir. 2014). If self-inflicted harm "does not amount to an 'injury' cognizable under Article III," then it also fails to satisfy the basic requirements for statutory standing. *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).

Second, Internet Providers add additional color around their increased legal expenses. (Countercompl. ¶¶ 130, 132.) Specifically, they allege to have incurred legal expenses "separate from any litigation costs" in responding to Rightscorp's infringement notifications. (*Id.*) Parsing this out further, Internet Providers claim that they incurred additional legal costs associated with developing a DMCA Policy. (*Id.*) But the Court finds this assertion fails to specifically attribute developing this policy to Rightscorp (versus establishing a safe harbor policy for all third-party notifications) and therefore fails to confer standing. *Daro v. Super. Ct.*, 151 Cal. App. 4th 1079, 1099 (Cal. Ct. App. 2007) ("When a UCL action is based on an unlawful business practice . . . there must be a causal connection between the harm suffered and the unlawful business activity."). To be sure, even if Internet Providers alleged facts sufficient to show causation, they still fail to plead a cognizable injury because they incurred costs based on modifying their own self-selected DMCA Policy. *Campeau v. Soc. Sec. Admin.*, 575 F. App'x 35, 38 (3d Cir. 2014) ("purely voluntary decision[s]" are self-inflicted injuries that don't confer standing). A DMCA Policy, it should be noted, that Internet Providers created to benefit from statutory immunity from infringement suits under the Act.

Further, the Court already dismissed Industry Plaintiffs' claim of "legal expenses in evaluating and defending against" this suit under the *Noerr-Pennington* doctrine. *UMG Recordings, Inc.*, 2021 WL 2810145, at *5 (rejecting as a proffered injury Internet Providers' costs associated with defending the current suit); *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). It does so again here. Similarly, the Court also rejected Internet Providers' contention that they suffered "legal costs associated with evaluating the proper response to Rightscorp's notices," as they failed to specify that that evaluation was separate and apart from preparing for the instant counterclaims. *Id.* at *6 (citing *Two Jinn v. Gov't Payment Serv., Inc.*, 223 Cal. App. 4th 1321, 1334 (2015)). As the Court already found, the *Noerr-Pennington* doctrine encompasses not just direct litigation costs but also those "incidental to the prosecution of a suit." *Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944 F.2d 1525, 1528-29 (9th Cir. 1991).

All that remains is Internet Providers' costs from legal evaluations of potential remedies against Rightscorp "in and around 2016." (Countercompl. ¶ 130.) Because this was done years before the instant suit, Internet Providers argue, it is separate and apart from the current litigation. Not so. Strategizing over a legal response before suing still "cannot establish standing to pursue a UCL claim based on expenses incurred." *Robinson v. HSBC Bank USA*, 732 F. Supp. 2d 976, 989 (N.D. Cal. 2010). The timing does not change that Internet Providers were exploring how and when to seek a legal remedy against Rightscorp. Just because it came to fruition several years later in the form of a counterclaim does not change the underlying preparation for future litigation.

At bottom, Internet Providers take issue with Congress's statutory regime concerning service provider liability for copyright infringement. Their desire for companies like Rightscorp to tailor infringement notifications in certain ways to save Internet Providers money is

understandable but, as it stands, no such requirement is obligated by law.[3] So any costs derived from Internet Providers' preferences are theirs to bear alone—parties "cannot manufacture standing merely by inflicting harm on themselves."[4] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *see also Campeau*, 575 F. App'x at 38 (explaining that plaintiff's self-inflicted injuries did not confer standing as they could not be attributed to the defendant (citing *Clapper*, 568 U.S. at 418)). Because Internet Providers lack statutory standing under California's UCL, the Court dismisses their amended counterclaim. As Internet Providers were granted an opportunity to amend previously, the counterclaim is now dismissed with prejudice.

### B. The Court Grants Industry Plaintiffs' Motion to Dismiss.

The Court next turns to Industry Plaintiffs' Motion to Dismiss. For the reasons detailed above, Internet Providers lack standing against them, too. Indeed, Industry Plaintiffs are further removed from causing any alleged economic harm to Internet Providers due to Rightscorp's infringement notification process. In any event, Internet Providers' amended counterclaim fails and is dismissed against Industry Plaintiffs with prejudice.

---

[3] Internet Providers argue that Rightscorp acted as an unlicensed private investigator, which they allege violated California's UCL and caused Internet Providers to "suffer economic injury." (Countercompl. ¶¶ 133-44 (citing California Business & Professions Code § 7521).) To illustrate that injury, Internet Providers allege that Rightscorp would not have engaged in the same "fraudulent business practices" had it been trained and licensed as a private investigator. (*Id.* ¶ 144.) But the Court finds this type of harm "speculative and [unable to] form the basis for a plausible UCL claim." *Khan v. 7-Eleven, Inc.*, No. 14-522, 2015 WL 12781203, at *3 (C.D. Cal. May 6, 2015).

[4] To the extent Internet Providers attempt to allege some form of economic harm from Rightscorp's "destruction of all underlying evidence," they fail to provide facts to support that harm. (*E.g.*, Countercompl. ¶ 150.) Because the factual support isn't there, the Court "need not credit" conclusory assertions of economic harm. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 908 (3d Cir. 1997). In any event, the Court limits this finding to Internet Providers' UCL counterclaim. Should Internet Providers believe pertinent evidence to this suit was destroyed, discovery sanctions are the appropriate remedy. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).

## IV. CONCLUSION

The Court finds that Internet Providers lack statutory standing to raise a counterclaim against Rightscorp or Industry Plaintiffs under California's UCL. As a result, the Court declines to reach the parties' additional arguments. It will issue an Order consistent with this Memorandum Opinion.

_____
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

12