1              UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
2                  TRENTON DIVISION

3
     UMG RECORDINGS, INC., *et al.*, : Case No. 3:19-cv-17272-MAS-TJB
4                                   :
            Plaintiffs,             :
5                                   : Courtroom 6E
     v.                             : Clarkson S. Fisher Building
6                                   : & U.S. Courthouse
     RCN TELECOM SERVICES, LLC,     : 402 East State Street
7    *et al.*,                      : Trenton, New Jersey 08608
                                    :
8            Defendants.            : February 16, 2023
                                    : 11:30 a.m.
9
10           TRANSCRIPT OF HEARING RE: DISCOVERY ISSUES
             BEFORE HONORABLE TONIANNE J. BONGIOVANNI
                UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:                McElroy, Deutsch, Mulvaney
12                               & Carpenter, LLP
                                 By:  KATHLEEN FENNELLY, ESQ.
13                               300 Mt Kemble Avenue
                                 Morristown, New Jersey 07960
14
                                 Jenner & Block
15                               By:  ANDREW H. BART, ESQ.
                                      JACQUELLENA CARRERO, ESQ.
16                               1155 Avenue of the Americas
                                 New York, New York 10036-2711
17
     ESR/Courtroom Deputy:       John Moller
18

19   Transcription Service:     Transcripts Plus, Inc.
20                               435 Riverview Circle
                                 New Hope, Pennsylvania 18938
                                 Telephone:  215-862-1115
21                               Facsimile:  215-862-6639
                                 E-mail: CourtTranscripts@aol.com
22

23     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING. TRANSCRIPT
                 PRODUCED BY TRANSCRIPTION SERVICE.
24

25

1    APPEARANCES:
     (continued)

2

     For the Defendants:        Armstrong Teasdale LLP
3                               By:  ZACHARY C. HOWENSTINE, ESQ.
                                7 Time Square, 44th Floor
4                               New York, New York 10036

5                               Armstrong Teasdale LLP
                                By:  MARGARET SZEWCZYK, ESQ.
6                               7700 Forsyth Boulevard, Suite 1800
                                St. Louis, Missouri 63105

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  We are on the record in UMG Recordings

2    versus RCN, 19-17272.

3           Can I have a hearing on behalf of the Plaintiffs?

4           MS. FENNELLY:  Good morning, Your Honor, Kathleen

5    Fennelly, McElroy, Deutsch, Mulvaney, and Carpenter on behalf

6    of Plaintiffs.  And with me, I have Andy Bart and Jackie

7    Carrero from Jenner & Block.

8           Mr. Bart will be making the presentation on behalf

9    of Plaintiffs.

10          THE COURT:  Okay, great.  And Defendants?

11          MR. HOWENSTINE:  Good morning Your Honor.  Zachary

12   Howenstine for the Defendant, RCN.  And with me is Maggie

13   Szewczyk, also with Armstrong Teasdale.

14          THE COURT:  Great, okay.  So I was just talking off

15   the record about how to proceed, and I've offered my apologies

16   that it's taken so long to address the issues that you raised,

17   let's say, nine months ago, but here we are.  So the plan is

18   for, Mr. Bart, you can address or raise whatever issue in

19   whatever sequence you want, we'll hear a discussion on that

20   issue.  I'll rule if I can, decide if I'm going to hold in

21   abeyance my decision, and then we'll move to the next.  Does

22   that make sense?

23          MR. BART:  Okay.  Yes, that works very well.  Thank

24   you, Your Honor.

25          THE COURT:  Okay.

1           MR. BART:  Before I start, let me also introduce my

2     client representative, Jared Freedman, from the --

3           THE COURT:  He doesn't want to sit with you?

4           MR. BART:  Who could blame her, really?

5           THE COURT:  You're welcome to come up, if you want.

6           MR. FREEDMAN:  I'm fine; thank you.

7           THE COURT:  That bench can get pretty hard after a

8     while.

9           MR. BART:  So what I really wanted to do at the

10    beginning was to just make sure that Your Honor has the

11    perspective of where the documents that we're looking at in

12    this case sit, how important they are to the foundation of the

13    case, and why it is that we're here.  I'd be happy to spend

14    just a couple of minutes giving that background, if that would

15    be helpful.

16          THE COURT:  Your show.

17          MR. BART:  Okay.

18          THE COURT:  Whatever you'd like to.

19          MR. BART:  Well, to begin with, what we're really

20    dealing with here are documents that form, and that may form,

21    the core of Plaintiffs' case against the Defendants.  This

22    case is a case of secondary copyright infringement.  It's

23    brought by the three major record labels in the United States,

24    record label groups, Universal, Sony, and Warner, against

25    what's known as an Internet service provider, RCN.  An

1    Internet service provider is, more or less, what it sounds

2    like, a company that provides Internet service, and often

3    cable and phone service also to a bunch of consumers.

4         And so the reason why this case, and a number of

5    other cases like it have been brought is because there's a

6    tremendous amount of online piracy that affects the value of

7    my clients' properties.  And a lot of it occurs using an

8    Internet protocol that's called BitTorrent.  And BitTorrent is

9    something that allows users to connect to each other, and to

10   copy and make infringing copies of recordings without anyone

11   being paid for them.  And their activity, for the most part,

12   is invisible to the outside world.  And so the record

13   companies, nobody really can go in and find out who is doing

14   this.

15        So monitoring companies have come up in the last 20

16   years, they develop technologies, and they go in and act as if

17   they are other users.  They engage with users who are sharing

18   content.  They document that infringement.  But the only

19   information that they have available to them is what's called

20   an IP address.  They don't get the name, they don't get the

21   address, and the only party that can connect the IP address

22   with the actual infringers is the Internet service provider,

23   that's part of their records.  One of the things they do is

24   they assign an IP address to each of their customers.

25        So these monitoring companies send all of these

1    notices, and in this case and in most of these cases, there

2    are millions of notices to the ISPs and say, in essence, do

3    something about this.  Now, the reason that's important is

4    because the ISP, as I said, is the only company -- the only

5    entity that can connect the infringement to a particular

6    person.  And if they do nothing, if they take these notices

7    and throw them in the waste bin, or leave them in a disk

8    somewhere, nothing is done, and the users can just continue to

9    infringe and there's nothing anyone can do about it.

10            Of course, the ISP is providing the mechanism, the

11   Internet connection, the broadband connection that enables

12   these users to make these copies.  And so because it is

13   materially contributing, or at least the argument goes, to

14   that infringement, and is being put on notice of the specific

15   infringements that are going on, they potentially have a

16   claim, such as the one here, for secondary copyright

17   infringement.

18            But the law gives them a safe harbor from that, the

19   Digital Millennium Copyright Act gives them a safe harbor from

20   such liability.  If they take the simple step of implementing

21   a reasonable repeat infringer policy that, in essence, passes

22   these notices on to the actual infringers, notifies them of

23   what's going on, and takes some appropriate action at some

24   point, it's not specifically identified in the law, it just as

25   "reasonable actions," to terminate repeat infringers at some

1  point.

2           So in this particular case, and in many cases, the

3  ISP received these notices, and concededly did nothing with

4  them for a period of years.  And then basically making the

5  risk calculus determination that it's better for us to have

6  the revenues coming in from all of these subscribers than it

7  is to terminate them, so we're just going to take our chances

8  and do nothing with the notices, and let it all fall where it

9  may.

10          Then in 2015, the first of these cases was tried in

11  Virginia, and there was a verdict -- it was basically a very

12  similar case to this.  It was a case brought by a music

13  publisher -- here, they're record companies, but they both own

14  copyrights -- brought by a music publisher using the same

15  monitoring company that's involved here against an ISP, and

16  there was a multi-million dollar verdict.  And the ISP

17  community all picked up and said, "Wait a minute, there's a

18  real problem here," and things started to happen.

19          And so RCN in this case received a letter from that

20  same music publisher saying, "We need to talk about the

21  infringements on your service," and they turned around and

22  they created their first repeat infringer policy in 2016.  And

23  then they sued the music publisher for a declaratory judgment.

24  And that case ultimately settled, and we don't really need to

25  get into the details of that.

1              But at the same time that that was going on, RCN was

2    in the process of being sold from one group of investment

3    bankers to another, from one private equity firm to another

4    private equity firm.  So during that period of time, that

5    exposure, that potential risk was a major topic of interest

6    for the company, for the potential purchaser, and is obviously

7    critical in terms of this case, in terms of the awareness of

8    the company, of what was going on at the company, its

9    willfulness in allowing these infringements to go on.  And so

10   a big focus of our case and our discovery efforts is to find

11   out that.  What were you guys thinking when it was happening?

12   Were you aware of all of this, millions and millions of

13   infringements on your services?  What were you thinking when

14   you were implementing these policies?  What were you telling

15   these third parties, etc.?

16             And I think that what has come up so far is that we

17   were right, because while we had received in discovery --

18   other than copies of the infringement notices themselves,

19   we've received about 500 documents from the Defendant in this

20   case.  But their privilege log on this subject is over 3,000

21   documents.

22             So this bucket, the big bucket, the ocean of

23   documents that we're talking about in this hearing, are the

24   crux of the case, and Defendant is taking whatever steps it

25   possibly can to make sure that these documents don't see the

1    light of day.

2           And as we go through the different categories,

3    you'll see that there have been shifting explanations offered.

4    Originally, a lot of things were offered as privileged, and

5    then they backed off and said, "Well, maybe it's not

6    privileged, but it's irrelevant, and we're not giving it to

7    you based on relevance."  There are tertiary types of

8    arguments that are being made.

9           But I think that the underlying core problem with

10   their assertion of privilege, and we've alluded to this in our

11   letters to Your Honor, is that there's never been to date any

12   evidentiary proffer to support any of these claims of

13   privilege.  The lawyers have drafted letters to Your Honor

14   explaining why they think these communications may be

15   privileged, and in some cases they say "may be privileged," or

16   "they might have discussed certain topics."  But the bottom

17   line is that you, sitting here today, don't have in front of

18   you a declaration by anybody with knowledge, a statement from

19   anyone who was there at the time saying, "I was seeking legal

20   advice.  These documents are privileged."  There's none of

21   that, okay?

22          So we looked at this and said, obviously there are -

23   - attorney-client privilege is a nuanced area.  We're not

24   looking to ask them to produce the 3,000 documents -- over

25   3,000 documents that are on this log.  We're going to look for

1    things that sort of wave red flags.

2         And so there were two initial buckets that waved big

3    red flags.  The first were communications that had no

4    attorneys on them at all, okay.  So this -- under pretty

5    generally applicable Third Circuit rules and rules of most

6    other circuits, to be privileged, the communication has to be

7    between two lawyers, and none of these were.

8         Secondly, there's a bucket of communications in

9    which an attorney is mentioned in the "cc" line or something

10   like that, but never participates in the communication.  From

11   our perspective, that raises a red flag of "did we add a

12   lawyer into the communication to just shield all of this from

13   production?"  And there's at least one instance that we

14   reflect in our papers where there was a series of daily

15   reports that was being prepared by a non-lawyer to send to

16   everybody about DMCA complaints within the company.  They

17   produce those documents, and then at some point they added the

18   general counsel of the company to the mailing list, and then

19   all of a sudden those documents moved from documents we've

20   seen to documents that are on their privilege log.

21        So the two buckets that we had there were documents

22   that had no attorneys on them at all, or documents that had

23   attorneys who didn't participate in any perceptible way in the

24   communication that was going back and forth.  And that was the

25   basis for our original application to Your Honor.

1          They came back and argued that there are some cases

2     in which communications can be held to be privileged, even

3     without the presence of an attorney, if it's a communication

4     that's gathering information for purposes of seeking legal

5     advice.  The problem with that is that there's no evidence

6     before us at all, no representation, no declaration, no

7     anything, saying that that ever took place.  And there are

8     other legal objections to it, and I don't want to just get too

9     granular here, but it also relates to the rendering of

10    prospective advice.  And a lot of these talk about -- the

11    description in the log talk about advice that had already been

12    rendered.

13         So we thought that there were major red flags with

14    regard to both the documents that had no lawyers on them and

15    the documents that had lawyers who were just mentioned.  And

16    Your Honor, after receiving a number of these communications,

17    directed the parties to submit a certain number of these

18    documents for in-camera review, which is still pending at this

19    point.

20         So from our perspective, that review can provide

21    some guidance to where we are, but we believe that it is

22    against the weight of the law to allow litigation counsel to

23    make broad assertions of privilege with no evidentiary

24    proffer, and take away an entire category of documents without

25    our ability to see anything.  Certainly at a minimum, one

1    would think that if there was communications between two non-

2    lawyers, the documents themselves would not be privileged.

3    And at most, they would be able to redact out the material in

4    that email that they contend reflects information for legal

5    advice, or legal advice, or whatever it is.

6         We see none of that.  We just get a privilege log

7    that says, "This is a privileged communication," and in many

8    cases that wound up shifting over time to, "And we don't think

9    it's relevant anyway."  And that's another set of issues that

10   we have to deal with.

11        So those are the first two buckets.  And the third

12   is that we were aware, from third party discovery, that the

13   CEO of the company, Mr. Holanda, was deeply involved in all of

14   these discussions about their policy and what to do about it.

15   Defendants originally refused to even search his files,

16   claiming that he wasn't involved in the DMCA process at RCN.

17   That was, at best, a clever bit of lawyering because, while he

18   clearly wasn't, as the CEO, involved in processing individual

19   notices, he was responsible for setting the policy and had

20   tons of communications that dealt with that.  And how do we

21   know that?  Because when Your Honor ordered them to search Mr.

22   Holanda's file, all of a sudden, not that he wasn't involved,

23   we got a privilege log with 560 documents on it.  So he was

24   right smack dab in the middle of it, and we still don't have

25   those documents.  We don't even have the documents that he

1    sent or received from non-lawyers.  We don't have the

2    documents that he sent or received where lawyers were just

3    copied, we believe, to just try and provide some cover for it.

4    And that shifting sands that I mentioned to you, they're

5    trying now to defend some of those documents by saying they're

6    irrelevant, which is not a proper basis for objection at this

7    point, particularly when they started off by arguing relevance

8    -- arguing privilege.

9            So I'm trying to keep it on a macro level for Your

10   Honor as much as possible because there are a lot of details

11   here, and when you get into all the different buckets, we can

12   wind up talking about a lot of different documents and a lot

13   of different side paths, and I'm willing to go into any of

14   them.  But from our perspective, this was a coordinated

15   attempt to avoid producing some of the most important

16   documents in the case with no evidentiary foundation for it

17   whatsoever in cases where all the outside facts indicate that

18   the communications are not privileged, and that we should

19   receive those documents.

20           So that is, by way of overview, our feeling on where

21   we stand today.

22           THE COURT:  Okay.  Before I hear from Defendant, I

23   have five buckets identified, and they're probably intertwined

24   what we just outlined.  I have those documents that were

25   withheld on relevance ground, I think 426; 126 privileged, in

```
 1   part, yet even the redacted documents haven't been produced.

 2   Is that still the case?

 3            MR. BART:  Yes.

 4            THE COURT:  Is that so?  You're thinking?

 5            MR. HOWENSTINE:  I'm just -- I want to make sure

 6   that I'm thinking of the same category that Your Honor is

 7   thinking of, but I believe that's correct, yes.

 8            THE COURT:  So there was a bucket of documents --

 9   and, again, my notes say 126 -- somewhere in the papers, I

10   thought it might have been a different number, like 109 or

11   something.  But there was a bucket of documents that were

12   listed by the Defendant as privileged in part, and I don't

13   believe there was a burdensome argument attached to that; you

14   have a burdensome argument attached to withheld on relevance

15   grounds.  So I don't see why they can't be produced to get one

16   bucket off the table.

17            MR. HOWENSTINE:  Well, Your Honor, I think maybe it

18   would be helpful to step back and frame what these categories

19   are.  So --

20            THE COURT:  Okay, let me just finish.

21            MR. HOWENSTINE:  Okay, sure.

22            THE COURT:  I was trying to get rid of one that I

23   thought was easy.

24            Then I have 54 sent to third parties.  127 where the

25   lawyer -- these are sort of commingled, I think.  The 127, no
```

 1    lawyers included.  And 425, lawyers are nominally included,

 2    but they weren't actively involved, essentially.

 3         So however you -- when we get to the point where

 4    you're talking about -- and if I can rule, I'd like to know if

 5    we can talk in these buckets, or a combinations of the

 6    buckets.

 7         And the other thought that was running through my

 8    head as you were speaking, Mr. Bart, for me to deal with

 9    whether or not something is privileged is easy, we do it all

10    the time; I get an in-camera review and a sampling.  But it

11    seems that there were nuanced arguments here about a common

12    interests in the family of documents, and that is not strictly

13    privileged, attorney-client privilege.  It's whether this

14    other umbrella protects production of these documents.

15         And then it also seemed that the defendant was

16    arguing burdensome.  Well, first of all, arguing that the bulk

17    of the material is not relevant as for the large category of

18    documents.  What has been redacted is, I'll use the phrase,

19    pretty much de minimis in the scheme of things.  And that I

20    believe you gave an example of a PowerPoint presentation, and

21    that none of that was relevant.  There was one submission that

22    may be relevant -- that is relevant, but it's privileged.  So

23    the question there is, do I require that you produce the

24    information that you claim is not relevant and require

25    redaction?

```
 1              So that's how I view it, that really I wouldn't need
 2  argument necessarily on just a strict attorney-client
 3  privilege.  But this is, again, to me, more nuanced because
 4  third parties have received it, no lawyers are mentioned,
 5  lawyers are nominally mentioned, the family argument, the
 6  common interest argument.  So anyway --
 7              MR. BART:  Can I just add one --
 8              MR. HOWENSTINE:  Yeah, Your Honor --
 9              THE COURT:  Yes.
10              MR. BART:  Judge, just one follow-up I'm not going
11  to go into --
12              THE COURT:  Yes, go ahead.
13              MR. BART:  I didn't address the third party
14  documents because that is a whole separate bucket apart from
15  the main bucket of documents.  And I think that is an
16  important point for us to address.  I was planning on doing
17  that at the very end.
18              THE COURT:  Okay.
19              MR. BART:  And the last point before Mr. Howenstine
20  gets up or responds is that the numbers that you were talking
21  about, the subdivisions, excuse me, are the right numbers for
22  Mr. Holanda's documents.  There are another -- there's a whole
23  other 800 documents, or something like that.  Excuse me.
24  Jackie is the master of the actual numbers.
25              THE COURT:  Good.
```

```
 1              MR. BART:  780 documents that are independent of Mr.

 2   Holanda's documents that also primarily fall into the two

 3   buckets of emails not involving attorneys and emails that are

 4   nominally involving attorneys.  So if you're looking at those

 5   documents together, the ones that don't include attorneys is

 6   about 233, the ones that nominally include attorneys are about

 7   1,100.  There are about 19 documents that are now being

 8   withheld because the claim is that there's information that

 9   the Defendants want to redact pursuant to the Cable Act.  And

10   then there are the other things that you talked about,

11   particularly the third party documents.

12              THE COURT:  Okay.  Just before -- I'm sorry, I'm

13   holding you up.  So the total there that you just outlined,

14   the 233 and the 1,100, that includes Mr. Holanda's, as well as

15   others.

16              MR. BART:  Yes.

17              THE COURT:  Okay.  All yours.

18              MR. HOWENSTINE:  Just to provide a little more

19   background, in addition to what Mr. Bart was saying, to

20   explain how we got to where we are right now.  We served a

21   privilege log that, as Mr. Bart said, had a lot of documents

22   on it.  And the Plaintiffs raised a number of challenges to

23   the documents that were on that privilege log, and Mr. Bart

24   has spoken about some of those categories of documents.  And,

25   again, here we're talking about our privilege log in totality.
```

1           And Your Honor then issued an order essentially

2    directing us to submit a sampling of those documents for in-

3    camera review.  And Your Honor has those, there are about 44

4    documents.  And rulings as to those documents would presumably

5    give us a path forward on what to do with the challenges to

6    the remaining documents on that privilege log.  So as to those

7    issues, the only thing really before the Court right now is

8    those 44 documents which have been submitted for in-camera

9    review.

10          Then as part of that order, Your Honor also directed

11   us to collect and search Mr. Holanda's documents.  And I

12   disagree with a lot of the things Mr. Bart said about the

13   significance of those documents.

14          THE COURT:  I'm shocked.

15          MR. HOWENSTINE:  I know; shocking.  But those five

16   buckets all relate exclusively to the Holanda email

17   collection.  So that's a discrete issue, it only relates to

18   those documents.

19          Now, Mr. Bart was giving sort of an overview of the

20   case and an explanation of what, you know, Plaintiffs believe

21   are the most significant issues, the most significant

22   documents, and he highlighted two things:  One, RCN's DMCA

23   policy, its so-called repeat infringer policy.  Because for a

24   number of years before this case was filed, RCN had a policy

25   in place.  It had a system for ingesting all of these email

1    complaints, which do come in in large numbers, associating

2    them with subscriber accounts, sending communications to

3    subscribers.  And then, you know, as the process plays out, if

4    complaints continue to be received, those accounts are

5    terminated.

6           Now, we have given the Plaintiffs an enormous dump

7    of data from our DMCA system that shows all of that activity.

8    The processing of the notices, the setting of communications,

9    the termination of accounts.  They have all of that.

10          And as to the Holanda email review, these five

11   buckets of documents, none of -- I'm comfortable representing

12   that none of those documents have any substantive information

13   about what RCN's DMCA policy is or should be.  These are other

14   communications that have legal advice in them.  You know, he's

15   the CEO, obviously, he's sending and receiving a lot of emails

16   that, you know, may contain discussion of legal issues.  In

17   many cases -- in the vast majority of cases, issues that have

18   nothing to do with anything that's happening in this case.

19          But because we did an email collection and review

20   with search terms, search terms like "DMCA" and "copyright,"

21   necessarily that's going to pull in a lot of stuff that just

22   doesn't actually have anything to do with this case.  Or maybe

23   it has one line in it that talks about the existence, the

24   status of some pending litigations, you know, one line in a

25   100-page document.  That's the sort of thing we're talking

1   about.

2          But as to this notion that they need, and are not

3   receiving, information about what RCN's DMCA policy is, or

4   decisions about how that DMCA policy should change, or what

5   the components of it should be, there is none of that in these

6   withheld Holanda documents.

7          The second category that Mr. Bart highlighted is

8   this notion that there were these other cases, these other

9   copyright cases against ISPs, and at some point RCN and its

10  affiliated companies became aware of those litigations and

11  were talking about them, discussing the implications.

12         I can also comfortably say in the withheld

13  documents, the Holanda documents, the five buckets that are in

14  front of the Court, a very tiny fraction of those have any

15  information about these other litigations.  And to the extent

16  there is information, and you can police me on this, there are

17  some very clearly privileged strategy memos that were

18  circulated that Mr. Holanda received because he's the CEO of

19  the company.  But there is otherwise not any detailed

20  discussion of what is happening in those cases, or what its

21  implications are for RCN, or the affiliated businesses.

22  That's just not what's in there.  It's the fact that Mr.

23  Holanda is the CEO, and as I said, he necessarily receives a

24  lot of information from a lot of different sources, much of

25  which are frequently containing attorney advice, containing

1    attorney work product.  You know, it's our job to police those

2    things and make sure they're not improperly being produced.

3         And because we started out with such a wide set of

4    search terms that were used for this email collection, it

5    necessarily pulled in a huge volume of just stuff that is not

6    relevant to the actual issues in this case.  It's the

7    incidental mention of a pending litigation, or what the status

8    is or, you know, Your Honor, referred to some Board of

9    Director meeting slides.  So these are 100-page decks, and

10   every deck has one slide that's a legal update.  And, you

11   know, throughout the period at issue here, there are, you

12   know, four, five, six pending litigations that RCN is involved

13   in, and there's a few sentences describing what's going on in

14   those cases.  That's clearly privileged, but it doesn't really

15   have any bearing on any of the issues in this case.

16        So what Plaintiffs' discovery requests are seeking

17   and what their motion to compel is seeking -- and I understand

18   Mr. Bart doesn't know what's in these documents, but

19   essentially it would require us to go in and redact out the

20   only information that is arguably germane to anything in this

21   case, and I would say only very marginally germane, and then

22   give them a deck, a 100-page deck that has nothing to do with

23   this case.  So those -- that's the reason why we have withheld

24   this stuff.

25        THE COURT:  But isn't that normally what's done?

```
 1              MR. HOWENSTINE:  Well, Your Honor, we've produced

 2    over 30 million pages of documents in this case, and at some

 3    point --

 4              THE COURT:  Can I just tell you, numbers don't

 5    matter to me.  There are some cases where folks come up and

 6    the asking party is incredulous just because the producing

 7    party only produced two documents.  And maybe that's all they

 8    have, that's what I'm concerned about.  We get into the

 9    numbers if you were arguing that it's duplicative, if that's

10    the description, and then burdensome.   But however many you

11    produce doesn't matter, it's what are you withholding, and

12    why.

13              And normally in a privileged issue dispute, you

14    would produce -- I would rule that you produce the document in

15    its entirety, whatever the chain is, and you redact that

16    information and identify that as privileged.  But what I'm

17    hearing from you is, in part, that the production -- to me,

18    even in this issue, there are two buckets.  Are there

19    documents that have been generated based on what seem to be,

20    in your view, broad search terms that are entirely irrelevant?

21    Not relevant, even under the broad assessment that we have.

22    It doesn't have to be, as we know, admissible, just not at all

23    relevant any way --

24              MR. HOWENSTINE:  Yes.

25              THE COURT:  -- to the issues here.
```

1          MR. HOWENSTINE:  That is Category 1, bucket one.

2          THE COURT:  Okay.

3          MR. HOWENSTINE:  And bucket two -- to speak to that

4   just briefly --

5          THE COURT:  Wait, let me ask though.  But I thought

6   that with Category 1, and maybe I'm wrong, there were some

7   documents or some parts of those documents that were being

8   redacted and that your argument was in the -- using the

9   example again of the Board of Directors' presentation, that

10  there was a whole host of slides and information, etc., that

11  you view as not relevant, but yet attached to that sequence of

12  information was something that you viewed as relevant, but

13  privileged, and you were, therefore, redacting it, and now

14  you're contending that all the rest of that that's not

15  relevant shouldn't be reduced.  Am I missing something?  Is

16  that not correct?

17         MR. HOWENSTINE:  Maybe I could clarify that a little

18  bit more with an example.

19         THE COURT:  Please.

20         MR. HOWENSTINE:  This Category 1, say there is an

21  email with four attachments, and one of those attachments hit

22  on a search term and contains privileged information, and so

23  we logged that attachment.  That attachment appears on our

24  privilege log.

25         THE COURT:  Say it again?

1          MR. HOWENSTINE:  We logged that attachment.  One

2    attachment hits on a search term, it contains privileged

3    information, it appears on our privilege log.  Now, the email

4    itself and the three other attachments are completely

5    irrelevant to this case.

6          THE COURT:  But let me ask this.  If you were

7    weeding out information that's not relevant, even if it had

8    the attorney-client -- you know, on something else, we're

9    going to buy widgets, and there's a discussion, you wouldn't

10   provide a privilege log for that.  You just say that all of

11   this information is not relevant.

12         MR. HOWENSTINE:  Right, and we've logged the

13   document because -- so for example -- I'm going to invent an

14   example.  But we would have Mr. Holanda sending an email

15   forwarding a deck of -- a Board of Directors presentation deck

16   and three other financial documents.  And that deck contains

17   one slide with a legal update, it contains the word "DMCA."

18   There's discussion of, you know, litigations that the company

19   is involved in concerning copyright issues.  So that document

20   would be, at least arguably, relevant and responsive.  We

21   would log it.

22         And then our view is the other attachments, the

23   financial documents and Mr. Holanda's email need not be

24   produced because they are completely irrelevant to the issues

25   in the case that didn't hit on any search term, so they need

1    not be produced.  It would be burdensome for us to have to go

2    and produce all that material.

3              THE COURT:  Are there any -- I know I'm getting into

4    the argument without having heard Plaintiffs first.  But are

5    there any documents in their entirety which you have withheld

6    that are in these buckets of discussion that are entirely --

7    they lack any relevant information?

8              MR. HOWENSTINE:  Right, those would be the documents

9    in that Category 1.  Because what the Plaintiffs are

10   challenging is not the document that we logged, but the fact

11   that we didn't produce the other attachment and the covered

12   email, and we're saying those are completely irrelevant.

13             THE COURT:  Yeah, I'm not -- maybe I'm not

14   explaining myself.

15             MR. HOWENSTINE:  Okay, I'm sorry.

16             THE COURT:  So I'll just hold up.  So this is

17   responsive, just this group of paper is responsive to search

18   terms.  You've reviewed it, and you have found nothing here at

19   all to be relevant.  Is that the case with any of these

20   documents or buckets of documents?

21             MR. HOWENSTINE:  So, Your Honor, are you asking if

22   there are documents that we are withholding --

23             THE COURT:  Only --

24             MR. HOWENSTINE:  -- on relevance grounds that did

25   hit on search terms?

| | |
|---|---|
| 1 | THE COURT:  Only on them.  I'm sorry, I said the |
| 2 | last part? |
| 3 | MR. HOWENSTINE:  That did hit on the Plaintiffs' |
| 4 | search terms? |
| 5 | THE COURT:  Yes. |
| 6 | MR. HOWENSTINE:  I think the answer is no. |
| 7 | THE COURT:  Okay, all right. |
| 8 | MR. HOWENSTINE:  I think the issue is that some |
| 9 | other attachment did hit on a search terms. |
| 10 | THE COURT:  Yes, there might be something -- there |
| 11 | might be this sheet in here that you redacted because it said |
| 12 | something that you view as privileged and, therefore, because |
| 13 | it's in this whole stream, they're connected.  And your |
| 14 | argument is you should not have to produce any of the other |
| 15 | information because it is not relevant. |
| 16 | MR. HOWENSTINE:  Correct. |
| 17 | THE COURT:  Okay.  And what's the issue with, if |
| 18 | that's so, producing it to them?  Oftentimes I hear from the |
| 19 | receiving party, "You just did a document dump, and you gave |
| 20 | us all of this information that we don't want and need to |
| 21 | see."  And you request that the producing party goes back and |
| 22 | narrows it so that you're not in a room full of documents. |
| 23 | Maybe what should have been done, and sorry if this |
| 24 | is my fault, maybe we should have narrowed the search terms so |
| 25 | that it would be "and" instead of "or" the Digital Millennium |

```
 1   Act.
 2            But in any event, your argument is not relevant,
 3   need not be produced.  And then in the alternative, or tied to
 4   that, is burdensome.  And how is it burdensome?  What is the
 5   burden given that your client/you have already gone through
 6   all of these documents, and you've done the heavy work of
 7   reviewing?  And, you know, today's day and age of redacting,
 8   and especially if you're telling me there's an isolated
 9   paragraph here or there, how difficult or how costly is it to
10   redact that information, and put it on a thumb drive or
11   whatever, and send it over to them?
12            MR. HOWENSTINE:  I mean, we're -- Your Honor, we're
13   still talking about thousands, tens of thousands of pages of
14   documents.  And, you know, document actually does have real
15   cost.  And I'm mindful of the fact that Your Honor didn't want
16   to hear about numbers, but we've spent a lot of our client's
17   money producing 30 million pages of documents in this case.
18   And if --
19            THE COURT:  And let me just -- I'm sorry, let me
20   just clarify.  I don't want to hear about numbers when
21   somebody is trying to say the sparsity or the sufficiency.
22   When we're getting to these types of issues, numbers certainly
23   do matter.  But, you know, when somebody comes in and says,
24   "Look, they've produced nothing, I only got two pages."  Well,
25   I'm underwhelmed if that's really all they have.
```

1           MR. HOWENSTINE:  And -- and --

2           THE COURT:  So, anyway, just to clarify that.

3           MR. HOWENSTINE:  And the other piece of this, Your

4    Honor, is, you know, we are obligated to protect our client's

5    interests.  And I understand that there's a protective order,

6    but Mr. Holanda is the CEO of the company.  There's a lot of

7    sensitive information, strategic planning, different things in

8    these documents.

9           THE COURT:  That's a separate category, though.  If

10   you were to come in and say, this is going to -- even though

11   they're not competitors, but this is -- you don't want that

12   out there, then that's a separate reason to say, you know, our

13   financial planning, whatever it is, but you haven't invoked

14   that.

15          MR. HOWENSTINE:  Well, to the extent we haven't, I

16   am invoking it now, Your Honor.  I mean, that's all across

17   these documents because, you know, that's the kind of material

18   that Mr. Holanda is sending and receiving, he's at the top of

19   the organization.  He's not involved in the minutiae, he's

20   involved in the big picture.  And, you know, that kind of

21   stuff, the company has charged us with safeguarding, and

22   that's why we're not doing sort of a willy-nilly document dump

23   of everything that just hits on a search term, even if it's

24   not relevant, we're just producing it.  Because, you know, the

25   company is very mindful of these things and has instructed us

1    to police that and be careful about what we're producing.

2            THE COURT:  What if we entered into -- you entered

3    into a heightened discovery confidentiality order that says

4    attorneys' eyes only?

5            MR. HOWENSTINE:  Your Honor, we have attorneys' eyes

6    only under the protective order in this case.

7            THE COURT:  You do?  Okay, all right.

8            Let me switch back -- I'm sorry, was there anything

9    else you wanted to say in terms of educating me to where we

10   are before we get into the granular --

11           MR. HOWENSTINE:  Just a final point, maybe two final

12   points very briefly.  One, this notion that Mr. Holanda is

13   deeply involved in RCN's DMCA policy and setting the policy.

14   I understand why Mr. Bart would like that to be the

15   Plaintiffs' narrative in this story, that would be a nice one

16   for them.

17           THE COURT:  Why?  I'm missing --

18           MR. HOWENSTINE:  Because he would like to create a

19   world in which these copyright issues are the boogeyman that's

20   lurking in the industry, and it's all that anyone is paying

21   attention to, and all the money we make is because of some

22   environment in which people are allowed to infringe a

23   copyright.  But that's just not true.

24           Mr. Holanda, because he's the CEO, yes, he gets

25   informed of policy decisions that are made, but there's

1    nothing in these documents in which he is wading into the

2    details of RCN's DMCA policy, or directing what the DMCA

3    policy is, or talking about how RCN, or any affiliated company

4    should deal with copyright issues.  There is none of that in

5    these documents.

6              And then the final point I wanted to make.  Mr. Bart

7    suggested that there was something abnormal going on here

8    because there hadn't been some sort of evidentiary proffer

9    that was made about the privilege claims.  As far as I know,

10   that's never come up in any of the briefs, that's a new issue.

11   And as I see it, what we have done is incredibly customary for

12   this sort of case.  We produced a privilege log where we

13   described our privilege claims.  And if they had some issue

14   with the sufficiency of the information in that privilege log,

15   they could ask us to provide more detail, and we would provide

16   it.  And essentially, we had all of that back and forth, which

17   is what led to the dispute initially that ultimately

18   culminated in Your Honor having us submit those 44 documents

19   for in-camera review.

20             So I'm sort of left wondering, given where we are,

21   and given the procedural background of this, what the form or

22   significance of that proffer would it be.  We have a huge

23   volume of documents that are at issue.  Both parties have

24   endeavored to put them in different categories, and highlight

25   issues that need to be decided.  But I don't really understand

```
 1    why or what form of an evidentiary proffer would be useful or

 2    appropriate in this case.

 3              MR. BART:  May I address that first, Your Honor?

 4              THE COURT:  Sure.

 5              MR. BART:  My biggest frustration, frankly, in

 6    hearing the whole recitation is this entire discussion is

 7    happening behind a wall and we're on the other side of the

 8    wall, and there is nobody from RCN who is saying anything.

 9    The only people that are saying anything are litigation

10    counsel, and what they have said has changed over time.

11    Originally it was privilege, then it was relevance, then on

12    some of the relevance it was the Cable Act.  Just now you

13    heard him say, "And if we haven't said it before, we're saying

14    it now."  He's made representations to you about what the

15    documents show or don't show.  That's not what the law

16    requires.

17              And far from this being an issue that hasn't come up

18    before, in our letter to you of February 8th, 2022, we say,

19    "All of RCN's privilege claims should be rejected because RCN

20    has failed to provide any evidence to support them.  A party

21    asserting entitlement to the attorney-client privilege may

22    meet its burden only by an evidentiary showing based on

23    competent evidence, such as declarations or affidavits from

24    the relevant attorneys or corporate employees," citing Greene,

25    Tweed of Delaware, Inc. from the Eastern District of
```

1    Pennsylvania from 2001.  "RCN was undoubtedly aware of this

2    requirement as the very case it cites recognized that attorney

3    declarations generally are necessary to support the

4    designating party's position in a dispute about attorney-

5    client privilege."

6         This has been a theme of ours throughout this

7    dispute because we're basically operating in a position where

8    we have no visibility into anything.  And nobody who is there

9    at the time -- there's no declaration from Mr. Holanda, and

10   there's no declaration from anybody else.  All there is are

11   the affirmative statements, the ipse dixits of counsel in

12   correspondence, and even more so in court today, telling you

13   what these documents say, "Absolutely, Your Honor, there's not

14   a word in there that has anything to do with the DMCA."

15        Well, that's not what the law requires and we're

16   entitled to something that is responsible to the rule of law,

17   and we haven't received it.

18        THE COURT:  But I hear two things:  One is, what if

19   they decide -- or determine -- I shouldn't say decide.

20   They've done the review, which everybody does, you get hits

21   from your search, and the attorney reviews them for relevance.

22   And if there were buckets where the Defendant has determined

23   that these documents are not relevant, generally that's where

24   -- you know, we're relying on counsel.

25        MR. BART:  Okay.

```
 1              THE COURT:  And so if they say they're not relevant,
 2    I would go with that.
 3              But what I'm hearing, what was clarified today is
 4    that the Defendant does not have a wholesale "these are not
 5    relevant" argument.
 6              MR. BART:  No, they don't.
 7              THE COURT:  What the Defendant has is either it's
 8    burdensome, now I'm hearing, and I'm -- this is not
 9    disparaging, maybe you told me before, but now I'm also
10    hearing, even if it is attached, there is other information,
11    the other information may be heightened confidential
12    information on business, whatever.
13              But I'm not hearing that you're -- well, where I
14    hear the Plaintiff challenging the designation is there are no
15    lawyers, so it's the absence of anyone, or there are lawyers
16    only nominally involved.  So I know we're talking a lot about
17    privileged, and the support that they've provided, but
18    honestly, I didn't come out here thinking that was the hurdle.
19              MR. BART:  Well, Your Honor, we've made it very
20    clear in our papers.  And I think that there is also a bit of
21    conflation between the original 780, or whatever the number is
22    of documents between those two buckets, and Mr. Holanda.
23              Mr. Holanda's documents raised a number of issues
24    that aren't present in that first group.  Originally, they had
25    identified all of these documents that were privileged, and we
```

1    challenged them primarily because there were no attorneys

2    present, or attorneys were marginally present.  Your Honor

3    took some in-camera.  There was never any proffer with regard

4    to any of those.  And the only defense on any of those, any of

5    those 780, whatever, was privilege.

6            Mr. Holanda's documents are more nuanced, and they

7    involve certain issues of relevance.  They involve certain

8    issues of third party production.  They involve certain issues

9    of the production of documents within email families that are

10   not part of that original group at all.  And I think most of

11   what counsel's presentation to Your Honor was about were the

12   Holanda documents.  And while, yes, we do believe that Mr.

13   Holanda was involved, whether he was the architect of the

14   policy, or whether he just passed on it, we have no visibility

15   into that.

16           But the documents that hit on this are -- and there

17   are still a lot of them that are not covered by the relevance

18   objections that are really just still in those first original

19   two buckets of no lawyers and marginally involved lawyers.  As

20   to all of those, those are privileged documents, and those are

21   not supported by anything.  And what we're basically saying

22   is, counsel can get up and say, "This is all privileged," and

23   there's no -- you get no visibility, and the law really just

24   doesn't allow you to do that.  We've cited the cases here,

25   we've --

1          THE COURT:  Let me -- I'm sorry, let me interrupt.

2    To clarify what I had mentioned about my not coming out here

3    thinking this was a privilege.  I should phrase it as your

4    garden variety privilege issue.

5          MR. BART:  Okay.

6          THE COURT:  I'm viewing this as -- I'll just use

7    something that's not involved here, the common defense

8    privilege.  So I'm coming out here thinking that what I have

9    to hear from you folks on is, first of all, clarifying whether

10   anything's been withheld entirely solely because it's not

11   relevant; that's not the case, so that's helped.

12          I want to know -- I have to decide whether or not

13   there is -- it is appropriate to with full documents because

14   of the family or common interests.  And then also, what am I

15   doing about the no lawyers included?  What's the justification

16   for that?  Because if there's no lawyers included, there's no

17   privilege issues if they get produced.  So I'll come back, but

18   I'm just telling you my mindset and what I wanted to hear from

19   you folks about.

20          And then as I started out of the gate is I don't

21   understand why the 126 documents where they're only privileged

22   in part, why those haven't been produced in redacted form

23   because I don't think there was a burdensome argument attached

24   to that.  So let me hear from the Defendant, then I think we

25   should just get back onto the track of going bucket-by-bucket.

```
 1              MR. BART:  Okay.

 2              MR. HOWENSTINE:  Okay.  And maybe to clarify

 3    something, because I think maybe Mr. Bart and I are even

 4    talking past each other a little bit.  A lot of his issues --

 5    a lot of the issues that he has raised relate to that first

 6    collection of 700 odd documents that they identified from our

 7    privilege log.  And in our view, there's no real issue before

 8    the Court on that, except to the extent we submitted 44

 9    documents for in-camera review.  As we see it, Your Honor

10    said, "Submit a sampling, I'll rule on that sampling, and then

11    we'll decide where to go from there."

12              So from our perspective, if we get rulings on those

13    44 documents, we can take those and hopefully apply those

14    rulings more broadly to everything else and resolve many, if

15    not most, of those issues.  But either way, I don't think that

16    there are any other issues concerning those 700 odd documents

17    that are specifically before the Court.

18              Then if we move to Mr. Holanda specifically, and the

19    five buckets, I understand Your Honor to be saying this

20    Category 2, the 126, you want us to just redact the legal

21    slides and produce them, we will do that.

22              THE COURT:  Okay.

23              MR. HOWENSTINE:  And then just to clarify, the

24    Category 1, the documents that we're withholding as

25    irrelevant, Your Honor mentioned that we had raised these
```

1    other issues about confidentiality, about burden, etc., and to

2    be clear, those arguments about burden, about confidentiality,

3    those apply only to documents that we have already determined

4    are irrelevant in their totality.  So in addition to being

5    irrelevant, in their totality, we're also saying that they

6    contain confidential information, etc.

7              THE COURT:  But I thought you told me a few moments

8    ago that there were not any documents that you were

9    withholding because you deem them to be entirely irrelevant.

10             MR. HOWENSTINE:  And I apologize, Your Honor, I

11   think --

12             THE COURT:  Did I mishear?

13             MR. HOWENSTINE:  I think we're continuing to have a

14   hard time with this issue of where one --

15             THE COURT:  I'm sorry I'm so dense.

16             MR. HOWENSTINE:  Well, no, I think it's my problem

17   in explaining it.  But it's an issue where we have one

18   document in the family that we agree may be irrelevant, but it

19   has been logged, and it's on our privilege log.  And to the

20   extent that the Plaintiffs are challenging the withholding of

21   that document, or the redacting of that document, that's a

22   separate issue.

23             The issue is that there are other documents

24   associated with that document that we say are completely

25   irrelevant, but because they were in the same family, and to

1    avoid questions about "why are there missing documents here,"

2    we identified and logged them, so they are aware.  In the

3    ordinary course, if we were just withholding something as

4    irrelevant, we wouldn't even tell them about it.  We wouldn't

5    -- it wouldn't appear on the log, it wouldn't be specifically

6    identified.

7            THE COURT:  But you're withholding that whole

8    category because you have appropriately identified that this

9    is part of a group.  But you're withholding -- you want to

10   withhold the whole category because there's a section that you

11   say is protected under the family argument.

12           MR. HOWENSTINE:  Right, we're saying that the

13   remainder of the family is completely irrelevant, and contains

14   sensitive information, and would be burdensome for us to

15   produce, so there's nothing for us to produce.

16           And to the extent the Plaintiffs have some issue

17   with our privilege claim as to the one document that hit on a

18   search term and was logged, those claims are being raised

19   separately.  The issue in the Category 1 is entirely our

20   decision not to produce the other completely irrelevant

21   documents.  Does that make sense?

22           THE COURT:  Yes, okay.  So why don't we hit

23   categories-by-category, or however you'd like to address the

24   issues?

25           MR. BART:  Okay.  I think part of the problem, Your

1    Honor, is that there, you know --

2              THE COURT:  Is me.

3              (Laughter)

4              MR. BART:  No, I honestly don't think that, but

5    there's no point in ascribing blame.  Part of the problem is

6    that there have been lists of objections that fall into

7    different buckets that come out of these letters, that

8    overlap, and it's almost impossible for us to parse through

9    them and make sense out of it.

10             The way we looked at the Holanda documents is that

11   there are 560 documents, there are 127 that reflect

12   communications with no attorneys at all, and that comes from

13   Footnote 7 of Plaintiffs' letter of June 3rd, 2022.

14             There are 425 documents reflecting communications

15   only nominally identified including attorneys, that's from the

16   next footnote in that same letter.

17             Then there are 427, and we had said 426, but our

18   brains are going to explode if we try to reconcile those two

19   numbers right now, or at least mine will, that were originally

20   being withheld on the grounds of privilege.  But now since

21   that assertion can't be defended, are being withheld on

22   assertions of relevance, even though they're part of a

23   concededly relevant email family, those are identified in

24   Footnote 1 of that same letter.

25             And all of these categories overlap, and for us to

1    get transparency into what we're talking about, I can only

2    address them by category.  I can't address them as Mr.

3    Howenstine has by saying, "This document says such and such,

4    and it contains this" because we haven't seen any of them,

5    okay?

6            What we know is that communications that reflect no

7    attorneys at all are not privileged communications.  They must

8    be produced.

9            Documents reflecting communications only nominally,

10   including attorneys, are the same.  They are not privileged,

11   and we've cited the authority for why they're not privileged.

12   No proffer has been made.

13           With regard to the documents that were originally --

14   that may have been originally listed as privileged, but are

15   now being defended as irrelevant, may be burdensome, may be

16   confidential, may be whatever else comes up in the next half

17   hour, if they're part of a relevant email family, the practice

18   everywhere is to produce the family, to redact out the

19   privileged material, to address those issues later on.  There

20   hasn't been a showing in any of the papers that we've had a

21   chance to respond to of what the confidentiality concerns are,

22   what the burdensome concerns are, any of that.  We're just

23   being told these comments, "They're irrelevant," "We've

24   determined they're irrelevant."  But the law says, and there's

25   no law cited to the contrary, that in those circumstances, the

1    general practice is to produce it all, to deal with relevance

2    objections down the road, and to redact out the privileged

3    category.

4           The fourth document -- bucket is the 126 that were

5    privileged in part, and I think maybe we've reached agreement

6    on that.

7           And the last one, and I think this is one that

8    requires some discussion, is the communications with third

9    parties.  Because I genuinely do believe -- I believe -- Mr.

10   Howenstine believes what he's believing, and I'm not casting

11   any doubts on that.

12          What we believe, we feel just as firmly.  We do

13   believe that this was a topic that was discussed at the time

14   of the purchase and sale of the company, and we have evidence

15   to prove it, because it was produced to us on a privilege log

16   from a third party that they got a legal analysis of these

17   issues as part of the buy and sell process because it was a

18   factor.  There was a $25 million verdict against Cox.  There

19   as a bigger verdict against Cox a little while later.  The

20   industry was paying attention to it.  Their firm did a memo on

21   this subject, it was circulating around everybody, and now

22   they're trying to pull everything back and say, you know what,

23   despite the fact that we were on different sides of the fence,

24   we have to make sure that none of these communications are

25   producible, because then all of this strategy is revealed,

```
 1   even though it was shared freely with lots of people.  It was
 2   shared with purchasers.  It was shared with financial
 3   advisors.  The lengths to which Defendant has gone to try and
 4   cull in these documents, they say that certain people receive
 5   documents by invitation of the Board, even though they weren't
 6   Board members, and even those documents were sent to third
 7   parties beyond that.
 8             There is such an effort to pull back and to say,
 9   "You're not going to see any of these materials," that any
10   good lawyer is going to say,  "Where there's smoke, there's
11   fire, and this is a major area that we need to pursue."
12             And with regard to the law itself on these issues,
13   the most recent case on the subject out of Delaware in this
14   District pretty clearly says that there is no common interest,
15   no privilege that attaches to communications between competing
16   parts of a merger transaction.  Now, there hasn't been
17   anything to the contrary since then, it's been cited with
18   approval since then.
19             THE COURT:  Is this 2020?
20             MR. BART:  Like 2020 or -- I think it is 2020.
21             THE COURT:  10X.
22             MR. BART:  Yeah.  Yeah, 10X Genomics, exactly.  And
23   so that's a powerful starting point, but it goes further than
24   that because a lot of the communications they're talking about
25   are communications between non-lawyers.  And even if there was
```

1    a common interest privilege between different sides of a

2    merger transaction, it only applies when there's

3    communications between the counsel.  And in repeated instances

4    throughout that, that's not what is happening here.

5            So this entire bucket, we submit, is a bucket of

6    materials that we are entitled to as a matter of law.  I'm

7    prepared to address it in more detail but, frankly, if you go

8    through it -- and it's part of the problem of not having an

9    evidentiary proffer, is that when you go through these

10   documents, each letter has new subparts and new arguments, and

11   it gets down to RCN saying that 15 of 54 documents reflect

12   communications with representatives or agents at Stonepeak.

13   Even if those people weren't lawyers, but there is no common

14   interest of privilege that applies to those people, they --

15           THE COURT:  So if -- I'm sorry.  If I determine that

16   there is no common interest privilege, how many documents does

17   that address and resolve?

18           MR. BART:  I believe it's 56 -- 54, I'm sorry, it's

19   54.

20           THE COURT:  Okay.

21           MR. BART:  I'll leave it at that, and I'll come back

22   if I need to.

23           THE COURT:  So that's the -- to the extent --

24           MR. BART:  That's the last bucket, yes.

25           THE COURT:  Right, to the extent of the third party.

```
 1            MR. BART:  Yes.

 2            THE COURT:  So I didn't see anything, Mr.

 3   Howenstine, in your response that addresses the 10X case from

 4   Delaware?  I don't know if you have anything --

 5            MR. HOWENSTINE:  Your Honor, yeah, I'm prepared to

 6   address that.  I mean, the 10X case is from Delaware, Mr. Bart

 7   said it's been cited, I believe it's been cited twice, and not

 8   by any court in this District.

 9            And the cases that we have cited rely on a case from

10   the Third Circuit, Teleglobe, that's 493 F.3d 345.  And if I

11   might approach, I would  bring Your Honor a copy.

12            THE COURT:  Sure.

13            MR. BART:  Was that case cited in any of your

14   papers?

15            MR. HOWENSTINE:  It's cited in the cases that we

16   cited, they relied on Teleglobe.

17            MR. BART:  Okay.

18            THE COURT:  Thank you.  Okay, anything you want --

19            MR. HOWENSTINE:  And -- and --

20            THE COURT:  -- to highlight on that?

21            MR. HOWENSTINE:  I'm sorry, just a little further to

22   that.  The notion that is thrown out -- and I believe we have

23   another copy of Teleglobe for opposing counsel here somewhere.

24            MR. BART:  Thank you.

25            THE COURT:  Is that one also underlined?
```

```
 1              MR. HOWENSTINE:  It is not.

 2              THE COURT:  So this is on --

 3              MR. HOWENSTINE:  Page 365.

 4              THE COURT:  Yes, at 16.

 5              MR. HOWENSTINE:  The notion in 10X Genomics is that

 6   parties to a business deal do not have an identical legal

 7   interest and, therefore, this common interest privilege does

 8   not apply.

 9              But Teleglobe, and, again, that's a Third Circuit

10   case, says is that it does not need to be an identical legal

11   interest.  It just needs to be a substantially similar legal

12   interest.

13              And what Teleglobe goes on to say is that because

14   the parties to a transaction are represented by their own

15   attorneys, courts can even relax the degree to which their

16   interests might converge.  So if you apply that here, just in

17   sort of a common sense way, I would suggest, we have parties

18   to a sophisticated deal, they're doing due diligence, they're

19   sharing information about the companies.  They're recognizing

20   that, to the extent the deal goes through, they are going to

21   be on the same side of a lawsuit.  They may become targets in

22   that lawsuit.  You know, even in this lawsuit, now that this

23   transaction has gone through, Stonepeak has been a target of

24   third party discovery from the Plaintiffs, so those concerns

25   were warranted.
```

1              They're sharing information because they do share a

2    substantially similar legal interest in the outcome of these

3    lawsuits.  And so I think Teleglobe governs here over an

4    isolated District Court case from Delaware.

5              And on the subject of whether attorneys need to

6    participate, you know, frankly, courts have gone different

7    ways on this.  They cited a case of Gallo, there's also a TDI

8    Bank [sic] case that's in the papers, that's 2014 Westlaw

9    12617548, which goes the other way and says, well, we look at

10   the restatement, and if you look at how the common interest

11   privilege is typically understood, it's not necessary that

12   attorneys be the ones exchanging that information.

13             So I think, again, stepping back, and looking at

14   what the expectations are in a sophisticated business deal in

15   which parties are evaluating the significance of litigation,

16   it is eminently reasonable and sensible to allow them to

17   exchange this sort of information while maintaining the

18   privilege over it.  And that's what Teleglobe recognizes;

19   that's what TDI Banks [sic] recognize.

20             And as Your Honor said, there are 54 documents on

21   the Holanda privilege law that are implicated by this, it

22   doesn't go beyond that.  So, you know, I'm happy to address it

23   in more detail, but I think the parties have briefed it, and

24   it is a legal issue for Your Honor to decide.

25             THE COURT:  I'm going to take a break because I've

```
 1    got a 1 o'clock initial, which will take me five minutes to
 2    set it on the record.
 3              I don't think my clerk -- he didn't bring out water
 4    for everyone?
 5              MR. HOWENSTINE:  We have just been through it.
 6              THE COURT:  Okay.  Didn't give you any water?
 7              MR. BART:  No.
 8              THE COURT:  Okay.  Do you want mater?
 9              MS. FENNELLY:  We have hand sanitizer.
10              THE COURT:  There you go.  Don't drink that.
11              I'll give you a chance, to the extent you want to
12    respond or are in a position, to respond to this case.
13              MR. BART:  Okay.
14              THE COURT:  And then collect your thoughts on what
15    else we need to argue, what else you want to have me focus on.
16              MR. BART:  Okay, thank you, Your Honor.  Do you need
17    us to vacate the --
18              THE COURT:  No.
19              MR. BART:  Thank you.
20              THE COURT:  You're good.  Thank you.
21              (Recess 12:53 p.m./Reconvene 1:14 p.m.)
22              THE COURT:  Perfect timing.  Your ball.
23              MR. BART:  Yeah, thank you.
24              Your Honor, with regard to this case, it arises --
25    first off, this In Re Teleglobe Communications, it arises in
```

 1    the context of a suit out of Bankruptcy Court relating to

 2    communications between parent and subsidiaries, and has

 3    nothing to do with a merger transaction, or the type of

 4    transaction that we're talking about.

 5             Obviously -- and I must confess, this is a very

 6    learned treatise on privilege that goes back to common law,

 7    and has -- was never cited before.  And so to try and actually

 8    parse through that, and give you a full summary here, if Your

 9    Honor permits, I would like to submit some response to this

10    because this is a newly submitted authority.

11             THE COURT:  Sure.

12             MR. BART:  And I will say that 10X Genomics cites

13    this case.  And so I don't think that they are, in any way,

14    irreconcilable.  I think that they are talking about different

15    principles.  And one thing that this case, on first blush,

16    makes very clear is that to the extent there is any common

17    privilege which more logically would flow between members of

18    the same corporate family, which is what is involved in this

19    case, it still had to be communications between the attorneys

20    for both parties.  And many of the communications we're

21    dealing with in this case were not between attorneys at all.

22             But rather than just trying to, forgive me, BS my

23    way through it on a five-minute break read, I'd like a few

24    days to just look at it, and to give you a response.  But my

25    initial reaction is that it's not inconsistent with anything

1    the 10X Genomics said, and no court certainly since then has

2    suggested that it is.

3                    THE COURT:  Okay.

4                    MR. BART:  Okay?

5                    THE COURT:  Anything else on any of the issues

6    you've raised?

7                    MR. BART:  No, I think that we've said what we

8    wanted to say.

9                    THE COURT:  So let me present the question this way.

10   Is there anything that could be done that might eliminate some

11   of these categories?  I know you've mentioned getting a

12   certification, or some representation on privilege.  Again,

13   I'm not minimizing that, but it seemed to me that there were

14   broader issues for me to deal with.  But is there anything

15   that you can think of?

16                   MR. BART:  No, Your Honor.  I think -- first off,

17   you know, I'll speak for Zach, even though I didn't ask him,

18   we appreciate all the time that you've given us to make our

19   arguments today.  But I think that all I would ask in leaving

20   is that we keep the original 780 separate from the Holanda

21   documents because there are a lot of different issues in the

22   Holanda documents than there are in the first ones.  I don't

23   know that I agree that your ruling on the 42 documents

24   necessarily compels, whichever way it goes, a ruling on the

25   rest because I think that those categories on their face, you

 1  know, need to be produced.

 2          But I don't want to engage in further argument.  I

 3  just would ask you to look at the 760 separate from the

 4  Holanda documents.  I can't think of anything offhand that

 5  would eliminate any of the other disputes.

 6          THE COURT:  So one of the last questions that I was

 7  going to ask is the in-camera review that I had conducted,

 8  which I did go through a while back, a long time back, and

 9  then as other issues were percolating, I kept putting them in

10  the trunk of my car, literally.  So generally when I do an in-

11  camera review, and I think my -- I know my thinking here was,

12  give me the sampling, and I could potentially rule on how I

13  think it should go, heads up or tails, with some of the

14  documents.  And then the -- my ruling would carry over to the

15  other remaining documents.  Are you thinking that's not going

16  to work or --

17          MR. BART:  Well, I think that -- I think our

18  objections are objections that stand as a matter of law,

19  regardless of what a couple of documents might look like.  I

20  mean, if there are -- I guess the simple answer is I don't

21  want to waive our objections, you know, to -- if you deem that

22  any of the individual in-camera documents are privileged for

23  some reason, even though they -- you know, I would maintain my

24  objections to the rest.  But, you know, I think if Your Honor

25  intended to take those rulings and apply them, which is what

1    we expected that you were going to do, I think both sides are

2    going to reserve their positions with regard to those points.

3            So without knowing what you've done, I think we put

4    it in your hands, and you'll decide those things, and we'll

5    follow from there.

6            THE COURT:  Is there any other approach that would

7    be more efficient?  I don't mind changing course.  If I were

8    to decide legal categories instead of -- I mean, I know

9    there's an overlap.  But if I were -- instead of telling you

10   how I rule on individual documents, if I were to rule on the

11   common interest issue, whether or not you'd have to produce

12   something where one item has been marked as privileged, but

13   the rest is marked as irrelevant, is it --

14           MR. BART:  Well, when you say "common interest,"

15   that's a separate bucket from what you were looking at in-

16   camera.  I mean, the ones -- I understood what you were

17   looking at in-camera were documents where there was no lawyer

18   mentioned or where a lawyer was simply incidentally mentioned,

19   and we had a certain number from each of those categories.

20           And, you know, we'll follow Your Honor's guidance.

21   Obviously, you know, we have our position that none of those

22   are privileged as a matter of law for the reasons that we've

23   stated.

24           THE COURT:  Okay.  For some reason, I thought I saw

25   and identified a common interest, but obviously I'm looking at

1    a lot of papers, so I stand corrected; thank you.

2              MR. BART:  No, that's okay.

3              THE COURT:  Your thoughts?

4              MR. HOWENSTINE:  My suggestion would be Your Honor

5    has the 44 in-camera review documents, if we were to get

6    rulings as to those 44 documents, I think we collectively

7    could put our heads together and see if we can chart a path

8    forward that either resolves in some way some broader

9    categories of 700.

10             And then as to the Holanda documents specifically,

11   and those five buckets, I think to the extent Your Honor feels

12   comfortable ruling on those issues as they've been presented,

13   we could certainly take those rulings, and then apply them to

14   the Holanda documents.  Or if you were to say, well, I'd like

15   to see a sampling of those documents so that I can issue those

16   rulings, we could do that, as well.

17             MR. BART:  Well, I think that was productive.  Why

18   don't we do this?  If Your Honor is open to this, if you

19   render your decisions on the 44, the parties will meet and

20   confer, and see if we can narrow our objections.

21             I think with regard to the Holanda documents, that

22   would only be applicable with regard to the ones that are only

23   being withheld -- you know, being defended on the grounds of

24   privilege, but I would be willing to have the broader

25   discussion with Defendants' counsel based on those rulings as

1    to the two buckets and the original ones, and any documents in

2    Holanda's that are being defended solely on the basis of

3    privilege.

4            And if we can't resolve it further, we'll come back

5    to you.  If we can, we'll advise you from there.

6            THE COURT:  Okay.

7            MR. BART:  Does that work?

8            THE COURT:  Okay.

9            MR. HOWENSTINE:  That makes sense.

10           THE COURT:  And then the last issue is the

11   Rightscorp, whether or not to go forward with those

12   depositions, is that still --

13           MR. HOWENSTINE:  I think there's sort of two

14   separate issues there.  One, we understood from the last

15   conference that Rightscorp was sort of being taken off the

16   table for now.  And we are talking to Rightscorp's counsel

17   directly, and trying to reach an agreement as to how those

18   depositions are going to go.

19           THE COURT:  Okay.

20           MR. HOWENSTINE:  But separately, there's the broader

21   issue that after Plaintiffs raised these privilege issues,

22   Your Honor entered an order staying all fact depositions in

23   the case.  So then, you know, the broader question is what's

24   going to happen there, are we going to march off and start

25   taking depositions or not?

1          THE COURT:  And the reason I stayed in its entirety

2     is I couldn't appreciate whether any of these rulings will

3     impact Rightscorp.  And the last thing I want to do is have

4     you in a situation where you have a do-over because it's not

5     just one document, it's a whole host of documents.

6          MR. BART:  I'm sort of outside of Defendants'

7     discussions with Rightscorp on this but, you know, I think

8     clearly as it relates to discovery between the primary

9     parties, we should hold off on depositions until the document

10    issues are resolved.

11          In terms of Rightscorp -- personally, I think

12    Rightscorp's counsel should weigh in on this.  You know, I

13    respect Zach, and I'm sure that he is being honest in saying

14    that they're making progress on trying to work through some of

15    those issues.  I can't really comment on whether there's any

16    value since the case in whole is sort of waiting for, you

17    know, this to be resolved --

18          THE COURT:  Right.

19          MR. BART:  -- whether there's any need to really

20    move forward on that, but I don't have that strong an opinion.

21    I think Rightscorp should probably be heard on that.

22          THE COURT:  Okay.  Because my thought with

23    Rightscorp was really going to be directed to you to see if

24    you could come to an agreement that based on prior -- as I do

25    with my patent cases, prior deposition testimony as to

```
1    procedures that they have in place that are more generic, that
2    you would not have to revisit those categories.  That you
3    would agree -- you folks would agree that that would be
4    applied here, so that you're minimizing the amount of time you
5    have to spend with Rightscorp.
6            MR. HOWENSTINE:  And that is what we are talking to
7    them about.
8            But just one additional comment.  All of the
9    privilege disputes, all of the document disputes that are in
10   front of the Court right now, none of those implicate
11   discovery we would take from Rightscorp --
12           THE COURT:  Perfect.
13           MR. HOWENSTINE:  -- or depositions we would take of
14   the Plaintiffs.
15           THE COURT:  Got it.
16           MR. HOWENSTINE:  So --
17           THE COURT:  As I read through the material, that was
18   my sense, but I just was hesitant to make that leap, and so
19   thanks for clarifying that.
20           So I leave it to you, but I would suggest,
21   especially -- nothing against Rightscorp, but if you want to
22   get me involved, and we could have the four of us have a quick
23   call, if you're interested in listening, because I think you
24   can have to agree, as well, that to standby --
25           MR. BART:  Yeah, and with regard to Zach's last
```

1    comment, we would be opposed to the notion that they would

2    proceed with their discovery of us while we're waiting for

3    these, you know, rulings to start the discovery with them.

4            THE COURT:  Yes.  No, I want to hold off.

5            MR. BART:  Yeah.

6            THE COURT:  There's a lot here.

7            MR. BART:  Yeah.

8            THE COURT:  It's not one little bucket.

9            MR. BART:  No, and we appreciate that.  And just for

10   clarity, Your Honor, with Your Honor's indulgence, we'll

11   submit a very brief response on this case by the end of next

12   week, if that's okay?

13           THE COURT:  Yes.  Actually, I will be out for the

14   first -- well, next Friday, I'm going to be out for a week.

15           MR. BART:  Whenever, in other words.

16           THE COURT:  So you don't have to have your -- I

17   don't want your pants on fire rushing through it to just sit

18   here.

19           MR. BART:  Okay.

20           THE COURT:  I don't know that there'd be a need to

21   respond, but I just want --

22           MR. BART:  Yup.

23           THE COURT:  I also want to digest that case and see

24   what impact it has, collect my thoughts, and hopefully get you

25   decisions within the month, you know, after the dust settles,

```
 1    so hopefully in March.

 2            I don't think I have questions on the documents that

 3    I did in the in-camera review, but if I do, I may be back to

 4    you.

 5            MR. BART:  Okay.

 6            THE COURT:  Anything?

 7            MR. HOWENSTINE:  One final comment, Your Honor, just

 8    to be clear.  In terms of moving this case along and making

 9    progress, given that the issues in front of the Court don't

10    impact any discovery we would take from the Plaintiffs, just

11    from efficiency sake, and just -- yeah, just in terms of

12    efficiency, we don't see any reason why we shouldn't be

13    allowed to go ahead and start taking depositions, of the

14    Plaintiffs, of Rightscorp, etc., if that's what we want to do.

15    We have time to do those things now, so, you know, we just

16    don't think there's any need to keep all fact deposition

17    stayed.

18            THE COURT:  You can move along with Rightscorp, but

19    honestly, I realize what you're saying, that they're apples

20    and oranges, but I just don't feel comfortable with all of

21    this information still up in the air because it may be helpful

22    to prep their witnesses, you know, to review with their

23    witnesses.  I just really prefer to just sit tight, with the

24    promise that I won't -- it won't take me months and months to

25    get you a decision.
```

1           MR. HOWENSTINE:  But then, Your Honor, you're saying

2     that we can proceed with Rightscorp?

3           THE COURT:  Yes, you can.

4           MR. HOWENSTINE:  Okay.

5           THE COURT:  But I just want to make sure that you

6     are all on the same page with what's going to occur with the

7     depositions.  I want you to endeavor to come up with an

8     agreement so that Rightscorp isn't duplicating the testimony.

9     So I invite you -- again, especially just to protect your

10    interest, as well, I invite you to ask me to have a call with

11    them.  Or if you put your in agreement in writing, that would

12    be fine.

13          I realize putting it in writing may not be

14    completely possible because, as I say, there may be questions

15    on procedures that somebody else asked a little

16    inarticulately, like me, and you want to cover some other

17    ground.  But I think the message should be clear, I don't want

18    you to have to repeat what has already been created in the

19    record from Rightscorp regarding how --

20          MR. BART:  Well, and this hasn't been said at any

21    point, but the parties before you have tried this case with

22    regard to another ISP within the last six months, and

23    Rightscorp was right in the middle of that.  So there has been

24    a very substantial amount of prior testimony on the basic

25    issues that are involved.  Obviously there is some specific

1    things that relate to RCN that are different from that case.

2    I believe that, you know, Mr. Howenstine and Rightscorp are

3    negotiating in good faith.  I would like to have, you know,

4    some awareness of what that is, but they should be able, I

5    would think, to narrow it down to things that are specifically

6    limited to this case.

7            THE COURT:  How does it impact you, if at all?  I

8    don't want to overlook any interest you may have.

9            MR. BART:  Well, I mean, I think that the --

10   ultimately there -- one of their primary defenses in the case

11   is the alleged unreliability of Rightscorp evidence.  And so

12   it relates to our affirmative case and our ability to present

13   our affirmative case.

14           We've heard a lot of this testimony, and I think we

15   anticipate where it's going, and they do, too.  But we are

16   certainly an interest party in how that comes out.

17           THE COURT:  Okay.

18           MR. HOWENSTINE:  And to be clear, Your Honor,

19   Rightscorp is nominally a third party.  We've had to serve

20   them with a subpoena, but they're also Plaintiffs' litigation

21   consultant for purposes of this case.  So they are actively

22   working with the Plaintiffs to present the case against RCN.

23           MR. BART:  Yes.

24           MR. HOWENSTINE:  So they are -- you know, they're at

25   the core of this case.

1          THE COURT:  I just want to make sure that the

2    conversation is being had between the three of you folks, and

3    that nothing's going to blow up for you later in terms of how

4    the depositions are proceeding.

5          MR. HOWENSTINE:  Right.  We're trying to hash that

6    out, and obviously we will need to loop in the Plaintiffs as

7    to any agreement that we reach.  And if we can't reach an

8    agreement, we'll come back to Your Honor.

9          THE COURT:  Do you think you will or won't?

10          MR. HOWENSTINE:  We're trying to put something in

11    writing right now.

12          THE COURT:  Okay.

13          MR. HOWENSTINE:  And we just -- we don't know if

14    it's going to be acceptable to Rightscorp or not.

15          THE COURT:  Okay.  So my invitation stands.  That if

16    you want to request a telephone call, invite Rightscorp to get

17    on the phone with me, share with me what the agreement is, and

18    I'm not trying to over-paper it, but I'm happy to just talk

19    things through, again, to avoid -- you know, for efficiency

20    sake.  But you can certainly, when you're ready, move ahead

21    with those steps, and hopefully before long, you'll have

22    guidance here, for better or worse.

23          MR. HOWENSTINE:  Thank you, Your Honor.

24          THE COURT:  Good, okay.

25          MR. BART:  Thank you for your time, Your Honor.

```
 1              THE COURT:  Again, so sorry that it's taken so long.

 2              MR. BART:  It was better to have it in person, so

 3   we've glad that that worked out.

 4              THE COURT:  Yes, just too many moving pieces.  And I

 5   know a lot of folks are still hesitant about coming to court,

 6   worrying about being close together, so I'm sensitive to that.

 7   I'm going to go off the record.

 8              (The hearing adjourned at 1:33 p.m.)

 9

10

11                    CERTIFICATE OF TRANSCRIBER

12              I, KAREN HARTMANN, a certified Electronic Court
     Transcriber, certify that the foregoing is a correct
13   transcript from the electronic sound recording of the
     proceedings in the above-entitled matter.
14
             /s/  Karen Hartmann    Date:  March 3, 2023
15   Karen Hartmann, AAERT CET 475
     TRANSCRIPTS PLUS, INC.
16

17

18

19

20

21

22

23

24

25
```